**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| MATTHEW OKONKWO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CV. NO.  1:07cv1062MHT |
| | ) | CR. NO.  1:06cr101MHT |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## UNITED STATES'S RESPONSE TO § 2255 MOTION

COMES NOW the United States of America (the "Government") by and through its attorneys, Leura G. Canary, United States Attorney, and Andrew O. Schiff, Assistant U.S. Attorney, and in compliance with this Court's December 11, 2007 order for the Government to address Petitioner Matthew Okonkwo's allegations of ineffective assistance of counsel, responds as follows:

## I.    PROCEDURAL HISTORY

On April 5, 2006, a grand jury for the Middle District of Alabama returned a twelve-count indictment against Matthew Okonkwo and Jonathan Adewunmi.[1]  Count 1 charged Okonkwo and Adewunmi with conspiring to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment, and collection of income taxes, in violation of 18 U.S.C. § 371.  Counts 2-12 charged both defendants with willfully aiding and assisting in the preparation and presentation to the IRS of eleven separate U.S. Individual Income Tax Returns for

---

[1]A copy of the indictment is attached hereto as Exhibit A.

the calendar year 1999, which were false and fraudulent as to material matters, in violation of

26 U.S.C. § 7206(2) and 18 U.S.C. § 2.

Adewunmi was not located; Okonkwo was arrested and pleaded not guilty. Okonkwo

proceeded to a trial by jury, which began with jury selection on October 30, 2006. Okonkwo moved

for judgment of acquittal at the end of the Government's case. The district court denied the motion.

Okonkwo rested without putting on evidence and renewed his motion for acquittal, which the court

denied. On November 1, 2006, the jury convicted Okonkwo on all counts.

On January 18, 2007, the District Court sentenced Okonkwo to 24 months on each count, all

to run concurrently. The final judgment of conviction and sentence against Okonkwo was entered

on January 23, 2007.

Okonkwo filed a timely notice of appeal on January 26, 2007. On August 15, 2007, the

Eleventh Circuit issued an opinion affirming the judgment.[2]

## II.    OFFENSE CONDUCT

Okonkwo was convicted of conspiring with Jonathan Adewunmi to defraud the United States

and with 11 substantive counts of aiding and assisting in the a false tax return. The Eleventh Circuit

summarized the evidence against Okonkwo as follows:

> Okonkwo admitted to being the president of Eagle Financial Services ("EFS") and
> doing business as Rainbow Tax Service ("RTS"), the businesses that were listed as
> the tax preparers for all but one of the fraudulent returns. Okonkwo stated that he
> was the only person to electronically file the 1999 tax returns for his business—the
> year in which the fraudulent returns were filed. Testimony from several of
> Okonkwo's employees indicated that he was exclusively responsible for printing
> refund checks. None of the taxpayers received the full amount of the refund paid to
> them and all but one check had a forged endorsement, and several refund checks
> were deposited into EFS's bank account. One taxpayer indicated that after she

---

[2]A copy of the opinion is attached hereto as Exhibit B.

cashed her refund check, Okonkwo convinced her to return all but $1000.00 of it, falsely telling her that she still owed taxes. All of the tax returns—including returns of tax payers who dealt exclusively with Okonkwo—were prepared in such a way as to maximize the earned income tax credit and the resulting refund check by reporting non-existent income from CJB Ice Cream ("CJB"), a company that Adewunmi, and not Okonkwo, was involved with. Last, evidence supports the conclusion that Okonkwo attempted to conceal his conduct—all the taxpayers were paid by Okonkwo and Adewunmi in cash, and, when the IRS came to search the business location, the files for the eleven fraudulent tax returns were not found.

Slip op. at 3-4 (footnote omitted).

## III.   ARGUMENT

To succeed on his claims of ineffective assistance of counsel, Okonkwo must prove both that his counsel's performance was deficient and that the deficient performance prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also Bell v. Cone*, 535 U.S. 685, 697-98 (2002) (reaffirming the *Strickland v. Washington* standard for reviewing ineffective assistance of counsel claims). More specifically, Okonkwo must show that (1) identified acts or omissions of counsel fell below an objective standard of reasonableness, and (2) his counsel's alleged errors or omissions prejudiced him to such an extent that, without counsel's alleged errors or omissions, there is a reasonable probability that the outcome of his sentencing would have been different. *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990).

In analyzing counsel's performance under the performance prong of *Strickland*, this Court must presume that the conduct of counsel was reasonable. *See id.* at 477. Counsel is "strongly presumed" to have rendered adequate assistance and to have exercised reasonable professional judgment, and the proper measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, 690. A "[d]efendant must prove deficient

performance by a preponderance of competent evidence." *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1303-04 (11th Cir. 2000) (footnotes omitted).

The Eleventh Circuit has described a defendant's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden. The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately. Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that *no competent counsel would have taken the action that his counsel did take....*

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis in original) (citations and quotations omitted).

Writing recently on the need for a hearing on an ineffective assistance of counsel claim, the Eleventh Circuit noted that because counsel's performance is evaluated on an objective standard, "it matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight. The relevant question is not what actually motivated counsel, but what reasonably could have motivated counsel." *Gordon v. United States*, 496 F.3d 1270, 1281 (11th Cir. 2007). Thus, "[w]hen we can conceive of a reasonable motivation for counsel's action, we will we will deny a claim of ineffective assistance without an evidentiary hearing." *Id.*

To succeed on an ineffective assistance of counsel claim, the defendant must show that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. It is not enough to show that any errors had some conceivable effect on the outcome of the proceeding. *Id.* at 693*; see also Robinson v. Moore*, 300 F.3d 1320, 1343-44

-4-

(11th Cir. 2002). Moreover, "[a] determination of the prejudice prong of the *Strickland* analysis is necessarily dependent on a review of the merits of [the underlying claim]." *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990). "Counsel cannot be labeled ineffective for failing to raise issues which have no merit." *Card v. Dugger*, 911 F.2d 1494, 1520 (11th Cir. 1990).

Finally, as the Eleventh Circuit has noted, "[i]t is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v. Moore*, 234 F.3d 526, 532 (11th Cir. 2000); *accord Robinson v. Moore*, 300 F.3d at 1343.

Addressing Okonkwo's claims in turn, it is clear that he cannot demonstrate that his counsel was ineffective or that he suffered prejudice as a result of any of the alleged deficiencies.

## A.    Inadequate Pretrial Preparation (Pet. Mem., Issue 1.A, at pp. 7-9)

Okonkwo's argument on this point amounts to a claim that if only counsel was better prepared, he would have done a better job in cross-examining two of the prosecution witnesses, so that what Okonkwo claims is the truth would have come out.

In addition to the principles discussed above, the court must consider Okonkwo's claim in light of the strength of the evidence[3] against him. *See Strickland*, 466 U.S. at 695-96; *Fortenberry v. Haley*, 297 F.3d 1213, 1228 (11th Cir. 2002) ("[T]he absence of exculpatory witness testimony . . . is more likely prejudicial when a conviction is based on little record evidence of guilt."). With respect to cross-examination in particular, "claims that an attorney should have cross-examined further on inconsequential matters do not establish constitutionally deficient performance." *Johnson v. Alabama*, 256 F.3d 1156, 1186 (11th Cir. 2001); *see also Mulligan v. Kemp*, 771 F.2d 1436, 1443

---

[3]Okonkwo admits that there was a "mountain [of] evidence stacked against" him. (Pet. Mem. at 16)

(11th Cir. 1985) (ineffectiveness not established when cross-examination was "unsuccessful, [but] not insubstantial").

Here, counsel's defense strategy–the only available strategy in light of the overwhelming evidence against Okonkwo–was to try to shift blame from Okonkwo to Jonathan Adewunmi, the absent co-defendant.[4] Counsel cross-examined consistent with that theory. With respect to Yvette Thomas, who worked in Okonkwo's office, counsel elicited the fact that Adewunmi prepared returns, that some clients requested that Adewunmi be the preparer, and that thousands of people came through the office during tax season.[5] With respect to Charlotte Green, one of the taxpayers, counsel elicited the fact that Adewunmi "handled her case" and that she understood that her paperwork would be turned over to Adewunmi.[6] Therefore, Okonkwo cannot rebut the presumption that counsel was acting consistently with a reasonable trial strategy.

### B.    Failure to Investigate Alleged False Testimony by Special Agent (Issue 1.B, at pp. 12-13)

Okonkwo complains about his counsel's failure to make use of the fact that the IRS special agent had allegedly falsely stated in a search warrant affidavit and in grand jury testimony that Okonkwo had been arrested on narcotics charges, which Okonkwo asserts is false. (The Government does not dispute that INS eventually determined through fingerprint comparison that the defendant was not the Matthew Okonkwo who was the subject of the arrest.) However, Okonkwo cannot rebut the presumption that counsel made a reasonable strategic decision in this regard.

---

[4]Trans., 10/31/2006, 21-24 (defense opening statement). A copy of the transcript is attached hereto as Exhibit C.

[5]*Id.* at 70-73 (Thomas cross-examination).

[6]Trans., 11/1/2006, 15-16 (Green cross-examination). A copy of the transcript is attached hereto as Exhibit D.

-6-

In the search warrant affidavit, Special Agent Larry Ellis included the fact that Louie Wilson, a fellow IRS Special Agent, had spoken to an Immigration and Naturalization Special Agent, who advised Wilson that in October 1990, an individual "identified as Okonkwo" had been arrested in Belgium for heroin possession.[7]   In his grand jury testimony, Agent Ellis also mentioned that Okonkwo had been arrested in Belgium for heroin trafficking.[8]   This information was *not* disclosed in any way during the trial.

Because Agent Ellis did not testify to the arrest at trial, the only use that could have been made of the information would have been to impeach the testifying agent on the basis that he made knowingly false statements under oath.  However, as the search warrant affidavit shows, Agent Ellis was relying on information that he had no reason to believe was inaccurate.  Thus, there was no evidence that Agent Ellis had intentionally provided false information, and a reasonable lawyer could have concluded that any slight impeachment value would have been outweighed by the risk of injecting the issue of heroin distribution into the case.  Therefore, there is no need for an evidentiary hearing on this issue.

### C.    Failure to Investigate Defendant's Line of Business (Issue 1.C, at pp. 14-15)

Okonkwo refers to various evidence concerning the workings of the tax return software that his counsel failed to introduce.  However, Okonkwo does not demonstrate how any of this evidence would have tended to negate his guilt.  Absence such a showing, and in particular in light of the strength of the evidence against him, Okonkwo can establish neither ineffectiveness nor prejudice

---

[7]Search Warrant Affidavit, May 14, 2001, at 3:13-15.  A copy of the affidavit is attached hereto as Exhibit E.

[8]The Government is not filing the grand jury transcript.  However, a copy was given to Okonkwo as Jencks Act material, and the Government can provide a copy to the court under seal if it so desires.

with respect to this issue. *See Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) ("[P]rejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative.") (citation and quotation omitted).

### D.     Failure to Advise Defendant of Government's Plea Offer (Issue 1.D, at pp. 16-17)

Okonkwo claims that counsel failed to adequately consult with Okonkwo concerning the possibility of accepting the Government's plea offer.[9]  As an initial matter, this claim is moot.  In the event Okonkwo had accepted the Government's offer, he would still have a felony conviction; he simply would have received a shorter sentence.  However, he has already served out his sentence, and he cannot demonstrate that his conviction on 12 counts at trial is resulting in continuing collateral consequences over and above those that he would be facing if he had been convicted of only a single felony count by way of a guilty plea. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("Once the convict's sentence has expired . . .  some concrete and continuing injury other than the now-ended incarceration or parole–some 'collateral consequence' of the conviction–must exist if the suit is to be maintained.").

Okonkwo's claim also fails on the merits.  To prevail on this claim, Okonkwo must show both ineffectiveness and "a reasonable probability that, but for counsel's errors, he would have pleaded guilty and would [not] have insisted on going to trial." *Smith v. Singletary*, 170 F.3d 1051,

---

[9]By email dated September 22, 2006, the Government forwarded a plea agreement to defense counsel, which would have resulted in Okonkwo pleading guilty to a single count of assisting in the filing of a false tax return.  The Government also agreed to a sentence at the low end of the applicable Guideline Range.  By letter dated October 5, 2006, defense counsel advised that "[a]fter number conversations with Mr. Okonkwo, he has elected to go to trial in this cause."  A copy of the Government's proposal and defense counsel's response are attached respectively as Exhibits F and G.

1053 (11th Cir. 1999). With respect to the first issue, Okonkwo does not dispute that the plea offer was brought to his attention. Rather he says that counsel was "nonchalant" in discussing the plea with him. This does not rise to the level of constitutionally deficient performance under the standard discussed above. Similarly, Okonkwo provides no evidence that he was willing to admit his guilt. Therefore, his claim of ineffectiveness on this issue can be denied without a hearing. *See Paez-Ortiz v.United States*, 200 Fed. Appx. 946, 948 (11th Cir. 2006) (unpublished) (affirming denial of section 2255 motion without hearing when "there is no clear evidence that [defendant] ever expressed a desire or intent to plead guilty before he was convicted").

### E.  Failure to Present Statute of Limitations Defense (Issue 1.E, at pp. 18-19)

"Counsel cannot be labeled ineffective for failing to raise issues which have no merit." *Card v. Dugger*, 911 F.2d 1494, 1520 (11th Cir. 1990). In this case, the indictment was returned on April 5, 2000. Count 1 alleges a conspiracy to defraud the United States "for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment, and collection of revenue . . . ." (Ind. ¶ 2) The indictment alleges overt acts in furtherance of the conspiracy occurring in 2000 on April 5, April 7, April 15, and May 8. Counts 2-12 all charge Okonkwo with assisting in the preparation of false 1999 tax returns, in violation of 26 U.S.C. § 7206(2). The returns in question were filed between January 24, 2000 and April 15, 2000.

Based on these facts, there would have been no merit to a limitations defense, because a six-year limitations period was applicable:

> No person shall be prosecuted, tried, or punished for any of the various offenses arising under the internal revenue laws unless the indictment is found or the information instituted within 3 years next after the commission of the offense, except that the period of limitation shall be 6 years–

>       (1)    for offenses involving the defrauding or attempting to defraud the United
>              States or any agency thereof, whether by conspiracy or not, and in any
>              manner;
>
>                              *    *    *    *
>
>       (3)    for the offense of willfully aiding or assisting in, or procuring, counseling, or
>              advising, the preparation or presentation under, or in connection with any
>              matter arising under, the internal revenue laws, of a false or fraudulent return,
>              affidavit, claim, or document (whether or not such falsity or fraud is with the
>              knowledge or consent of the person authorized or required to present such
>              return, affidavit, claim, or document);
>
>       For the purpose of determining the periods of limitation on criminal prosecutions, the
>       rules of section 6513 shall be applicable.

26 U.S.C. § 6531.

Section 6513 provides, in effect, that for limitations purposes, returns that are filed early are deemed to have been filed on April 15. *See* 26 U.S.C. § 6513 ("[A]ny return filed before the last day prescribed for the filing thereof shall be considered as filed on such last day."); *United States v. Habig*, 390 U.S. 222, 225-26 (1968) ("[I]f a taxpayer anticipates the April 15 filing date by filing his return on January 15, the six-year limitations period for prosecutions under § 6531 commences to run on April 15. Practically, the effect of the reference to § 6513 in § 6531 is to give the Government the administrative assistance, for purposes of its criminal tax investigations, of a uniform expiration date for most taxpayers, despite variations in the dates of actual filing.").

Under these statutes, it is clear that the indictment was timely. With respect to Counts 2-12, the indictment was returned less than six years after the "deemed" filing date of April 15, 2000. With respect to Count 1, the indictment alleged overt acts in furtherance of the conspiracy occurring within the six-year period. *See United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976) (government "must allege and prove the commission of at least one overt act by one of the

conspirators within [the limitations period] in furtherance of the conspiratorial agreement"). Therefore, any limitations defense would have been futile, and counsel was not ineffective for failing to raise it.

### F.    Failure to Present Mitigating Evidence at Sentencing (Issue 1.F, at pp. 20-23)

For the reasons stated above (*see* Part III.D), this claim is moot since Okonkwo has already served his sentence.

On the merits, Okonkwo cannot establish that a reasonable attorney would have declined to present the evidence Okonkwo refers to. As an initial matter, Okonkwo never alleges that he advised counsel of these facts. Counsel's affidavit does acknowledge that Okonkwo had told counsel that he had a leadership role in a church. However, this is clearly a fact that could have cut either way at sentencing. Moreover, the transcript shows that the Court immediately required counsel to defend against the notion that a high sentence was justified because the defendant had taken advantage of uneducated people to perpetrate the fraud.[10] Counsel then attempted to convince the court that a sentence at the low end of the Guideline Range was appropriate because defendant had already spent eight months in the Montgomery City Jail. This was a reasonable strategic choice, and the fact that counsel was unsuccessful of course does not render him ineffective.

### CONCLUSION

For the reasons set forth above, Okonkwo has failed to plead facts or present sufficient evidence or argument demonstrating that he is entitled to an evidentiary hearing, and his claims for relief should be denied without such a hearing. *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977); *Gordon v. United States*, 496 F.3d 1270, 1281 (11th Cir. 2007); *Tejada v. Dugger*, 941 F.2d

---

[10]Sentencing Trans., 1/18/2007, at pp. 5-7. A copy of the transcript is attached as Exhibit H.

1551, 1559 (11th Cir. 1991); *United States v. Laetividal-Gonzalez*, 939 F.2d 1455, 1465 (11th Cir.

1991).

      Respectfully submitted this 18th day of January, 2008.

                    LEURA G. CANARY
                    UNITED STATES ATTORNEY

                    /s/ Andrew O. Schiff
                    ANDREW O. SCHIFF
                    Assistant United States Attorney
                    131 Clayton Street
                    Montgomery, AL  36101-0197
                    (334) 551-1777
                    (334) 223-7135 (fax)
                    E-mail:  andrew.schiff@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MATTHEW OKONKWO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CV. NO.  1:07cv1062MHT |
| | ) | CR. NO.  1:06cr101MHT |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following non-CM/ECF participant: Matthew Okonkwo, #A27 906 495), c/o U.S. Immigration and Customs Enforcement, 146 CCA Road, Lumpkin, GA 31815.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Andrew O. Schiff
ANDREW O. SCHIFF
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
andrew.schiff@usdoj.gov

# EXHIBIT A

FILED

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

APR - 5 2006

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.  1:06CR101-MHT |
| | ) | [18 USC 371; |
| MATTHEW OKONKWO and | ) | 26 USC 7206(2); |
| JONATHAN ADEWUNMI | ) | 18 USC 2] |
| | ) | |
| | ) | **INDICTMENT** |

The Grand Jury charges:

## COUNT 1–CONSPIRACY

1.      At all times relevant to this Indictment:

        a.      The defendant MATTHEW OKONKWO did business as Eagle Financial Services ("Eagle") and Rainbow Tax Services in Dothan, Alabama.

        b.      The defendant JONATHAN ADEWUNMI did business as CJB Ice Cream Co. in Fort Walton Beach, Florida.

        c.      Household Financial Corporation ("Household") provided a service to tax preparers whereby their clients could obtain refund anticipation loans, which would allow the clients to receive refunds, less Household's interest charge, upon the tax returns being accepted for filing by the Internal Revenue Service.  Eagle and Rainbow both participated in Household's program and could disburse the proceeds of refund anticipation loans from their premises in Dothan.

## THE CONSPIRACY

2.      From at least as early as in or about January 2000 through at least as late as April 15, 2000, the exact dates being unknown to the grand jury, in Houston County, in the Middle District of Alabama, and elsewhere, the defendants herein,

MATTHEW OKONKWO and
JONATHAN ADEWUNMI,

did conspire among themselves to defraud the United States and an agency thereof for the purpose

of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal

Revenue Service ("IRS") in the ascertainment, computation, assessment, and collection of revenue,

that is, income taxes.

## OBJECT OF THE CONSPIRACY

3.    The object of the conspiracy was to obtain money that the conspirators were not

entitled to by causing false claims for income tax refunds to be submitted to the IRS.

## MEANS AND MANNER BY WHICH THE CONSPIRACY WAS CARRIED OUT

4.    The manner and means by which the conspiracy was sought to be accomplished

included, among others, the following.

5.    On or about the dates set forth below, OKONKWO and ADEWUNMI caused to be

filed federal income tax returns, which, as the defendants then knew, were false and fraudulent and

sought refunds well in excess of the true refund, if any, owed to the taxpayer, as follows:

| Date | Taxpayer's Initials | Refund | False Statements on Return |
|---|---|---|---|
| Jan. 24, 2000 | MJR | $4366 | 1. Dependents that MJR was not entitled to claim. 2. A W-2 falsely stating that CJB had paid MJR wages of $10,258 and had withheld federal income tax of $550. |
| Jan. 28, 2000 | CG | $2813 | A W-2 falsely stating that CJB had paid CG wages of $5,063 and had withheld federal income tax of $501. |
| Feb. 4, 2000 | RCH | $4121 | A W-2 falsely stating that CJB had paid RCH wages of $9,000 and had withheld federal income tax of $350. |

2



| Feb. 6, 2000 | LLL | $4134 | 1. A dependent that LLL was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid LLL wages of $8,990 and had withheld federal income tax of $311. |
| Feb. 25, 2000 | TF | $4116 | 1. Dependents that TF was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid TF wages of $4,000 and had withheld federal income tax of $300. |
| Mar. 3, 2000 | JLH | $4509 | 1. Dependents that JLH was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid JLH wages of $6,000. |
| Mar. 10, 2000 | CAD | $4190 | 1. Dependents that CAD was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid CAD wages of $7,150 and had withheld federal income tax of $250. |
| Mar. 17, 2000 | QJC | $4117 | 1. Dependents that QJC was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid QJC wages of $9,000 and had withheld federal income tax of $310. |
| Apr. 5, 2000 | TCD | $4289 | 1. Dependents that TCD was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid TCD wages of $8,015 and had withheld federal income tax of $420. |
| Apr. 7, 2000 | MAG | $4466 | 1. Dependents that MAG was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid MAG wages of $9,600 and had withheld federal income tax of $650. |
| Apr. 15, 2000 | TTC | $4387 | 1. Dependents that TTC was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid TTC wages of $8,000 and had withheld federal income tax of $562. |

6.    At or about the same time as the filing of the returns described above, OKONKWO

would disburse the proceeds of a Household financed refund anticipation loan by making out a check

payable to the taxpayer in the amount of the claimed refund, less approximately 4%. OKONKWO

and ADEWUNMI would cause these checks to be negotiated without the taxpayers' knowledge, and they transmitted only a small percentage of these funds to the taxpayers.

## OVERT ACTS

7.     In order to effect the object of the conspiracy, the defendants herein,

MATTHEW OKONKWO and
JONATHAN ADEWUNMI,

did a number of overt acts in the Middle District of Alabama, and elsewhere, some of which are set forth below:

a.     On or about February 25, 2000, ADEWUNMI obtained a W-2 form from TF.

b.     On or about March 3, 2000, ADEWUNMI obtained a W-2 form from JLH.

c.     On or about March 17, 2000, ADEWUNMI obtained QJC's W-2 form from LLL.

d.     On or about April 5, 2000, OKONKWO caused to be filed a tax return in the name of TCD.

e.     On or about April 7, 2000, OKONKWO caused to be filed a tax return in the name of MAG.

f.     On or about April 15, 2000, OKONKWO caused to be filed a tax return in the name of TTC.

g.     On or about May 8, 2000, OKONKWO caused a refund anticipation loan check in the amount of $4,117.05 made payable to TCD to be deposited into a bank account controlled by Eagle.

All in violation of Title 18, United States Code, Section 371.

4

## COUNTS 2-12

1.     The allegations set forth in paragraphs 1 through 7 of Count 1 of this Indictment are hereby realleged as if set forth herein.

2.     On or about the dates set forth below, in the Middle District of Alabama, and elsewhere, the defendants

MATTHEW OKONKWO and
JONATHAN ADEWUNMI,

while aiding and abetting each other, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of U.S. Individual Income Tax Returns, Forms 1040 and 1040A for the calendar year 1999, for the taxpayers (identified by initials) set forth below, which were false and fraudulent as to material matters, in that they made the false representations set forth below, which caused the IRS to pay refunds that the taxpayers either were not entitled to at all, or in an amount significantly in excess of the amount they were entitled to:

| Count | Date | Taxpayer's Initials | Refund | False Statements on Return |
|-------|------|---------------------|--------|----------------------------|
| 2 | Jan. 24, 2000 | MJR | $4366 | 1. Dependents that MJR was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid MJR wages of $10,258 and had withheld federal income tax of $550. |
| 3 | Jan. 28, 2000 | CG | $2813 | A W-2 falsely stating that CJB had paid CG wages of $5,063 and had withheld federal income tax of $501. |
| 4 | Feb. 4, 2000 | RCH | $4121 | A W-2 falsely stating that CJB had paid RCH wages of $9,000 and had withheld federal income tax of $350. |

5



| 5 | Feb. 6, 2000 | LLL | $4134 | 1. A dependent that LLL was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid LLL wages of $8,990 and had withheld federal income tax of $311. |
| 6 | Feb. 25, 2000 | TF | $4116 | 1. Dependents that TF was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid TF wages of $4,000 and had withheld federal income tax of $300. |
| 7 | Mar. 3, 2000 | JLH | $4509 | 1. Dependents that JLH was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid JLH wages of $6,000. |
| 8 | Mar. 10, 2000 | CAD | $4190 | 1. Dependents that CAD was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid CAD wages of $7,150 and had withheld federal income tax of $250. |
| 9 | Mar. 17, 2000 | QJC | $4117 | 1. Dependents that QJC was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid QJC wages of $9,000 and had withheld federal income tax of $310. |
| 10 | Apr. 5, 2000 | TCD | $4289 | 1. Dependents that TCD was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid TCD wages of $8,015 and had withheld federal income tax of $420. |
| 11 | Apr. 7, 2000 | MAG | $4466 | 1. Dependents that MAG was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid MAG wages of $9,600 and had withheld federal income tax of $650. |

6

| 12 | Apr. 15, 2000 | TTC | $4387 | 1. Dependents that TTC was not entitled to claim.<br>2. A W-2 falsely stating that CJB had paid TTC wages of $8,000 and had withheld federal income tax of $562. |

All in violation of Title 26, United States Code, Section 7206(2) and Title 18, United States Code, Section 2.

A TRUE BILL:

*Jayne D Gilbert*

Foreperson

*Leura G. Canary*

LEURA G. CANARY
United States Attorney

*Andrew O. Schiff*

Andrew O. Schiff
Assistant United States Attorney

7

# EXHIBIT B

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 07-10451
Non-Argument Calendar

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 15, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00101-CR-T-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MATTHEW OKONKWO,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Alabama

**(August 15, 2007)**

Before DUBINA, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

Matthew Okonkwo appeals his conviction for one count of conspiracy to

defraud the United States, in violation of 18 U.S.C. § 371, and eleven counts of

aiding and abetting the filing of a false income tax return, in violation of 26 U.S.C.

§ 7206(2). Okonkwo argues on appeal that the trial evidence failed to support his

convictions. As to the conspiracy to defraud count, he asserts that the evidence

showed only that he and John Adewunmi, his alleged co-conspirator, worked at the

same tax preparation business. As to the remaining counts, he argues that no

evidence linked him to Adewunmi's preparation of fraudulent tax returns, and that

Adewunmi was acting by himself. In support, he points out that only one of the

people whose tax returns were at issue ever saw or met him and only one witness

placed Okonkwo in the same room as Adewunmi. Finally, Okonkwo argues that

the government failed to prove that he knowingly and willfully filed the fraudulent

tax returns.

We review a challenge to the sufficiency of the evidence de novo, viewing

the evidence in the light most favorable to the prosecution. United States v.

Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003); Jackson v. Virginia, 443 U.S. 307,

319 (1979). "The elements of a conspiracy under 18 U.S.C. § 371 are (1) an

agreement among two or more persons to achieve an unlawful objective; (2)

knowing and voluntary participation in the agreement; and (3) an overt act by a

conspirator in furtherance of the agreement." Hasson, 333 F.3d at 1270. "To

prove knowing and voluntary participation, the government must prove beyond a

2

reasonable doubt that appellants had a specific intent to join the conspiracy,"
although a common purpose and plan may be inferred from the circumstances.
United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997), modified on
other grounds by United States v. Toler, 144 F.3d 1423, 1427 (11th Cir. 1998).

It is a felony to "willfully aid[] or assist[] in . . . the preparation or
presentation . . . of a return . . . which is fraudulent or is false as to any material
matter." 26 U.S.C. § 7206(2). "In a prosecution under 26 U.S.C.[] § 7206(2), the
element of willfulness or intent is usually the most difficult to prove," and will
usually be proven through circumstantial evidence, such as repetitive or evasive
conduct. United States v. Brown, 548 F.2d 1194, 1199 (5th Cir. 1977).[1]

After reviewing the record, we conclude that there was sufficient evidence to
allow the jury to find that there was an agreement between Adewunmi and
Okonkwo to conspire to defraud the government, and that Okonkwo had the intent
to do so. Okonkwo admitted to being the president of Eagle Financial Services
("EFS") and doing business as Rainbow Tax Service ("RTS"), the businesses that
were listed as the tax preparers for all but one of the fraudulent returns.[2] Okonkwo
stated that he was the only person to electronically file the 1999 tax returns for his

---

[1] We adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[2] The one return that does not list EFS or RTS as the tax preparer does not contain any information or signature as to the filer or preparer of the return.

3

business—the year in which the fraudulent returns were filed. Testimony from several of Okonkwo's employees indicated that he was exclusively responsible for printing refund checks. None of the taxpayers received the full amount of the refund paid to them and all but one check had a forged endorsement, and several refund checks were deposited into EFS's bank account. One taxpayer indicated that after she cashed her refund check, Okonkwo convinced her to return all but $1000.00 of it, falsely telling her that she still owed taxes. All of the tax returns—including returns of tax payers who dealt exclusively with Okonkwo—were prepared in such a way as to maximize the earned income tax credit and the resulting refund check by reporting non-existent income from CJB Ice Cream ("CJB"), a company that Adewunmi, and not Okonkwo, was involved with. Last, evidence supports the conclusion that Okonkwo attempted to conceal his conduct—all the taxpayers were paid by Okonkwo and Adewunmi in cash, and, when the IRS came to search the business location, the files for the eleven fraudulent tax returns were not found.

**AFFIRMED.**

4

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA

THE UNITED STATES
OF AMERICA

vs.                              CRIMINAL ACTION NO.
                                 1:06-CR-101-MHT

MATTHEW OKONKWO

VOLUME I OF II
1st DAY OF:
JURY TRIAL PROCEEDINGS

\* \* \* \* \* \* \* \* \* \*

BEFORE:        The Hon. Myron H. Thompson

HEARD AT:      Montgomery, Alabama

HEARD ON:      October 31, 2006

APPEARANCES:   Andrew O. Schiff, Esq.
               Ben E. Bruner, Esq.

Page 2

T A B L E   O F   C O N T E N T S

| ITEM DESCRIPTION | PAGE NO. |
|---|---|
| Title Page ........................ | 1 |
| Table of Contents ................... | 2 |
| Preliminary Discussion (The jury is not present) .............. | 5 |
| Pretrial jury charge by the Court ........................ | 9 |
| Opening Statements by Mr. Schiff ........................ | 13 |
| Opening Statements by Mr. Bruner ....................... | 20 |
| Lashonda Campbell - Direct Examination by Mr. Schiff ........................ | 25 |
| Lashonda Campbell - Cross Examination by Mr. Bruner ....................... | 31 |
| Quincy Campbell - Direct Examination by Mr. Schiff ........................ | 33 |
| Quincy Campbell - Cross Examination by Mr. Bruner ....................... | 36 |
| Robin Hill - Direct Examination by Mr. Schiff ........................ | 37 |
| Robin Hill - Cross Examination by Mr. Bruner ....................... | 40 |
| Tensia Fountain - Direct Examination by Mr. Schiff ........................ | 42 |
| Tensia Fountain - Cross Examination by Mr. Bruner ....................... | 46 |
| Mary Rumph - Direct Examination by Mr. Schiff ........................ | 47 |

Page 3

T A B L E   O F   C O N T E N T S

| ITEM DESCRIPTION | PAGE NO. |
|---|---|
| Mary Rumph - Cross Exmination by Mr. Bruner ................. | 52 |
| George Green - Direct Examination by Mr. Schiff ................. | 53 |
| George Green - Cross Examination by Mr. Bruner ................. | 54 |
| George Green - Redirect Examination by Mr. Schiff ................. | 56 |
| Martha Green - Direct Examination by Mr. Schiff ................. | 56 |
| Martha Green - Cross Examination by Mr. Bruner ................. | 58 |
| Yvette Thomas - Direct Examination by Mr. Schiff ................. | 59 |
| Yvette Thomas - Cross Examination by Mr. Bruner ................. | 69 |
| Debra Barham - Direct Examination by Mr. Schiff ................. | 75 |
| Debra Barham - Cross Examination by Mr. Bruner ................. | 92 |
| Brian Wilson - Direct Examination by Mr. Schiff ................. | 94 |
| Louie Wilson - Direct Examination by Mr. Schiff ................. | 102 |
| Larry Ellis - Direct Examination by Mr. Schiff ................. | 105 |
| Larry Ellis - Cross Examination by Mr. Bruner ................. | 112 |

Page 4

T A B L E   O F   C O N T E N T S

| ITEM DESCRIPTION | PAGE NO. |
|---|---|
| Larry Ellis - Redirect Examination by Mr. Schiff ................. | 117 |
| Court Reporter's Certification ............... | 119 |

-o0o-

Page 5

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON. MYRON H. THOMPSON ON OCTOBER 31, 2006 AT THE

UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

PRELIMINARY DISCUSSION

(THE JURY IS NOT PRESENT):

THE COURT: The Court calls the case of United States of America vs. Matthew Okonkwo, criminal action number zero six C R one oh one M. H. T.

Is the Government ready to proceed?

MR. SCHIFF: We are, Your Honor.

THE COURT: Is the defendant?

MR. BRUNER: Yes, Your Honor.

THE COURT: Now are there any preliminary matters we need to take up? Are there any motions in limine? I don't think there are any.

MR. SCHIFF: Your Honor, there is a -- The parties agreed on a stipulation concerning documents for which the Government would have otherwise called two bank custodians of records.

THE COURT: Would you speak into the mic, please?

MR. SCHIFF: Yes, sir.

The parties reached a stipulation concerning certain documents that the Government would have otherwise presented through the testimony of a bank

Page 6

1 custodian of records. The Government's plan was simply
2 to move those documents into evidence without objection
3 at the beginning of the case, if that's acceptable to
4 Mr. Bruner.
5 　　MR. BRUNER: Judge, we don't have any issue
6 with those documents, although should testimony come up
7 and they not be used, we may go back to strike them if
8 for some reason they aren't. I'm anticipating they
9 will, but you never know.
10 　　MR. SCHIFF: That's fine. Yes, if for some
11 reasons -- I believe we preserved objections as to
12 relevance of the documents.
13 　　THE COURT: Very good.
14 　　Anything else?
15 　　MR. SCHIFF: There is an issue, I don't know
16 if the Defense intends to raise it. Two of the
17 Government's witnesses have criminal histories that I do
18 not believe are usable for impeachment. I don't know
19 whether the Defense intends to use that. Neither of
20 those witnesses will be testifying today. I thought
21 that's something we could take up tomorrow morning.
22 　　THE COURT: Do you intend to use these
23 convictions or criminal histories?
24 　　MR. BRUNER: One of them I would agree with
25 Mr. Schiff that probably is not usable under the rules.

Page 7

1 The murder conviction I might disagree with. I don't
2 care how old it was. But that probably, Judge, would
3 depend on the nature of the testimony. I do not
4 anticipate asking those questions. Should I determine
5 that I need to, I will ask for a side bar.
6 　　THE COURT: Very good.
7 　　Anything else?
8 　　MR. BRUNER: Judge, I have one issue on a
9 personal note. This case is obviously running long.
10 　　THE COURT: Yes.
11 　　MR. BRUNER: I am scheduled to be at a plea
12 hearing on a misdemeanor case in Elmore County Thursday
13 morning at eight-thirty. Since it's out there, even
14 though I think I can probably get in and get out, I'm --
15 hopefully I can get back in time before we start, but I
16 did want to make the Court aware that I do have some
17 scheduling problems.
18 　　I anticipate this case may go for a day
19 and-a-half, and I thought we've probably -- at least to
20 the jury by then. But I just wanted to advise the Court
21 of that.
22 　　THE COURT: We'll see.
23 　　Anything else? How long do you need for your
24 opening statements?
25 　　MR. SCHIFF: Twenty minutes.

Page 8

1 　　MR. BRUNER: Ten to fifteen, Your Honor.
2 　　THE COURT: Twenty and fifteen, then.
3 　　MR. SCHIFF: And there are any witnesses that
4 the Government will be taking out of turn because of
5 their travel issues. And Mr. Bruner has agreed that I
6 may show those witnesses and display to the jury the
7 particular documents that relate to them subject to the
8 authenticating witness being called later.
9 　　THE COURT: Okay, very good.
10 　　Anything else?
11 　　MR. BRUNER: Judge, I would invoke the rule.
12 　　THE COURT: Okay. Well bring your witnesses
13 forward and we'll swear in all witnesses at this time.
14 Anyone who intends to testify should be sworn.
15 　　(Whereupon, all witnesses currently present
16 were duly sworn by the courtroom deputy clerk.)
17 　　THE COURT: And you may bring in the jury.
18 　　(Whereupon, the jury was escorted into the
19 courtroom.)
20 　　MR. SCHIFF: Judge, there were witnesses who
21 were told to come tomorrow.
22 　　THE COURT: That's fine.
23 　　Now I believe someone asked for the rule, is
24 that correct?
25 　　MR. BRUNER: That's correct, Your Honor.

Page 9

1 　　THE COURT: All witnesses, except those who
2 are parties or representatives of parties, are excused
3 at this time. Please go to the witness room.
4 　　(Whereupon, said prospective witnesses were
5 escorted out of the courtroom.)
6 　　THE COURT: Any other matters we need to take
7 up?
8 　　MR. SCHIFF: Nothing from the Government.
9 　　THE COURT: You may be seated.
10 　　Now, members of the jury, as I said the other
11 day, you are the jury that will try the case of United
12 States of America vs. Okonkwo. Please stand at this
13 time. If you'll stand, and the clerk will swear you in.
14 　　(Whereupon, the petit jury was duly sworn by
15 the courtroom deputy clerk.)
16 　　THE COURT: You may be seated.
17 　　PRETRIAL JURY CHARGE:
18 　　THE COURT: Would you hand them their pads and
19 pencils.
20 　　Members of the jury, you have been sworn as
21 the jury to try this case. By your verdict you will
22 decide disputed issues of fact. I will decide all
23 questions of law that arise during the trial, and before
24 you retire to deliberate at the close of the case I will
25 instruct you on the rules of law that you must follow

Page 10

1  and apply in reaching your decision in this case -- that
2  is, your verdict.
3       Now because you will be called upon to decide
4  the facts of the case, you should give careful attention
5  to the testimony and evidence presented for your
6  consideration during the trial.  But you should keep an
7  open mind, and should not form or state any opinion
8  about the case one way or the other until you have heard
9  all of the evidence in the case and until you have had
10 the benefit of the closing arguments of the attorneys as
11 well as my instructions on the law.
12      Now during the trial you must not discuss the
13 case in any manner among yourselves or with anyone else.
14 Nor should you permit anyone to discuss the case in your
15 presence.  And insofar as the attorneys are concerned,
16 as well as others whom you may come to recognize as
17 having some connection with this case, in order to avoid
18 even the appearance of impropriety you should have no
19 contact whatsoever with these persons while you are
20 serving on this jury.
21      Now the reasons for these cautions lie in the
22 fact that it will be your duty to decide this case only
23 on the basis of the testimony and evidence presented
24 during the trial without consideration of any other
25 matters whatsoever.

Page 11

1       Now a question sometimes arises as to whether
2  individual members of the jury will be permitted to take
3  notes during the trial.  If you would like to take notes
4  you may do so; on the other hand, you are not required
5  to take notes if you do not want to.  That is left up to
6  you individually.  If you do decide to take notes, be
7  careful not to get so involved in note-taking that you
8  become distracted from the ongoing proceedings.
9       Also, your notes should be used only as aids
10 to your memory, and if your memory should later differ
11 from your notes, you should rely upon your memory and
12 not necessarily your notes.  If you do not take notes,
13 you should rely upon your own independent recollection
14 or memory of what the testimony was, and you should not
15 be unduly influenced by the notes of other jurors.
16 Notes are not entitled to any greater weight than the
17 recollection or impression of each juror as to what the
18 testimony was.
19      Now from time to time during the trial I may
20 be called upon to make rulings of law on objections or
21 motions made by the attorneys.  You should not infer or
22 conclude from any ruling that I make that I have any
23 opinion on the merits of the case favoring one side or
24 the other.  And if I should sustain an objection to a
25 question that goes unanswered by a witness, you should

Page 12

1  not speculate on what the answer might have been if
2  given, nor should you draw any inferences or conclusions
3  from the unanswered question itself.
4       Now during the trial it may be necessary for
5  me to confer with the attorneys from time to time out of
6  your hearing concerning questions of law or procedure
7  that require consideration by the Court alone.  On some
8  occasions I may even excuse you from the courtroom for
9  this purpose.  Now I will try to limit these
10 interruptions as much as possible, but I ask that you
11 remember at all times the importance of the matter that
12 you are here to decide, as well as be patient even
13 though the case may seem to go slowly at times.
14      Now we will begin by affording the attorneys
15 for each side an opportunity to make their opening
16 statements in which they may explain the issues in the
17 case and summarize the facts that they expect the
18 evidence will show.
19      Now after all of the testimony and evidence
20 has been presented, the attorneys will then be given
21 another opportunity to address you at the end of the
22 trial and make their summations, or final arguments, in
23 the case.  Now the statements that the attorneys make
24 now, as well as the arguments that they present at the
25 end of the trial, are not to be considered by you as

Page 13

1  evidence, which will come only from witnesses and
2  exhibits, or as your instructions on the law, which will
3  come only from me.  Nevertheless, these statements and
4  arguments are intended to help you understand the issues
5  and the evidence as it comes in, as well as the
6  positions taken by both sides.
7       Now at this time I'm going to ask that you
8  given your close attention to the attorneys as they make
9  their opening statements.
10      Mr. Schiff.
11      MR. SCHIFF:  Thank you.
12          OPENING STATEMENTS:
13      MR. SCHIFF:  May it please the Court, Mr.
14 Bruner, ladies and gentlemen of the jury.  Good
15 afternoon.
16      My name is Andrew Schiff.  We met yesterday.
17 I'm an Assistant U. S. Attorney here in Montgomery, and
18 it is my privilege to represent the United States in
19 this case.  With me at counsel table is Larry Ellis, a
20 special agent with the Internal Revenue Service,
21 Criminal Investigation Division.  And Tim Calloway, a
22 computer specialist in our office who will be helping me
23 with the presentation of my opening statement.
24      Ladies and gentlemen, this is a case about
25 lying.  The lies that the defendant, Mr. Okonkwo, and

Page 14

1  his accomplice, Jonathan Adewunmi, told to get money
2  from the Government. The evidence will show that
3  between Mr. Okonkwo and Adewunmi eleven tax returns
4  filed with the Government claiming refunds that the
5  taxpayers were not entitled to.
6      The first lie that every one of these tax
7  returns contained was a W two form from a company called
8  C. J. B. Ice Cream Company. All eleven returns had this
9  W two form attached. All eleven W two forms claim that
10  the person had worked for C. J. B. Ice Cream and it had
11  taxes withheld by C. J. B. Ice Cream when in fact the
12  people had not worked for C. J. B. Ice Cream, no taxes
13  were withheld. In fact, C. J. B. did not withhold taxes
14  from anybody at any time.
15      The second lie which is on some of the returns
16  are children claimed as dependents that were not the
17  actual children of these taxpayers. And as you'll hear
18  from a witness from the Internal Revenue Service, the
19  purpose of these false representations was to make the
20  taxpayer eligible for something called the earned income
21  credit. And to be eligible for the earned income
22  credit, you had to show some income, but not too much.
23  And that's why many of these taxpayers who didn't have
24  enough income on their own to qualify needed an extra
25  push from the C. J. B. Ice Cream.

Page 15

1      The other thing you need to qualify for the
2  earned income credit are dependents. And you need --
3  The more dependents you have, up to two, the bigger your
4  earned income credit. So the taxpayer did not have
5  children or had children that they could not claim as
6  dependents, children that were not their own, were put
7  on the returns. Other taxpayers, you'll hear, did have
8  children, so it wasn't necessary to make up children in
9  those cases.
10      As a result of these false tax returns, tax
11  refunds were issued of approximately two, three or four
12  thousand dollars. And as you'll see from the evidence,
13  most of the money ends up in bank accounts controlled by
14  either Mr. Okonkwo or Mr. Adewunmi.
15      Now here is how this works. The players in
16  this are Mr. Okonkwo. He owned a business in Dothan
17  called Eagle Financial Services. He also used the name
18  for his business of Rainbow Tax Services, and he was in
19  the tax preparation business.
20      And one of the services he offered his
21  customers was this instant refund program that you may
22  have heard of. You go to your tax preparer, and instead
23  of having to wait the week or two for the I. R. S.
24  refund to make its way to you, your tax preparer can cut
25  you a check on the spot minus a fee from the bank, and

Page 16

1  then the bank gets paid off a week or two later by the
2  I. R. S. And Mr. Okonkwo's business, Eagle, banked at
3  Regions Bank.
4      The other individual, Jonathan Adewunmi, had
5  an address at Two twelve Hickory Street in Fort Walton
6  Beach, and he had his own clients from the Fort Walton
7  area. But you'll see that all these returns of Mr.
8  Adewunmi's clients were filed through either using the
9  Eagle or Rainbow names that belonged to Mr. Okonkwo.
10      And Mr. Adewunmi drives an ice cream truck.
11  The reason that's important is you'll hear that a lot of
12  the people know him not by his last name, but only as
13  John the ice cream truck driver. But we'll have other
14  evidence that shows that when they're talking about John
15  the ice cream truck driver, the man they're talking
16  about is in fact Jonathan Adewunmi.
17      Now Mr. Adewunmi you wife, a woman by the name
18  of Beatrice Onadeko, owns her own business called
19  Portable Clothing Outlet. And the reason that becomes
20  important is that many of the tax refund checks, the
21  ones that don't end up in the Eagle bank account, end up
22  in one of two bank accounts, and Miss Onadeko's bank at
23  South Land Bank in Dothan.
24      As I said preliminarily, C. J. B. Ice Cream
25  Company has a W two form that's issued to or that's

Page 17

1  actually issued to the taxpayers, but when the return is
2  electronically filed the information from the C. J. B.
3  company is put in there, but in fact C. J. B. did not
4  withhold any money from these eleven people or anybody
5  else for that matter. The address of C. J. B. Ice Cream
6  on I. R. S. records is Two twelve Hickory Street, the
7  same address as Mr. Adewunmi's address, according to
8  Florida driver's license records.
9      Now the taxpayers. There's eleven of them,
10  and one purpose of the opening statement is to give you
11  sort of the big picture of the case because the evidence
12  tends to come in in dribs and drabs and not necessarily
13  in the logical sequence from beginning to end. For
14  example, this afternoon my first several witnesses are
15  witnesses who came from quite aways to travel and
16  they're going to go first, even though you will not have
17  heard at the time they testify an explanation from the
18  I. R. S. witness about how the program worked.
19      And again, what I'm going to show you are not
20  necessarily the order that the witnesses are going to
21  testify to, but first I'm going to tell you about the
22  particular witnesses that dealt with Mr. Okonkwo and
23  then those that dealt with Mr. Adewunmi.
24      Charlotte Green gives Mr. Okonkwo her real W
25  twos, but a tax return is filed by Eagle with a fake C.

Page 18

1  J. B. Ice Cream.  She gets a refund check of more than
2  two thousand dollars.  Mr. Okonkwo tells her that she's
3  entitled to a thousand dollars.  She's very happy.  She
4  goes and cashes the check, keeps the thousand for
5  herself and gives the balance to Mr. Okonkwo.
6       Tina Doyle is a woman down in Dothan who had
7  been dating Mr. Okonkwo.  At some point the conversation
8  turned to taxes.  She gives him her real W two from
9  Dairy Queen, but the return is filed by Rainbow with a
10 fake C. J. B. Ice Cream W two.  In addition, this is one
11 of the fake children, a baby that Miss Doyle did not
12 have.  And Miss Doyle, who is twenty-one years old at
13 the time, certainly did not have a twenty-eight year old
14 permanently disabled foster child.  In fact she had no
15 children at all.  She gets a four thousand dollar refund
16 check issued in her name.  Mr. Okonkwo gives her a
17 hundred dollars.  The check is deposited into the Eagle
18 account.
19      Tuwanda Campbell has now since been married
20 and is now known as Tawana Tyler, known as Campbell
21 during the events is married now to Mr. Tyler.  She
22 gives Mr. Okonkwo her real W twos.  Again a fake C. J.
23 B. Ice Cream included with the return.  Two fake
24 children, a four thousand dollar refund, some cash to
25 Miss Campbell and the check deposited into Mr. Okonkwo's

Page 19

1  bank account.
2       Now Martha Green doesn't have any contact with
3  Mr. Okonkwo at all, but in prior years her husband had
4  asked him to do taxes for him.  And for the year
5  nineteen ninety-nine, which is the year of all these tax
6  returns, a return is filed in Ms. Green's name with the
7  C. J. B. return with the W twos and some fake children,
8  and again the check is deposited not Eagle bank account.
9       Robin Hill and James Tarris I'll discuss
10 together, not because they're related in any way but
11 it's the same pattern for the two of them.  They both
12 deal only with Mr. Adewunmi, give him their W two's, and
13 the return is filed either using the Rainbow name or the
14 Eagle name.  Mr. Harris's return also includes some fake
15 children, four thousand dollar checks are issued, one is
16 deposited into the Eagle account, the other is deposited
17 into one of Miss Onadeko's account.  Oh, excuse me, both
18 checks are deposited into the Eagle account.
19      At the time Lashonda Lee was known as Lashonda
20 Lee.  She's since married Mr. Campbell, and her husband
21 was in jail at the time, so she made all the
22 arrangements directly with Mr. Adewunmi.  She gives the
23 W twos to him, and again the same pattern.  Fake W twos
24 from C. J. B. Ice Cream, fake children, four thousand
25 dollar refunds, one deposited into the Eagle account,

Page 20

1  one deposited into a Beatrice Onadeko account.
2       And the last three again are not related, but
3  they follow a pattern similar to each other.  These
4  people do not deal with Mr. Okonkwo, only with Mr.
5  Adewunmi.  And in this case, the same issue with fake C.
6  J. B. Ice Cream W twos and fake dependents.  And in this
7  case, all the checks end up in one of Miss Onadeko's
8  accounts.
9       Now, ladies and gentlemen, that is a summary
10 of the evidence that the Government intends to introduce
11 in this case.  Now I'm going to tell you something that
12 probably every prosecutor in the country uses in
13 their openings.  This is not C. S. I.  I'm not going to
14 have any D. N. A., fingerprints, blood spatter evidence.
15 This is old-fashioned paper trail and witness testimony.
16 And at the end of the case, I'll have a chance to
17 address you again and argue why that evidence supports a
18 verdict of guilty on the charges of conspiracy and
19 assisting false tax returns that are charged in the
20 indictment.
21      Thank you for your time and attention.
22      THE COURT:  Mr. Bruner?
23           OPENING STATEMENTS:
24      MR. BRUNER:  Thank you, Your Honor.
25      If it please the Court, and ladies and

Page 21

1  gentlemen, I'm Ben Bruner and I represent Matthew
2  Okonkwo.
3       Matthew, stand up.
4       (Whereupon, the defendant rose in place.)
5       MR. BRUNER:  This lectern here seems to be
6  blocking us so I'm not ignoring y'all over here but I'm
7  not that tall enough to see over it.
8       You can have a seat.
9       Mr. Schiff has said this isn't C. S. I. but a
10 lot of this stuff is still a little more technologically
11 advanced than I'm used to.  You're going to see computer
12 graphics, and you're going to see copies, and a lot of
13 that has to do with how you file your taxes.  A lot of
14 people do online filing.  I'm a simple person, and this
15 is a simple case.  The question you need to ask
16 yourself, or we're going to ask you is, where is Waldo.
17 Except in this case, it's where is Jonathan.
18      What you're going to find out is that Jonathan
19 is the guy with the business, the ice cream business.
20 Now Jonathan came to work for Mr. Okonkwo.  Your common
21 sense will tell you when tax season gets busy you hire
22 people.  Well Jonathan came to work there.  He had
23 access to all the records, all the computers, all the
24 numbers, just like everybody in an office like that
25 does.  And except in three instances, Jonathan is the

Page 22

1 only person that's ever ended up talking to the people
2 that were the actual victims. I guess the Government is
3 the technical person out the money, but the actual
4 victims of the persons.
5        Mr. Okonkwo in about three instances ever
6 dealt with anyone. And he had a number of people
7 working for him that he turned these returns over to be
8 finished. Now Jonathan had access to that whole office,
9 and he had the E. I. N. And if y'all don't know what
10 that is, it's an employee identification number for his
11 ice cream business. And that's how this gets started.
12        Well what Jonathan would do, it appears to be,
13 take his E. I. N. from his ice cream business, he'd make
14 up a W two like a person worked there. He'd put that W
15 two for four or five thousand dollars, whatever it was,
16 on their tax return in that office. They would then
17 file that tax return because now it looks like they
18 withheld more and you get more on your return back
19 because you've got this extra W two on there. And in
20 some cases he would put on an extra child, or whatever,
21 to bump this up. It's always his company that's on
22 these tax returns.
23        So where is Waldo? Where is Jonathan? That's
24 the issue. And you're going to find out that when the
25 I. R. S. or the F. B. I. and the feds raided Mr.

Page 23

1 Okonkwo's business down in Dothan, he had files on
2 hundreds of tax returns. They didn't have files on
3 these. These eleven transactions that now Mr. Okonkwo
4 is being held responsible for here in a court of law.
5 Now they don't know where those files are. But where is
6 Jonathan with his company's W two attached to those
7 fraudulent tax returns? Where is Jonathan?
8        Like I said, this is a simple case. I mean
9 it's going to look a little more intimidating to people
10 like me who are a little bit older and the computer
11 world still scares us a little bit, but it's a simple
12 case. Who did it? We don't deny these were false tax
13 returns filed with an extra W two on it. What we deny
14 is that Mr. Okonkwo had anything to do with it. Can't
15 really trace any of the money to anybody. It's going in
16 all sorts of accounts. It's not like he made two
17 thousand dollars extra and they could show him drawing
18 out two thousand dollars. Some of it is going to
19 Jonathan's wife's account.
20        Once again, where's Jonathan.
21        Let me apologize while I'm doing it. I'm
22 walking around here with reading glass. I've got new
23 contact lenses and I can't seem to read right now so if
24 you see me messing around with these, please don't hold
25 it against me, and certainly don't hold it against my

Page 24

1 client because I'm not used to this.
2        What Mr. Okonkwo is going to ask you to do is
3 consider the evidence and use your common sense here.
4 Where is Jonathan? Why is his company's W two form
5 attached to this, to these tax returns? Who's got the
6 money? Where did the money go? We don't know. It went
7 several places. It's an unfortunate situation.
8        Mr. Okonkwo had this business. We don't deny
9 that that's his business. But like I said, you're going
10 to find out that business was full of files, and it was
11 full of business that's not charged here. Not found to
12 be fraudulent. Only these eleven transactions which
13 weren't contained in his files. Where is Jonathan.
14        Ladies and gentlemen, it's a pleasure to
15 practice law in front of any jury. I think this is one
16 of the great national services we can do, and I
17 appreciate it and Mr. Okonkwo appreciates it. But what
18 we'd ask you to do is use your common sense. That's why
19 we have juries. You're going to hear a lot of evidence.
20 We're going to try to keep things simple on our side as
21 best we can, because that's just the kind of person I
22 am. I'm not going to try to confuse anybody.
23        Thank you for your time and your attention.
24 THE COURT: First witness.
25        MR. SCHIFF: Your Honor, before we start with

Page 25

1 witnesses, the Government would move in certain
2 documents by agreement of the parties.
3        THE COURT: Okay.
4        MR. SCHIFF: Government's exhibits one A, one
5 B, one C, one D, one E, one F, one G, one H, one J, one
6 O, two C, four C, five C, six C, seven C, eight C, nine
7 C, ten C and twelve C.
8        THE COURT: Do you wish to introduce all of
9 those?
10        MR. SCHIFF: Yes, I would move the admission
11 of those documents.
12        THE COURT: They are admitted.
13        MR. BRUNER: Judge, just for clarification,
14 does the clerk have copies of all those documents?
15 COURTROOM DEPUTY CLERK: Yes.
16        MR. BRUNER: Okay, thank you.
17        MR. SCHIFF: Lashonda will be first. Lashonda
18 Campbell.
19        L A S H O N D A   C A M P B E L L,
20 the witness herein, having first been duly sworn or
21 affirmed to tell the truth, was examined and testified
22 as follows:
23        DIRECT EXAMINATION
24        BY MR. SCHIFF OF LASHONDA CAMPBELL:
25 Q Good afternoon, Miss Campbell.

Page 26

1 A  Hello.
2 Q  Where do you currently reside?
3 A  Eleven Scarborough Road, Wanda Robbins, Georgia.
4 Q  And where did you reside back in nineteen
5 ninety-nine and two thousand?
6 A  I think it was a Hundred eighth Avenue, apartment
7 fifteen in Shalamar, Florida.
8 Q  Is that near Fort Walton Beach?
9 A  Mm-hmm.  Ten minutes away.
10 Q  Now back in the beginning of two thousand, did you
11 ask someone to assist you in preparing your tax return
12 for nineteen ninety-nine?
13 A  Yes, I did.
14 Q  Who did you talk to?
15 A  My sister had recommended me to a man named John.
16 I don't know his last name.
17 Q  Okay.  What do you know about John?
18 A  It was my first time filing, so she told me that
19 he'll come to my house and get all the information and
20 stuff like that.  And so whenever I talked to him, he
21 told me he'll meet me at a McDonald's and pick up all
22 that information.
23 Q  Did you know anything about John other than the
24 fact that he did tax returns?
25 A  No.  Well, he was the ice cream man.

Page 27

1 Q  That's what I meant.  Did you ever see him driving
2 around?
3 A  Yeah, an ice cream truck.
4 Q  The kind of truck where it stops and it sells ice
5 cream?
6 A  Yes.
7 Q  Did you know his wife?
8 A  I didn't know her by name, but I know her by face.
9 Q  Okay.  Now describe what happened when you met with
10 John about your taxes.
11 A  We met at the McDonald's in Shalamar, and he asked
12 me to have all my information.  I said, "Yes, I have my
13 W two form and my Social Security card."
14     And he was like, "So who are you going to be
15 claiming?"
16     And I'm like, "My daughter."
17     And he's like, "Well, I'll need her Social
18 Security card too."  So I asked him how much was I
19 looking at getting, and he told me roughly around eight
20 hundred because I didn't make that much for that year.
21 Q  And what documents did you give him?
22 A  W two form, my Social Security card and my
23 daughter's Social Security card.  And he asked to see my
24 I D.
25 Q  Okay.  Now can you see on the screen in front of

Page 28

1 you Government's exhibit five A, the tax return?
2 A  No.  That's not the one I had.
3 Q  Is it coming up on the screen?
4 A  Mm-hmm.
5 Q  Okay.
6     THE COURT:  Members of the jury, can you see
7 that on the screen?
8     (Whereupon, several jurors indicated.)
9     THE COURT:  Very good.  If during the trial
10 the attorneys should mention that there is something on
11 the screen and it's not up there, raise your hand and
12 let us know.
13 Q  And, ma'am, is that your name at the time and your
14 Social Security number?
15 A  Yes, it is.
16 Q  Okay.  Now do you see in the middle under -- in the
17 box it says "exemptions" there are two names?
18 A  Mm-hmm.
19 Q  Are either of those your children?
20 A  Yes.  Lashada Hampton.
21 Q  Okay.  What about Christie Degalery?
22 A  Don't know her.
23 Q  Did you tell John that you had a daughter named
24 Christie Degalery?
25 A  No, sir.

Page 29

1 Q  In nineteen ninety-nine, did you work for C. J. B.
2 Ice Cream Company?
3 A  No, sir.
4 Q  Did you give John a W two form from C. J. B. Ice
5 Cream?
6 A  No, sir.
7 Q  Did you tell John that you worked for C. J. B. Ice
8 Cream?
9 A  No, sir.
10 Q  Okay.  At the time, did you know that a return had
11 been filed in your name claiming a refund of more than
12 four thousand dollars?
13 A  No, sir.
14 Q  Did John ever give you any money for a refund for
15 that year?
16 A  Well, back then it was my boyfriend.  When his W
17 two form came in, at the time he was incarcerated, and I
18 told him that my sister recommended me to John and that
19 he possibly can do his, too.  So whenever I met him to
20 give him -- it's my husband now but at the time my
21 boyfriend -- information, he told me, you know, I can go
22 ahead and give you in cash, you know, what I can get
23 back from your W two form whenever I filed it.  And that
24 was five hundred dollars.
25 Q  So was that for your return?

Page 30

1 A Yes, for mine.
2 Q Okay. Did you get any money back based on the
3 return that was done for Quincy Campbell?
4 A We didn't see him after that.
5 Q Okay. And I'll show you document the first page of
6 which has been marked as five B. And I'll call your
7 attention to the last two pages of the document. Did
8 you receive this check in the amount of four thousand
9 and three dollars?
10 A No, sir.
11 Q Okay. And can you see the signature on the last
12 page?
13 A Yeah -- No, that's not my signature.
14 Q That's not your signature?
15    Now did you make the arrangements for Mr.
16 Campbell's return that year?
17 A Yes. It was like probably a week after he came and
18 picked up my tax form.
19 Q And that year -- Well, did you tell John that
20 Quincy Campbell had a son named Derrick Rhodes, or a
21 foster child named Tawana Williams?
22 A No, sir.
23 Q In nineteen ninety-nine did Quincy work for C. J.
24 B. Ice Cream?
25 A No, sir.

Page 31

1 Q Did you give John a W two that said that Quincy
2 worked for C. J. B. Ice Cream?
3 A No, sir.
4 Q Did you tell John that Quincy had worked for C. J.
5 B. Ice Cream?
6 A No, sir.
7 Q And were you aware that a tax return had been filed
8 in Quincy's name seeking a refund of over four thousand
9 dollars?
10 A No, sir.
11 Q Ma'am, that's all the questions I have. Mr. Bruner
12 may have some questions for you.
13        CROSS EXAMINATION
14    BY MR. BRUNER OF LASHONDA CAMPBELL:
15 Q Ma'am, I'm Ben Bruner. I represent matthew
16 Okonkwo. Matthew is sitting here next to me.
17    Have you ever met Mr. Okonkwo?
18 A No, sir.
19 Q In your conversations with John, did you ever
20 discuss Mr. Okonkwo?
21 A No, sir.
22 Q Where -- To the best of your knowledge, where did
23 John work out of, did he have an office?
24 A They said that he used to do tax refunds here in
25 Alabama. That's like the only thing I really knew

Page 32

1 besides him working on the ice cream truck.
2 Q Where did you meet him when you dealt with him?
3 A I met him at the McDonald's in Shalamar, Florida.
4 That was my first time meeting him.
5 Q Okay. And when was your second time?
6 A Same place.
7 Q Have you seen John since this incident?
8 A Yeah.
9 Q Where did you see him?
10 A I seen him at the Sam's in Fort Walton Beach. It
11 was him and his wife.
12 Q When was this?
13 A It was right after Mr. Ellis had came over and kind
14 of briefed us a little bit about the investigation. And
15 I went to Sam's and I heard him talking, I remember the
16 accent, so when I looked back it was him and his wife
17 standing up there.
18 Q Okay. Do you know where he is today?
19 A No, sir.
20    MR. BRUNER: Those are my questions, Judge.
21    MR. SCHIFF: No redirect.
22    (Whereupon the witness, Lashonda Campbell,
23 stepped down from the stand.)
24    MR. SCHIFF: Quincy Campbell.
25       Q U I N C Y   C A M P B E L L,

Page 33

1 the witness herein, having first been duly sworn or
2 affirmed to tell the truth, was examined and testified
3 as follows:
4        DIRECT EXAMINATION
5    BY MR. SCHIFF OF QUINCY CAMPBELL:
6 Q Good afternoon, Mr. Campbell.
7    Where are you living now?
8 A Excuse me?
9 Q Where do you live now?
10 A In Georgia.
11 Q And where did you live back in nineteen ninety-nine
12 and two thousand?
13 A Fort Walton Beach, Florida.
14 Q And there was a period of time back then that you
15 were in prison?
16 A I was in Okaloosa County Jail.
17 Q In Florida?
18 A Yeah.
19 Q What dates were you incarcerated, do you remember?
20 A From November to March the twenty-seventh.
21 Q November ninety-nine?
22 A November ninety-nine to March twenty-seven, two
23 thousand.
24 Q Now, did you have any income for nineteen
25 ninety-nine before you were incarcerated?

Page 34

1  A  Just a little bit.
2  Q  Okay.  Who did you work for?
3  A  R. L. Campbell Roofing Company.
4  Q  Now at the time, what was your relationship with
5  Lashonda Lee?
6  A  At the time she was my girlfriend.
7  Q  And you later got married?
8  A  Yes.
9  Q  Did you ask Miss Lee to take care of your nineteen
10  ninety-nine taxes?
11  A  Yes.  I had some money to pay bills.
12  Q  And did you deal directly with the man who did
13  those taxes?
14  A  Me?
15  Q  Did you deal with him?
16  A  No.
17  Q  Okay.  So I have on the screen what's been marked
18  as Government's exhibit nine A. I'll call your
19  attention to the top of the page.  And if you could look
20  at the number at the upper right on your Social Security
21  number.
22  A  Yeah.
23  Q  Can you make it out?
24  A  Yes.  Two six six nine three eight eight seven?
25  Q  Yes.  Is that your Social Security number?

Page 35

1  A  Yes.
2  Q  Now toward the middle of the page there is two
3  names, a Derrick Rhodes and a Tawana Williams.  One is
4  listed as a son, and one is listed as a foster child.
5  Did you have a son named Derrick Rhodes?
6  A  No.  I just had a son.  He only one years old.
7  Q  Okay.  So you did have a son at the time?
8  A  No, I just had a son last year in August.  He one
9  now.
10  Q  So at the time you had no children?
11  A  No.
12  Q  And no foster children named Tawana Williams?
13  A  No, sir.
14  Q  Now in nineteen ninety-nine did you work for a
15  company called C. J. B. Ice Cream?
16  A  No, sir.
17  Q  Did you tell Lashonda that you worked for C. J. B.
18  Ice Cream?
19  A  No, sir.
20  Q  Did you give her a W two form from C. J. B. Ice
21  Cream?
22  A  No, sir.
23  Q  Now I'm going to put on the screen a document, the
24  first page of which have has been marked nine B.  I'll
25  call your attention to the second to last page of that

Page 36

1  document.  It's a check made payable to you for three
2  thousand nine hundred and forty-five dollars.  Did you
3  ever get that check?
4  A  No, sir.
5  Q  Okay.  The second page of the check, is that your
6  signature?
7  A  No, sir.
8  Q  And underneath it says "For deposit Eagle Financial
9  Services."  Do you know what that is?
10  A  No, sir.
11  Q  Okay.  Nothing further on direct.  Mr. Bruner may
12  have some questions for you.
13         CROSS EXAMINATION
14       BY MR. BRUNER OF QUINCY CAMPBELL:
15  Q  Sir, I'm Ben Bruner.  I represent Matthew Okonkwo
16  in this case.  This is Mr. Okonkwo seated next to me.
17  Do you know him?
18  A  No, sir.
19  Q  Have you ever seen him before?
20  A  No, sir.
21  Q  Ever heard his name before?
22  A  Just -- I just seen it on the subpoena.
23  Q  In relation to this case?
24  A  Yeah.
25  Q  Investigators had mentioned his name to you?

Page 37

1  A  No, I just seen it on the subpoena.
2  Q  On the subpoena.  Okay.  But you've never met him?
3  A  No, sir.
4  Q  And you never hired him to do your taxes?
5  A  No, sir.
6       MR. BRUNER:  Those are my questions, Judge.
7       MR. SCHIFF:  No redirect.
8       THE COURT:  Thank you.  You may step down.
9       (Whereupon the witness, Quincy Campbell,
10  stepped down from the stand.)
11       MR. SCHIFF:  Government would call Robin Hill.
12         R O B I N    H I L L,
13  the witness herein, having first been duly sworn or
14  affirmed to tell the truth, was examined and testified
15  as follows:
16         DIRECT EXAMINATION
17       BY MR. SCHIFF OF ROBIN HILL:
18  Q  Good afternoon, Miss Hill.
19  A  Good afternoon.
20  Q  Where do you live now?
21  A  Jacksonville, Florida.
22  Q  And where did you live back in nineteen
23  ninety-nine?
24  A  Fort Walton Beach, Florida.
25  Q  Okay.  And did you talk to anyone about doing your

Page 38

1 taxes back in the nineteen ninety-nine two thousand
2 period?
3 A  Yes, sir.
4 Q  Okay.  And who did you talk to about that?
5 A  A guy by the name of John.
6 Q  And how did you -- How were you referred to John?
7 A  He had a tax company called Jupiter Tax Service,
8 but one of my friends referred me to him.
9 Q  Okay.  Do you know anything else about John?
10 A  No, sir.
11 Q  Did you ever see him drive anything?
12 A  Ice cream truck.
13 Q  Okay.  And you don't know his last name?
14 A  No.
15 Q  Can you describe your discussions with John?
16 A  Like I said, my friend referred me to his company.
17 When I went in to see about the taxes, about him doing
18 my taxes -- I'm trying to think -- that day he was busy
19 and he told me to come back.  And I went back in a turn
20 a couple of days later, went back for him to file my
21 taxes.  He asked me did I have all my information.
22     I said, "Yes."  And I was like, "I hadn't
23 really worked that long, but what could you look at and
24 let me know what you could do before you do them?"  And
25 that's what he did.

Page 39

1 Q  Okay.  I'm going to put on the screen a document
2 that's been marked as Government's exhibit four A.  And
3 I call your attention to the top of the document.  And
4 if you could, look at the Social Security number.  Is
5 that your actual Social Security number?
6 A  Yes, sir.
7 Q  Okay.  And if you could look at the middle of your
8 exemptions, there's two children listed with the last
9 name of Hill.  Are those your actual children?
10 A  Yes, sir.
11 Q  And attached is a W two form from a C. J. B. Ice
12 Cream Company indicating that you made nine thousand
13 dollars.  Did you in fact work for C. J. B. Ice Cream?
14 A  No, sir.
15 Q  And did you give John a W two from C. J. B. Ice
16 Cream?
17 A  No, sir.
18 Q  Did you tell John you worked for C. J. B. Ice
19 Cream?
20 A  No, sir.
21 Q  Did you ever get any of the money that John had
22 told you about?
23 A  The first year when I went, I received about one
24 fifty.
25 Q  Okay.  You used him in more than one year?

Page 40

1 A  Mm-hmm.
2 Q  Okay.  Putting on the screen now a document that's
3 been marked as Government's exhibit four B on the first
4 page.  And calling your attention to the second to the
5 last page of that document.  It appears to be a check
6 made payable to you of approximately -- well, three
7 thousand nine hundred and forty-nine dollars.  Did you
8 get that check?
9 A  No, sir.
10 Q  On the next page the back of the check, is that
11 your signature?
12 A  No, sir.
13 Q  And it's deposited into an account called Eagle
14 Financial Services, do you know that account?
15 A  No, sir.
16 Q  You don't know that business?
17 A  No, sir.
18 Q  Okay.  Nothing further on direct.  The other lawyer
19 may have some questions.
20            CROSS EXAMINATION
21       BY MR. BRUNER OF ROBIN HILL:
22 Q  Ma'am, I'm Ben Bruner.  I represent Matthew Okonkwo
23 who is seated right here with me.
24     Do you know Mr. Okonkwo.
25 A  No, sir.

Page 41

1 Q  Have you ever seen him before?
2 A  No, sir.
3 Q  Had he ever done any tax work for you?
4 A  No, sir.
5 Q  You said -- Where did you meet John when you went
6 and met him?
7 A  Jupiter Tax Service.
8 Q  And where was that located?
9 A  Fort Walton Beach, Florida.
10 Q  Okay.  Did you understand John to work anywhere
11 else?
12 A  No, sir.
13 Q  Now when you went and saw him, what kind of office
14 does he have down there at Jupiter Tax Service?
15 A  It was a tax office.
16 Q  I mean is it in a shopping center, or --
17 A  No.  Just a building he had leased out, I guess.
18 But it was set up like a tax company.
19 Q  Had some computers in there?
20 A  Yes.
21 Q  Have anybody else working there?
22 A  When I went there there was nobody else there.
23 Q  Have you seen John since this time?
24 A  Since that first time that he did my taxes?  I went
25 to him a second year.

Page 42

1 Q   Okay.  What year was that?
2 A   The following year.  I guess ninety-nine, but I
3 hadn't saw him since that time.
4 Q   That's ninety-nine, you say?
5 A   If I'm not mistaken it was ninety-nine.
6 Q   Okay.  Have you seen John since then?
7 A   No, sir.
8       MR. BRUNER:  Judge, that's all my questions.
9       THE COURT:  Anything else?
10       MR. SCHIFF:  No redirect.
11       THE COURT:  You may step down.
12       (Whereupon the witness, Robin Hill, stepped
13 down from the stand.)
14       MR. SCHIFF:  The Government would call Tenesia
15 Fountain.
16       T E N E S I A   F O U N T A I N,
17 the witness herein, having first been duly sworn or
18 affirmed to tell the truth, was examined and testified
19 as follows:
20               DIRECT EXAMINATION
21       BY MR. SCHIFF OF TENESIA FOUNTAIN:
22 Q   Good afternoon, Miss Fountain.
23       Where do you currently live?
24 A   Fort Walton.
25 Q   Is that where you lived back in nineteen

Page 43

1 ninety-nine and two thousand?
2 A   No, I was living on Daloona.
3 Q   Can you spell that?
4 A   Daloona.  That's where I was working at.
5 Q   Is that near Fort Walton Beach?
6 A   Yes.
7 Q   Did you ask anyone for assistance in doing a tax
8 return for you back in ninety-nine or two thousand?
9 A   No.  I knowed (sic.) John, and a lady had told me
10 about him.
11 Q   Who told you about John?
12 A   Let me see -- It's been so long ago I can't
13 remember.
14 Q   Okay.
15 A   But he was doing tax for her.
16 Q   And did have you a meeting with John in person?
17 A   Yes.  He came and picked up the paper.
18 Q   What paper did you give him?
19 A   I give him the tax paper.
20 Q   Okay.  A W two form?
21 A   Yes.
22 Q   Did you work that year?
23 A   Excuse me?
24 Q   Did you work that year?
25 A   Did I work down here?

Page 44

1 Q   Did you have a job back in nineteen ninety-nine?
2 A   Yes.
3 Q   Okay.  Now can you see this document on the
4 computer screen?  Can you make that out?  I'm putting on
5 the screen what's been marked as Government's exhibit
6 six A.
7 A   I can make some of it out.
8 Q   Okay.  Would it be better if you looked at the
9 actual piece of paper?
10 A   I think so.
11 Q   Okay.
12       MR. SCHIFF:  May I approach the witness?
13       THE COURT:  Yes.
14 Q   And, ma'am, I would call your attention to the
15 upper right portion of the document where it has a
16 Social Security number.  Is?
17 A   Mm-hmm.
18 Q   Is that your Social Security number?
19 A   Yes, it is.
20 Q   And I'd call your attention to the middle of the
21 document under "exemptions".  There's a Kevin Smith
22 listed as your son.
23 A   No, it's not.
24 Q   You don't have a son named Kevin Smith?
25 A   No.

Page 45

1 Q   And there's a foster child by the name of Jesse
2 Grimsly.  Did you have --
3 A   No, I didn't.
4 Q   And did you tell John that you had a son named
5 Kevin Smith or a foster child named Mr. Grimsly?
6 A   No, I didn't.
7 Q   Now there's a W two with this return from a Gloria
8 Devin?
9 A   That's where who I was working for.
10 Q   So that's your actual job?
11 A   Yeah, it was.
12 Q   Okay.  Following that, there's a W two from a C. J.
13 B. Ice Cream.
14 A   No.
15 Q   You did not work there?
16 A   No, I didn't.
17 Q   Did you tell John that you worked there?
18 A   No, I didn't.
19 Q   Did you give him any paperwork showing that you
20 worked there?
21 A   No, I didn't.
22 Q   Ma'am, I'm going to show a document that's been
23 marked as Government's exhibit six B.  I'll call your
24 attention to the second to the last page of that
25 document.  There's a check made payable to Tenesia

Page 46

1 Fountain of approximately three thousand nine hundred.
2 Did you get that money?
3 A No, I didn't.
4 Q Now calling your attention to the last page,
5 there's a signature.
6 A No, I didn't.
7 Q Okay. That's not your endorsement at the top?
8 A No, it's not.
9 Q Okay. Did you get any --
10 A Twelve hundred.
11 Q Okay. John gave you twelve hundred dollars as a
12 refund?
13 A Yeah.
14 Q Okay. Nothing further on direct. The other lawyer
15 may have some questions for you, ma'am.
16        CROSS EXAMINATION
17        BY MR. BRUNER OF TENESIA FOUNTAIN:
18 Q Ma'am, I'm Ben Bruner. I represent Matthew
19 Okonkwo. Do you know Mr. Okonkwo?
20 A No, I don't.
21 Q Have you ever heard of him?
22 A No, I didn't.
23 Q Did John ever mention him?
24 A No, he didn't.
25 Q When is the last time you saw John?

Page 47

1 A It been so long ago, I can't remember.
2 Q Hadn't seen him recently?
3 A No, I hadn't.
4 Q Thank, you ma'am.
5        MR. BRUNER: Judge, those are my questions.
6        THE COURT: Okay. Any further direct?
7        MR. SCHIFF: No redirect.
8        THE COURT: Very good. You may step down,
9 ma'am.
10        (Whereupon the witness, Tenesia Fountain,
11 stepped down from the stand.)
12        THE COURT: Next witness?
13        MR. SCHIFF: Mary Rumph.
14        M A R Y    R U M P H,
15 the witness herein, having first been duly sworn or
16 affirmed to tell the truth, was examined and testified
17 as follows:
18        DIRECT EXAMINATION
19        BY MR. SCHIFF OF MARY RUMPH:
20 Q Good afternoon, Miss Rumph.
21        Miss Rumph, where do you currently live?
22 A Fort Walton Beach, Florida.
23 Q Where did you live back in nineteen ninety-nine and
24 two thousand?
25 A Fort Walton Beach, Florida.

Page 48

1 Q What was your street address back then?
2 A Two-fifteen Hickory Street.
3 Q Two-fifteen Hickory?
4 A Yes.
5 Q Did you know a man in your neighborhood named John?
6 A Yes.
7 Q Where did he live?
8 A I really don't know the exact address, but he lived
9 on Hickory.
10 Q How many houses down from you?
11 A Two.
12 Q Okay. And what did -- Did you know John's last
13 name?
14 A No.
15 Q Did you know his wife?
16 A I have saw her, but I didn't know her.
17 Q You don't know her name?
18 A No.
19 Q And what did John do for a living, as far as you
20 could tell?
21 A When I saw him he was driving an ice cream truck.
22 Q And did you ever ask him to do a tax return for
23 you?
24 A No, sir.
25 Q Was there a point where you may have given him your

Page 49

1 Social Security number?
2 A Yes.
3 Q What was the purpose of you giving him your Social
4 Security number?
5 A He said he wanted to claim me one year.
6 Q He was going to claim you?
7 A Mm-hmm.
8 Q Did you understand how that was going to work?
9 A Not exactly. I wasn't working at that particular
10 time.
11 Q Did he give you any money for you giving him the
12 Social Security number?
13 A No.
14 Q Now did John know whether or not you were working?
15 A I don't think so. He didn't know I wasn't working.
16 Q He didn't know one way or the other?
17 A No. I don't remember me telling him, but I may
18 have.
19 Q Okay. Were you in fact working that year?
20 A No, I wasn't.
21 Q I'm going to put a document on the computer screen
22 and you can tell me -- what's been marked as
23 Government's exhibit two A. Can you read that okay?
24 A Yeah, I see it.
25 Q Okay. Do you see the Social Security number?

Page 50

1 A  Yeah.
2 Q  Is that your Social Security number?  Let me show
3 you the document.
4        MR. SCHIFF:  May I approach the witness?
5        THE COURT:  Yes.
6 Q  I'm handing you Government's exhibit two A.  And
7 I'll direct your attention to the upper right portion.
8 A  I think it is.  I got my Social Security card.  Let
9 me look here.
10 Q  Okay.  By comparing the number on the return -- I
11 don't want to read your number into the record, but by
12 comparing the number on the return with your actual
13 Social Security number, are they one and the same?  Is
14 it the same number on both?
15 A  It looks like it.  Forty-three.  Yeah, I think it's
16 the same number.
17 Q  Do you have glasses?
18 A  Yeah, but I broke them.
19 Q  Oh.  Okay.  Now did you have a foster child by the
20 name of Justin Lee?
21 A  No.  I don't have any foster children.
22 Q  Okay.  And so no foster child by the name of
23 Anthony Lee either?
24 A  No.
25 Q  Did you tell John that you had foster children?

Page 51

1 A  No.  I don't even know them children.
2 Q  Did you work for a company called C. J. B. Ice
3 Cream Company?
4 A  No, sir.
5 Q  Did you tell John that you worked for C. J. B. Ice
6 Cream Company?
7 A  No, sir.
8 Q  Did you give him any paperwork from C. J. B. Ice
9 Cream Company?
10 A  No, sir.
11        MR. SCHIFF:  May I approach the witness?
12        THE COURT:  Yes.
13 Q  Showing you what's been marked as Government's
14 exhibit two B.  Do you have your glasses?
15 A  Yeah.  I broke them, but --
16 Q  Showing you the second to the last page of
17 Government's exhibit two B, a check payable to you, four
18 thousand one hundred and ninety-four dollars.  Did you
19 get this check?
20 A  No, sir.
21 Q  That's the type of thing you would have remembered?
22 A  Yeah, I would have really remembered that.
23 Q  Okay.  On the back of the check, is that your
24 signature?
25 A  No, sir.  I had a comparison here with my I D.

Page 52

1 That's not even close.
2 Q  Ma'am, nothing further on direct.  Mr. Bruner may
3 have some questions for you.
4        CROSS EXAMINATION
5        BY MR. BRUNER OF MARY RUMPH:
6 Q  Ma'am, I'm Ben Bruner.  I represent Matthew Okonkwo
7 in this case.  Mr. Okonkwo is seated right here next to
8 me.  Do you know him?
9 A  Mc?
10 Q  Yes, ma'am.
11 A  No, I don't know him.
12 Q  You know him?
13 A  I never saw him before.
14 Q  Okay.  And have you ever heard his name?
15 A  What his name?
16 Q  Matthew Okonkwo.
17 A  No, sir.
18 Q  Have you seen John since that time?
19 A  I saw him because he used to stay down below me.
20 He married my son -- I mean he stayed with my son Andy.
21 Q  How long ago was this?
22 A  About two or three years ago, I would say.
23 Q  Have you seen him since then?
24 A  No.  I haven't saw him since he stopped driving ice
25 cream truck.

Page 53

1        MR. BRUNER:  Judge, those are my questions.
2        THE COURT:  Any redirect?
3        MR. SCHIFF:  No redirect.
4        (Whereupon the witness, Mary Rumph, stepped
5 down from the stand.)
6        THE COURT:  Next witness.
7        MR. SCHIFF:  Government would call George
8 Green.
9        G E O R G E    G R E E N,
10 the witness herein, having first been duly sworn or
11 affirmed to tell the truth, was examined and testified
12 as follows:
13        DIRECT EXAMINATION
14        BY MR. SCHIFF OF GEORGE GREEN:
15 Q  Good afternoon, Mr. Green.
16        Mr. Green, can you please tell the jury where
17 you live now?
18 A  In Dothan, Alabama.
19 Q  How long have you lived in Dothan?
20 A  Twenty-seven years.
21 Q  Okay.  Did there come a point where you used Eagle
22 Financial Services to prepare your income tax return?
23 A  Yes, sir.
24 Q  Can you remember when that was?
25 A  I think it was ninety-eight and ninety-nine.

**Multi-Page**

| Page 54 |
|---|
| 1      THE COURT: Would you speak up? |
| 2      THE WITNESS: Yes, sir. |
| 3  A  It was ninety-eight or ninety-nine. |
| 4      THE COURT: Thank you. |
| 5  Q  Were you employed at that time? |
| 6  A  Yes, sir. |
| 7  Q  And who at Eagle did you deal with? |
| 8  A  Mr. Matthews. |
| 9  Q  Okay. And what is your wife's name? |
| 10  A  Martha Green. |
| 11  Q  And are you aware of ever receiving a refund in the |
| 12  amount of approximately twenty-eight hundred dollars, |
| 13  either you or your wife, from Eagle? |
| 14  A  No, sir. |
| 15      MR. SCHIFF: Nothing further on direct. |
| 16          CROSS EXAMINATION |
| 17      BY MR. BRUNER OF GEORGE GREEN: |
| 18  Q  Sir, I'm Ben Bruner. I represent Matthew Okonkwo. |
| 19  Do you know Matthew? |
| 20  A  Yes, I just know him from the tax. I don't know |
| 21  him personally. |
| 22  Q  Okay. When you went into his place of business, |
| 23  who all was there? |
| 24  A  He was there and the receptionist. I don't know |
| 25  her name. |

| Page 56 |
|---|
| 1      THE COURT: Okay. |
| 2      THE COURT: Anything further direct? |
| 3          REDIRECT EXAMINATION |
| 4      BY MR. SCHIFF GEORGE GREEN: |
| 5  Q  You said you gave Mr. Matthew your information. |
| 6  Would that have included your wife's Social Security |
| 7  number? |
| 8  A  Yes, sir. |
| 9      MR. SCHIFF: Nothing further on redirect. |
| 10      (Whereupon the witness, George Green, stepped |
| 11  down from the stand.) |
| 12      THE COURT: Next witness? |
| 13      MR. SCHIFF: Government would call Martha |
| 14  Green. |
| 15      M A R T H A   G R E E N, |
| 16  the witness herein, having first been duly sworn or |
| 17  affirmed to tell the truth, was examined and testified |
| 18  as follows. |
| 19          DIRECT EXAMINATION |
| 20      BY MR. SCHIFF OF MARTHA GREEN: |
| 21  Q  Good afternoon, Mrs. Green. |
| 22  A  Hi. |
| 23  Q  Mrs. Green, where do you live now and where did you |
| 24  live back in nineteen ninety-nine and two thousand? |
| 25  A  I live Ten-thirty two Helen Avenue, and I lived |

| Page 55 |
|---|
| 1  Q  Okay. Was a fellow by the name John there? |
| 2  A  I didn't see him. I don't know. |
| 3  Q  Okay. And who did you talk to? Did you talk to |
| 4  Matthew? |
| 5  A  Yes, sir. |
| 6  Q  And did you give him your information? |
| 7  A  Yes, sir. |
| 8  Q  And Matthew had, like you said, a receptionist and |
| 9  some other people were working there? |
| 10  A  He had a receptionist, I know. There was other |
| 11  people there, yes, sir. |
| 12  Q  There were other people there? |
| 13  A  Yes, sir. |
| 14  Q  And what did he tell you about your taxes? |
| 15  A  He told me he would have them -- I left the papers |
| 16  there, and he told me he would have them in a day or two |
| 17  and to give him a call back. |
| 18  Q  Did you give him a call back? |
| 19  A  Yes, sir. |
| 20  Q  And were the papers ready? |
| 21  A  No, sir. I never got anybody else on the phone |
| 22  after that. |
| 23  Q  Did your wife ever call or go over there? |
| 24  A  No, sir. Not that I know of. |
| 25      MR. BRUNER: Those are our questions, Judge. |

| Page 57 |
|---|
| 1  there in ninety-nine and two thousand. |
| 2  Q  Okay. And did you ever ask Matthew Okonkwo, |
| 3  Jonathan Adewunmi or anyone else from Eagle Financial to |
| 4  prepare a nineteen ninety-nine income tax for you? |
| 5  A  No, sir. |
| 6  Q  Now I'm putting on the screen a document that's |
| 7  been marked as Government's exhibit eleven A, and I call |
| 8  your attention to the top. Can you read that on the |
| 9  screen? |
| 10  A  It's rather dim, but I can see it a little. |
| 11  Q  Can you read it well enough to make out the name |
| 12  and Social Security number? |
| 13  A  Martha A. Green. Yes, mm-hmm. |
| 14  Q  And is that your actual Social Security number? |
| 15  A  Yes, sir, two six seven eight six four four nine |
| 16  eight. |
| 17  Q  Yes, that is yours? |
| 18  A  Yes, sir. |
| 19  Q  Now calling your attention to the middle of the |
| 20  page under "exemptions," there's a daughter's listed |
| 21  named Erica Gomez. Did you have a daughter by that |
| 22  name? |
| 23  A  No, sir. |
| 24  Q  Okay. Or a daughter named Tasheka Davis? |
| 25  A  No, sir. |

Page 58

1  Q  Did you ever communicate to anybody at Eagle
2  Financial that you had either of those two as your
3  daughters?
4  A  No, sir.
5  Q  And on the third page of the document is what
6  appears to be a W two form from C. J. B. Ice Cream
7  Company showing wages earned by you of ninety-six
8  hundred dollars.  Did you ever work for that company?
9  A  No, sir.
10  Q  Again, did you ever communicate to anyone at Eagle
11  Financial that you worked for C. J. B. Ice Cream?
12  A  No, sir.
13  Q  Now I'm going to put on the screen the second to
14  the last page of Government's exhibit eleven B.  And you
15  had a chance to look at that before, and you concluded
16  that -- You can't make it out, can you?
17  A  No.
18  Q  Okay.  Did you ever get a check from Eagle
19  Financial in the amount of two thousand eight hundred
20  and eight dollars?
21  A  No, sir.
22  Q  Okay.  I have nothing further on direct.  Mr.
23  Bruner may have some questions for you.
24  A  All right.
25          CROSS EXAMINATION

Page 59

1          BY MR. BRUNER OF MARTHA GREEN:
2  Q  Ma'am, I'm Ben Bruner.  I represent Matthew Okonkwo
3  in this matter.  Mr. Okonkwo is seated right here.  Have
4  you ever met Mr. Okonkwo?
5  A  No, sir.
6  Q  Have you ever seen him before, to your knowledge?
7  A  No, I haven't.
8      MR. BRUNER:  Those are my questions, Your
9  Honor.  Thank you.
10      THE COURT:  Anything else?
11      MR. SCHIFF:  No, nothing on redirect.
12      THE COURT:  Thank you.  You may step down.
13      (Whereupon the witness, Martha Green, stepped
14  down from the stand.)
15      THE COURT:  Who is your next witness?
16      MR. SCHIFF:  Yvette Thomas.
17          Y V E T T E   T H O M A S,
18  the witness herein, having first been duly sworn or
19  affirmed to tell the truth, was examined and testified
20  as follows.
21          DIRECT EXAMINATION
22          BY MR. SCHIFF OF YVETTE THOMAS:
23  Q  Miss Thomas, where do you currently live?
24  A  Three oh one in an apartment two, Tram Street,
25  Dothan, Alabama.  Three six three zero three.

Page 60

1  Q  And do you know Matthew Okonkwo?
2  A  Yes, I used to be an employee.
3  Q  Okay.  How did you first come to be employed for
4  him?
5  A  He married my cousin.
6  Q  Your cousin introduced you?
7  A  Yes.
8  Q  And what years did you work there?
9  A  Ninety-six to two thousand and one.
10  Q  And did you work there continuously or on and off?
11  A  On and off.
12  Q  Okay.  And you said you worked for Matthew Okonkwo.
13  What was the name of the business?
14  A  Eagle Financial Services.
15  Q  Were there any other names used for the business?
16  A  Rainbow, at first.
17  Q  Rainbow Tax Services?
18  A  Yes.
19  Q  And what were your duties there?
20  A  Answer the phone, and filing, and making copies.
21  Q  Copies of?
22  A  Identification, checks.
23  Q  Did you play any role in distributing refund
24  checks?
25  A  No.

Page 61

1  Q  Did you ever call customers when the check was
2  ready?
3  A  Yes.
4  Q  Now did you have anything to do with actually
5  preparing the tax returns?
6  A  No.
7  Q  Who prepared the tax returns?
8  A  Matthew.
9  Q  Did you play any role in electronically filing the
10  returns?
11  A  No, I don't know how.
12  Q  Who did that?
13  A  Matthew.
14  Q  Did you have any involvement in printing the refund
15  checks?
16  A  No.
17  Q  And what I'm calling the "refund checks," are you
18  familiar with what I'm talking about, the rapid refund
19  checks?
20  A  Mm-hmm.
21  Q  You have to say yes or no.
22  A  Yes.
23  Q  And did you -- Where were those checks printed?
24  A  Transmitted through the office.
25  Q  But physically, was the printer in your office?

Page 62

1  A  No.
2  Q  Was it on the preparations of Eagle?
3  A  Yes.
4  Q  Where on the premises?
5  A  In his office.
6  Q  Whose office?
7  A  In Matthew's office.
8  Q  Now during the time you worked for Eagle, how were
9  these instant refund checks normally handled?  What was
10 the procedure?
11 A  You had to make copies of all the files, and you
12 look up the Social Security number to match up the
13 checks to the person who it belonged to.
14 Q  And would you maintain files for the customers?
15 A  Yes.
16 Q  Did you ever have a situation where there was a
17 check but no file for the customer?
18 A  If someone didn't have a file, you take it to the
19 office and Matthew would give it to whoever.
20 Q  When you say "give it to whoever," what do you
21 mean?
22 A  The other people that work in the office.
23 Q  Who were those people?
24 A  John and Freedom.
25 Q  Do you know John's last name?

Page 63

1  A  No.
2  Q  Do you know what he did other than work on tax
3  returns?
4  A  Tax preparer.
5  Q  Okay.  Did you ever see him drive anything?
6  A  No.
7  Q  Okay.  Do you know anything about John's wife?
8  A  I just seen her come to the office one time.
9  That's it.
10 Q  What was she called?
11 A  Bee.
12 Q  Just Bee?
13 A  Bee.
14 Q  Did she have a business in town?
15 A  Yeah, she had a fashion store.
16 Q  Now you mentioned someone named Freedom.  Who was
17 Freedom?
18 A  He was a tax preparer.
19 Q  Okay.  Now how did they -- How did it work with
20 these other tax preparers?
21 A  Filed taxes.
22 Q  Did they -- If freedom or Jonathan Adewunmi had a
23 tax return, did they go through you or did they go
24 directly to Matthew?
25 A  Matthew.

Page 64

1  Q  Now would Eagle keep a file on the returns that
2  Jonathan Adewunmi brought in?
3  A  All of them had files.
4  Q  Okay.  But you said sometimes there was a rapid
5  refund check but no file?
6  A  If they didn't have a file, it would go to Matthew
7  and he would find out who the file belonged to.
8  Q  Okay.  Now I want to show you some documents.  Do
9  you remember where Eagle had bank accounts?
10 A  Regions Bank.
11 Q  Okay.  And did you ever go to Regions on a banking
12 errand?
13 A  To make a deposit.
14 Q  And when you made a deposit, who filled out the
15 deposit ticket?
16 A  Matthew.
17 Q  Okay.  Showing you what's been marked as
18 Government's exhibit four C -- and can you can you see
19 deposit ticket?
20 A  Yes.
21 Q  Okay.  Whose handwriting is that?
22 A  Matthew.
23 Q  Showing you what's been marked as seven C.  Would
24 you be better off with seeing -- Why don't I show you
25 the actual paper document.

Page 65

1      MR. SCHIFF:  May I approach?
2      THE COURT:  Yes.
3  Q  Do you recognize the handwriting on the deposit
4  ticket on seven C?
5  A  Yes.
6  Q  Whose handwriting is it?
7  A  Matthew.
8      MR. SCHIFF:  May I approach?
9      THE COURT:  Yes.
10 Q  Showing you what's been marked as nine C.  Do you
11 see the deposit ticket there on the first page of
12 exhibit nine C?
13 A  Yes.
14 Q  And do you recognize the handwriting on that?
15 A  Matthew.
16 Q  Okay.
17     MR. BRUNER:  Judge, I'm going to object.
18 There's been no foundation left that she knows his
19 handwriting.
20     THE COURT:  Well you're a little late.  She's
21 already identified it.
22     MR. BRUNER:  I understand that's what she's
23 saying.
24     THE COURT:  Why don't you ask her if she is
25 familiar with his handwriting and so forth.

Page 66

1 Q  You said you worked there for approximately five
2 years?
3 A  Yes.
4 Q  During the five years there, did you become
5 familiar with Mr. Okonkwo's handwriting?
6 A  Yes.
7      THE COURT:  Do you wish to take her on cross
8 on this issue before she proceeds further?
9      MR. BRUNER:  No, Your Honor.
10     THE COURT:  Okay.  Go ahead.
11 Q  And finally, a document that's been marked as both
12 Government's exhibit ten C and twelve C.  Calling your
13 attention to the deposit ticket on the first page.
14 Again, do you recognize the handwriting on the deposit
15 slip?
16 A  That's the same handwriting.
17 Q  Okay.  The handwriting of?
18 A  Matthew.
19 Q  Okay.  Ma'am, do you know what an E. F. I. N.
20 number is?
21 A  Electronic filing number.
22 Q  Did you ever learn that there was an E. F. I. N.
23 number in your name?
24 A  Yes.  Someone told me.
25 Q  Okay.  You found that out after the fact?

Page 67

1 A  Yes.
2 Q  Did you confirm with I. R. S. that there was an E.
3 F. I. N. number in your name?
4 A  Yes.
5 Q  And what was the name of the -- Was there a
6 business name that your E. F. I. N. number was
7 associated with?
8 A  Eagle Financial.
9 Q  Do you remember whether it was Eagle or Rainbow?
10     MR. BRUNER:  Object.  Asked and answered.
11     THE COURT:  Overruled.
12 Q  Was it Eagle or Rainbow?
13 A  Eagle.
14 Q  Okay.  And is your -- Back in nineteen ninety-six,
15 was your address twelve oh five, apartment B, North
16 Alice Street in Dothan?
17 A  Yes.
18 Q  Okay.  And did you have a mailing address of P. O.
19 Box one forty-seven in Dothan?
20 A  Yes.
21 Q  Did you ever use that E. F. I. N. number?
22    (Whereupon, the witness indicated.)
23 Q  Ma'am, you're shaking your head.  Let me get the
24 question out, and then give a verbal answer.
25     Did you ever use that E. F. I. N. number to

Page 68

1 file a tax return with the I. R. S.?
2 A  No.
3 Q  Would you know how to transmit a tax return?
4 A  No, I don't know how.
5 Q  Okay.  Ma'am, showing you a document that's been
6 marked as Government's exhibit six A, the tax return of
7 Tenesia Fountain.  And calling your attention to the
8 second page of the document towards the lower right-hand
9 portion.  Do you see it says "preparers S. S. N.," can
10 you make that out on the screen?
11 A  Yes.
12 Q  Okay.  Is that your Social Security number?
13 A  Yes.
14 Q  Did you have anything to do with the preparation of
15 the Tenesia Fountain tax return?
16 A  No.
17 Q  Calling your attention to Government's exhibit
18 seven A, the James Harris tax return.  Again, the second
19 page, lower right under "preparer's Social Security
20 number."  Is that your Social Security number?
21 A  Yes.
22 Q  Did you prepare the James Harris tax return?
23 A  No.
24 Q  Showing you what's been marked as Government's
25 exhibit eight A, the Cynthia Dozer tax return.  Again,

Page 69

1 calling your attention to the Social Security number on
2 the lower right under "preparer," again, is that your
3 Social Security number?
4 A  Yes.
5 Q  And did you prepare the Cynthia Dozer tax return?
6 A  No.
7 Q  Finally, one more, Government's exhibit ten A.  The
8 tax return of Tia Doyle.  Again calling your attention
9 to the Social Security number under the "preparer"
10 section on the bottom right of page two.  Is that your
11 Social Security number?
12 A  Yes.
13 Q  And did you prepare the Tia Doyle tax return?
14 A  No.
15 Q  Now you were an employee of Eagle, correct?
16 A  Yes.
17 Q  And did you receive a W two form from Eagle at the
18 end of the year?
19 A  Twice.
20 Q  Okay.  And did Mr. -- Did Matthew Okonkwo have
21 access to your Social Security number?
22 A  Yes.
23 Q  Nothing further on direct.  Mr. Bruner may have
24 some questions for you.
25     CROSS EXAMINATION

Multi-Page

**Page 70**

1        BY MR. BRUNER OF YVETTE THOMAS:
2 Q Ma'am, I'm Ben Bruner, I represent Mr. Okonkwo in
3 this matter. I've got some questions for you.
4      During the time period we're talking about
5 here, and I know this is about six years ago, did you
6 work in the year two thousand there.
7 A Yes.
8 Q The whole year?
9 A Just during the season.
10 Q When would that be?
11 A January to April.
12 Q And did you work full-time?
13 A Went to school.
14 Q So how many hours a day did you work?
15 A Six or seven.
16 Q From what to what? If you could.
17 A Like from seven in the morning until about four or
18 five in the afternoon.
19 Q And was -- were there other people that were
20 seasonal workers there?
21 A Yes.
22 Q And who were they?
23 A Freedom, John, Kim. There was a lot of people.
24 There were other people preparing taxes.
25 Q They had other people preparing taxes, is that what

**Page 71**

1 you said?
2 A Yes.
3 Q Okay. Now did John have his own tax business too?
4 A No.
5 Q He didn't? They didn't have some of their own
6 clients?
7 A Yes, they had their own clients.
8 Q And how many of their own clients did he have, did
9 John have?
10 A I don't know.
11 Q Was he there pretty much all the time?
12 A Yes.
13 Q And was he working all the time?
14 A I seen him most of the time at the office.
15 Q Okay. And what would he do, did he prepare taxes?
16 A Yes.
17 Q And other people prepared taxes, didn't they?
18 A Yes.
19 Q But was your job mainly clerical?
20 A That's it, secretary, yeah.
21 Q And did you work the year before?
22 A Ninety-nine?
23 Q Yes, ma'am.
24 A It was off and on because I had just had my baby.
25 Q Okay. But you did work some?

**Page 72**

1 A Yes.
2 Q Was John there that year?
3 A Yes.
4 Q Now what happens -- Let me ask you just briefly,
5 what happens when somebody came in, did they meet you
6 first?
7 A Yes.
8 Q Okay. And if they said hey, I'm here to have my
9 taxes done, what would happen?
10 A You have to sign in on a log-in.
11 Q They signed in?
12 A Yes.
13 Q And if that happened, what happened then?
14 A They would wait to see that person.
15 Q And who did they see?
16 A Whichever one of the preparers they asked for.
17 Q Okay. And that could be anybody?
18 A Whoever their request for is.
19 Q Whoever they requested?
20 A Yeah.
21 Q What if they didn't know anybody?
22 A Then they go to Matthew.
23 Q Okay. But did people come in and request John?
24 A Some of them, yes.
25 Q Okay. And about how many people, you were the

**Page 73**

1 receptionist, how many people came through there during
2 tax season that year, two thousand?
3 A There was a lot of customers. Probably over a
4 thousand.
5 Q A thousand?
6 A Yes.
7 Q And how many did John have?
8 A I wouldn't know.
9 Q But he was busy all the time?
10 A Yes.
11 Q Did he ever talk about having an ice cream truck?
12 A No.
13 Q Did you ever give checks to a customer, ma'am?
14 A No.
15 Q So did anybody ever come by and ask for their
16 check?
17 A Yes.
18 Q And who would give them the check?
19 A Kim or Matthew.
20 Q Who is Kim?
21 A A preparer that worked in the office, too.
22 Q Okay. Did John ever give anybody checks?
23 A Did he come get a check?
24 Q Yes, or did he handle the money, any money?
25 A Unless I wasn't there. I wasn't there full-time.

Page 74

1    MR. BRUNER: Okay. That's all at this time,
2  Your Honor.
3    MR. SCHIFF: Nothing on redirect.
4    THE COURT: You may step down.
5    (Whereupon the witness, Yvette Thomas, stepped
6  down from the stand.)
7    THE COURT: Next witness? Well how long have
8  we been going? We'll take a fifteen minute recess.
9  We'll come back and resume.
10    How many more witnesses do you have this
11 afternoon, Mr. Schiff?
12    MR. SCHIFF: I could put on as many as four.
13    THE COURT: Four? Okay, then. We'll take a
14 fifteen minute recess and then we'll come back and
15 finish the day.
16    Members of the jury, turn over your notes in
17 your chairs whenever you leave the courtroom. Even if
18 you've written nothing, it's none of our business. So
19 make sure you turn them over. Why don't you go ahead
20 and put your names on your pads even if you've written
21 nothing just so we can make sure that you get your pad
22 back.
23    And, again, you are cautioned again not to
24 discuss the case among yourselves or with anyone else.
25    Recess will be for fifteen minutes.

Page 75

1    (Whereupon, a recess was taken.)
2    THE COURT: Proceed.
3    MR. SCHIFF: The Government calls Debra
4  Barham.
5    D E B R A   B A R H A M,
6  the witness herein, having first been duly sworn or
7  affirmed to tell the truth, was examined and testified
8  as follows:
9    DIRECT EXAMINATION
10    BY MR. SCHIFF OF DEBRA BARHAM:
11 Q Ms. Barham, how are you employed?
12 A I'm employed with the Internal Revenue Service
13 located in Ogdan, Utah.
14 Q What's your title?
15 A I am the court witness coordinator.
16 Q So this is what you do for a living?
17 A That is correct.
18 Q Okay. And how -- how long have you worked for the
19 I. R. S.?
20 A I have been employed with Internal Revenue Service
21 for twenty years.
22 Q And what are your duties?
23 A On a daily basis I will review tax returns and
24 transcripts. I will prepare exhibits that are used in
25 court and I also testify in court.

Page 76

1 Q And are you familiar with the I. R. S. procedures
2  for electronic filing of tax returns for the tax year
3  nineteen ninety-nine?
4 A Yes, I am.
5 Q And what about are you familiar with the records
6  that the I. R. S. maintains related to electronically
7  filed returns from nineteen ninety-nine?
8 A Yes, I am.
9 Q And are you familiar with the process for refund
10 anticipation loans as it existed for the tax year
11 nineteen ninety-nine?
12 A Yes, I do.
13 Q Can you tell the jury what a refund anticipation
14 loan is?
15 A A refund anticipation loan is when an individual
16 goes to a paper preparer or an electronic return
17 originator. They have a tax return prepared, and upon
18 acceptance of that tax return by the Internal Revenue
19 Service, they can be issued a refund anticipation loan
20 based on their anticipated refund.
21 Q And who actually puts the check in the customer's
22 hand?
23 A That would be the paid preparer or the electronic
24 return originator.
25 Q And what would be the procedure in place for an

Page 77

1  electronically filed return when there is a refund
2  anticipation loan?
3 A I'm sorry, state your question again.
4 Q Yeah. What was the system that was in place back
5  for the tax year nineteen ninety-nine, would you
6  describe the process from the time that the return is
7  electronically transmitted to the time that the refund
8  is issued? What happens first?
9 A What happens first is, the information is keyed in
10 into software. That would include wages, withholding,
11 their exemptions, their filing status, if they had any
12 other type of deductions, mortgage interest, those types
13 of things. That is keyed into their software program.
14    That tax return information then is
15 transmitted to the Internal Revenue Service, and at that
16 point it is determined if there is an overpayment and a
17 refund is due to the taxpayer, or if there is a balance
18 due. If there is a refund and they have requested the
19 refund anticipation loan, then that is issued to the
20 individual.
21 Q And so whose money is the refund anticipation loan?
22 A It is from the bank because is it a loan from
23 particular banks.
24 Q Then how does the bank get paid?
25 A Then Internal Revenue Service will directly deposit

Multi-Page

---

Page 78

1 the funds into the particular bank that has issued that
2 refund anticipation loan.
3 Q Now in the process of electronic filing, what
4 happens to the paper W two that an individual has
5 received from their employer?
6 A That will be retained in the paid preparer or the
7 electronic return originator's office.
8 Q How does the I. R. S. get the information that was
9 on the W two?
10 A We receive it when it is transmitted to us on that
11 electronic return.
12 Q So that information is put into the software by the
13 preparer?
14 A It is keyed in, that is correct.
15 Q What type of record does the I. R. S. maintain with
16 respect to electronically filed income tax returns?
17 A I'm sorry?
18 Q How does it maintain the records relating to an
19 electronically filed return?
20 A Those records are maintained electronically,
21 however they are available to be printed out in a hard
22 copy.
23 Q And when a printout is made of an electronically
24 filed return, what does the printout look like?
25 A It will look like the type of form that it should

---

Page 79

1 have been on, whether it be a ten forty, a ten forty A
2 or the ten forty E Z.
3 Q And what does the W two look like?
4 A It looks just like the W two that you may be issued
5 from your own employer.
6 Q Now, have you reviewed certain tax returns in
7 preparation for your testimony today?
8 A Yes, sir, I have.
9     MR. SCHIFF: May I approach the witness?
10     THE COURT: Yes.
11 Q Ma'am, do you have in front of you Government's
12 exhibits two A, three A, four A, five A, six A, seven A,
13 eight A, nine A, ten A, eleven A and twelve A?
14 A Yes, I do.
15 Q And can you say what those are and just briefly
16 same the name of each taxpayer that they relate to.
17 A Two A is Mary Rumph.
18 Q For what tax year?
19 A It's a form ten forty A, U. S. individual income
20 tax return for the period ending December thirty-first,
21 nineteen ninety-nine.
22 Q Okay. You can just say the year and the person's
23 name.
24 A Okay. Three A is Charlotte Green, form ten forty A
25 for the period ending December thirty-first, nineteen

---

Page 80

1 ninety-nine.
2     Four A is for Robin Hill, form ten forty A for
3 the tax period ending December thirty first, nineteen
4 ninety-nine.
5     Five A is form ten forty for Lashonda Lee for
6 the period ending December thirty-first, nineteen
7 ninety-nine.
8     Six A is for Teneshia Fountain, form ten fort
9 for the period ending December thirty-first, nineteen
10 ninety-nine.
11     Seven A for James L. Harris, form ten forty
12 for nineteen ninety-nine.
13     Eight A, Cynthia Dozer form ten forty for the
14 period ending December thirty-first, nineteen
15 ninety-nine.
16     Nine A, Quincy J. Campbell, form ten forty,
17 for the period ending December thirty-first, nineteen
18 ninety-nine.
19     Ten A, Tia Doyle form ten forty for the period
20 ending December thirty-first, nineteen ninety-nine.
21     Eleven A, Martha Green, form ten forty for the
22 period ending December thirty-first, nineteen
23 ninety-nine.
24     And twelve A is Tawana Campbell form ten forty
25 A for the period ending December thirty-first, nineteen

---

Page 81

1 ninety-nine.
2 Q And are all of those documents printouts of the I.
3 R. S.'s computer records for those returns?
4 A Yes, they are.
5     MR. SCHIFF: The Government would move the
6 admission of exhibits two A, three A, four A, five A,
7 six A, seven A, eight A, nine A, ten A, eleven A and
8 twelve A.
9     THE COURT: All admitted.
10 Q Let's look at two A as an example. How do you know
11 from looking at two A, and if I don't have a portion on
12 the screen tell me what I should put on the screen, how
13 do you know from exhibit two A that this return was
14 filed electronically?
15 A Based on in the upper right-hand corner there is a
16 fourteen digit number that begins with seven two.
17 Q Those little tiny numbers?
18 A Yes, that is correct.
19 Q Okay. Now they're not so tiny. And is there
20 something about those numbers that lets you know it's
21 electronically numbered?
22 A Yes. That is the document locator number. Every
23 tax return that is processed by the Internal Revenue
24 Service receives a unique document locator number. And
25 the first two digits indicate to me that was an

---

Page 82

1 electronically filed tax return that was processed at
2 the Memphis processing center.
3 Q Now on page two, line forty, it says the amount you
4 overpaid. Is that what's commonly referred to as the
5 refund amount?
6 A That is correct.
7 Q Now underline forty-one there's the bank account
8 information. And in the situation of a -- if the
9 taxpayer has been given a refund anticipation loan,
10 whose bank account information will that be?
11 A That would be the bank that issued the refund
12 anticipation loan.
13 Q Now under the signature of the taxpayer there are a
14 five digit number, zero four three eight seven. What
15 does that refer to?
16 A That is a P. I. N. That's a personal
17 identification number in lieu of a signature.
18 Q And how was the taxpayer issued such a personal
19 identification number?
20 A It's a self-select. They are able to select their
21 own identification number.
22 Q Can the preparer pick a P. I. N. for the customer?
23 A It is possible.
24 Q Now what is an E. F. I. N. number, E. F. I. N.?
25 A An E. F. I. N., that's the Electronic Filed

Page 83

1 Identification Number. Each electronic return
2 originator is required to have an E. F. I. N. in order
3 to transmit tax returns to the Internal Revenue Service.
4 Q And can you tell from this tax return what E. F. I.
5 N. number was used?
6 A Yes. In the preparer's signature box there is a
7 six digit number that begins with a six three. That is
8 the E. F. I. N. for Eagle Financial Services.
9 Q Six three three eight eight nine?
10 A That is correct.
11 Q Okay. And what are the five digits to the right of
12 that number?
13 A That is a self-select P. I. N. that the preparer
14 puts in conjunction with their E. F. I. N. in lieu of a
15 pen and ink signature.
16 Q Now how does a preparer get an E. F. I. N. number?
17 A They complete what is called a form eighty-six
18 thirty-three application to participate in electronic
19 filing. They submit their application. It is
20 processed, and at that time they are then issued an
21 Electronic Filing Identification Number.
22 Q And does the I. R. S. maintain a record of E. F. I.
23 N. applications?
24 A Yes, we do.
25 Q And in what form does it maintain those records?

Page 84

1 A Generally it is in a paper form. After a certain
2 period of time those paper forms can be destroyed and
3 then it is maintained electronically.
4 Q And the E. F. I. N. applications that are
5 maintained electronically, is it possible to access and
6 print those?
7 A Yes, it is.
8       MR. SCHIFF: May I approach?
9       THE COURT: Yes.
10 Q I'm going to show you exhibits one K and one L.
11 Can you identify those?
12 A Yes. One K is the E. F. I. N. application
13 information for E. F. I. N. six three three two four
14 six, which is Rainbow Tax service. And one L is the E.
15 F. I. N. application for E. F. I. N. number six three
16 three eight eight nine, Eagle Financial Services.
17 Q Are these -- are Government's exhibits one K and
18 one L printouts of the I. R. S.'s computer records of E.
19 F. I. N. applications that you just described?
20 A Yes, they are.
21       MR. SCHIFF: The Government would move the
22 admission of one K and one L.
23       THE COURT: They are admitted.
24 Q On the second page of the document, that's entitled
25 "application summary," this would be the summary for

Page 85

1 Rainbow Tax Services?
2 A That is correct.
3 Q And is this information taken from the original
4 application?
5 A Yes, it is.
6 Q I'm putting on the screen one L. Would that be the
7 application for Eagle Financial?
8 A That is correct.
9 Q Okay. So the actual person -- According to the I.
10 R. S.'s records, the actual person who applied for the
11 E. F. I. N., would that be Mr. Okonkwo?
12 A Yes, it would be.
13 Q Now on the return we were looking at before, two A,
14 on line thirty-five the taxpayer reports a total amount
15 withheld of five hundred and fifty dollars.
16 A That is correct.
17 Q Yet the taxpayer applies for a refund of four
18 thousand three hundred and sixty-six dollars. How is it
19 that the taxpayer is able to get a refund far in excess
20 of the amount of taxes that were withheld during the
21 year?
22 A There is earned income credit listed on line
23 thirty-seven A of three thousand eight hundred and
24 sixteen dollars.
25 Q Can you please explain to the jury what the earned

Page 86

1  income credit is.
2  A  The earned income credit is a credit that is given
3  based on a taxpayer's filing status, their number of
4  dependents and their income.
5  Q  And if the credit exceeds the amount of the tax,
6  what happens?
7  A  The remaining is refunded to them.
8  Q  Okay.  So the taxpayer will get the difference?
9  A  That is correct.
10 Q  Now does a taxpayer have to have some earned income
11 to qualify for the credit?
12 A  Yes, they do.
13 Q  Is there an amount by which, if the taxpayer makes
14 -- Is there an upper limit that would disqualify one for
15 the earned income tax credit?
16 A  Yes, there is.
17 Q  And is it a -- Does the amount of credit vary
18 depending on how much income you had?
19 A  Yes.  There is a graduated table for receiving the
20 maximum amount of earned income credit.
21 Q  Okay.  Is there a particular amount of income that
22 would maximize the credit?
23 A  Generally between eight and twelve thousand dollars
24 of income you will receive the maximum earned income
25 credit.

Page 87

1  Q  The exact amount would depend upon the particular
2  year?
3  A  That is correct.
4  Q  Now do you have to have -- Again, all these
5  questions we're talking about nineteen ninety-nine.  Did
6  you have to have dependents to qualify for the earned
7  income tax credit?
8  A  Yes, during nineteen ninety-nine.
9  Q  Okay.  And would two dependents result in a greater
10 earned income tax credit than one dependent?
11 A  Yes, it would.
12 Q  Would three dependents get you a bigger earned
13 income credit than two?
14 A  No.
15 Q  Now -- So minor children under eighteen would
16 qualify as dependents, is that correct?
17 A  That is correct.
18 Q  Can foster children qualify as dependents?
19 A  Yes, they do.
20 Q  Are there any circumstances under which a child
21 over eighteen can qualify as a dependent for purposes of
22 the earned income tax credit?
23 A  Yes.  If they are a student or if they are
24 disabled.
25 Q  And do you know if there's an age limit on being a

Page 88

1  student and being claimed as a dependent?
2  A  Yes, it is twenty-four.
3  Q  Okay.  Is there an age limit for being permanently
4  and totally disabled, your child being permanently and
5  totally disabled and being able to claim that child for
6  the earned income tax credit?
7  A  No, there is not.
8  Q  Now going back to exhibit two A, the tax return, I
9  believe you testified before that the W two that's being
10 attached is based on the information that was
11 electronically put in by the preparer?
12 A  That is correct.
13 Q  All right.  Now on the W two there is in box B on
14 the upper left an Employee Identification Number.  Do
15 you see that?
16 A  I do.
17 Q  What is an Employee Identification Number?
18 A  An Employee Identification Number is a number that
19 is issued by Internal Revenue Service for businesses and
20 corporations.
21 Q  And how does -- back in nineteen ninety-seven,
22 back in nineteen ninety-seven how did one -- or how did
23 a business that wanted an Employer Identification Number
24 get one?
25 A  They would complete a form S S four and they would

Page 89

1  mail in.  Then they would be issued an Employer
2  Identification Number.
3  Q  And what kind of record does the I. R. S. maintain
4  with respect to -- What did you call the form?
5  A  The form S S four.
6  Q  Yes.  Does the I. R. S. keep the paper S S four?
7  A  After six months, no.
8  Q  Does the I. R. S. keep an electronic record of the
9  S S four?
10 A  Yes, we do, on our master file.
11 Q  And, again, is it possible for the I. R. S. to
12 access and print the electronically stored information
13 relating to the S S four?
14 A  Yes, we are.
15    MR. SCHIFF:  May I approach the witness?
16    THE COURT:  Yes.
17 Q  Showing the witness what has been marked as
18 Government's exhibit one I.  Can you identify that
19 document?
20 A  Yes.  This is a printout of the command code I N O
21 L E S that gives the entity information for C. J. B. Ice
22 Cream Company, lists the name, the address, the city and
23 state.  Tells us the location of the company.  Gives us
24 that they're a fiscal year filer with a month ending of
25 December.  Tells us the establishment year.

Page 90

1    It also tells us based on their S S four what
2 type of forms they indicated they would be filing with
3 Internal Revenue Service.
4 Q  And is that a printout of the computer record
5 pursuant to the process you just described?
6 A  That is correct.
7 Q  Now what is the second page of Government's exhibit
8 one I?
9 A  The second page is from the master file command
10 code B M F O L I.  And it shows whether we have tax
11 returns that have been filed based on this particular
12 business's Employer Identification Number.
13 Q  And what type of tax returns would show up in that
14 field if they had been filed?
15 A  There would be form nine forty-ones.  If they were
16 issuing W two's for employee there would be nine
17 forties.  Also associated with employees, there could be
18 ten sixty-fives which are partnerships returns, or form
19 eleven twenties that are corporate returns.
20 Q  Let's talk about form nine forty-one for a minute.
21 A  Okay.
22 Q  What is a form nine forty-one?
23 A  When you have employees in which withholding has
24 been withheld from their wages, then in turn those
25 monies are sent to Internal Revenue Service.

Page 91

1 Q  And are there any form nine forty-ones -- Does the
2 second page of the document indicate any form nine
3 forty-ones filed by C. J. B. Ice cream?
4 A  No, it does not.
5 Q  Let's go to the third page.  What is the third page
6 of Government's exhibit one I?
7 A  The third page is a printout from the master file
8 with command code B M F O L I.  This one is dated June
9 ninth of two thousand four.  I should preface the second
10 page is a printout dated October twenty-sixth of two
11 thousand.  This shows that we have information for forms
12 ten sixty-five based on particular periods, but there
13 are no tax returns that have been filed.
14 Q  Okay.  Any form nine forty-ones?
15 A  No, there are not.
16 Q  So we could conclude from that that no wages were
17 withheld and paid over to the I. R. S. by C. J. B. Ice
18 Cream?
19 A  Based on this, that's correct.
20 Q  When I say "no wages," that is for withholding.
21 A  That is correct.
22    MR. SCHIFF:  The Government would move the
23 admission of Government's exhibit one I.
24    THE COURT:  Admitted.
25 Q  And, again, on the first page of one I, is that

Page 92

1 information about C. J. B. Ice Cream Company, is that
2 extracted from the original application form?
3 A  Yes, it is.
4 Q  Now can you tell the jury what a reject code is?
5 A  During the process of electronic returns there are
6 reject codes.  If there is a math error or information
7 that does not match, that tax return will be rejected
8 back to the preparer before it is accepted with the
9 Internal Revenue Service.
10 Q  And if a dependent has already been used on a tax
11 return filed that year, will that result in a rejection?
12 A  Yes, it will.
13 Q  If someone is listed as a -- If a dependent is
14 listed as being over the age of eighteen and either the
15 student or the permanently disabled box is not checked,
16 would that result in rejection?
17 A  Yes, it will.
18    MR. SCHIFF:  Nothing further on direct.
19           CROSS EXAMINATION
20    BY MR. BRUNER OF DEBRA BARHAM:
21 Q  Ma'am, I'm Ben Bruner.  I represent Matthew Okonkwo
22 in this case.  I just have a couple of questions.
23    On the electronic filing where there are loans
24 given, can you trace for me who actually cuts the check
25 and where that check goes?

Page 93

1 A  Based on the routing transit number we can identify
2 which bank issued that refund anticipation loan, but
3 then we would have to go back to the preparer or to the
4 bank to see the hard copy of the check.
5 Q  And who would that check, the loan check be made
6 payable to?
7 A  It should be made to the taxpayer.
8 Q  Would it ever be made payable to the preparer?
9 A  Should not be.
10 Q  Are there any regulations on that?
11 A  I believe in publication thirteen forty-five and
12 thirteen forty-six it does outline whether paid
13 preparers can have checks.  And to my knowledge they
14 cannot have checks issued in their name.
15 Q  Thank you.
16    MR. SCHIFF:  No redirect.
17    THE COURT:  Thank you.
18    (Whereupon the witness, Debra Barham, stepped
19 down from the stand.)
20    THE COURT:  Who is your next witness?
21    MR. SCHIFF:  Mr. Wilson.
22       B R I A N   W I L S O N,
23 the witness herein, having first been duly sworn or
24 affirmed to tell the truth, was examined and testified
25 as follows:

Page 94

1          DIRECT EXAMINATION
2    BY MR. SCHIFF OF BRIAN WILSON:
3  Q  Could you state your name, please.
4  A  Brian Wilson.
5  Q  And, Mr. Wilson, how are you currently employed?
6  A  I'm employed by H. S. B. C. Taxpayer Financial
7  Services.
8  Q  And where are you based?
9  A  Out of Delaware.  New Castle, Delaware.
10  Q  Try to speak into the mic, please.
11  A  Sorry.
12  Q  Did you say New Castle, Delaware?
13  A  Correct.
14  Q  And H. S. B. C. Taxpayer Financial Services, has
15  that entity been -- or that business been known as other
16  names in the past?
17  A  Correct.  Under Beneficial and also under
18  Household.
19  Q  How is the business known back in -- for the tax
20  year nineteen ninety-nine?
21  A  Household.
22  Q  And how long have you worked for this business
23  under whatever name?
24  A  Approximately sixteen years.
25  Q  And what's your title and what are your duties?

Page 95

1  A  I'm the customer service manager for Taxpayer
2  Financial Services.
3  Q  And who are the customers that you assist?
4  A  The taxpayers who apply for refund anticipation
5  loans.
6  Q  And are you familiar with Household's refund
7  participation loan program as it existed for the tax
8  year nineteen ninety-nine?
9  A  Yes.
10  Q  Can you tell the jury how it worked?
11  A  What would happen is a customer would go into a tax
12  preparer's office who is processing these refund
13  participation loans.  The taxpayer preparer would fill
14  out the tax return.  Also the customer would sign an
15  application disclosure.
16        The information would be transmitted
17  electronically via the tax preparer's software to the I.
18  R. S., and to Household at the time.  The household
19  system would decision a loan, make a loan decision on
20  certain screening criteria and then we would issue an
21  authorization back to the tax preparer through the
22  software again to print the check.
23  Q  How much time typically passes between the time
24  that the return is electronically filed and the time
25  that household will authorize the preparer to cut a loan

Page 96

1  check?
2  A  Typically about twenty-four hours.
3  Q  But not right on the spot?
4  A  Not right on the spot, no.
5  Q  Why not right on the spot?
6  A  Well we have to get an I. R. S. acknowledgement.
7  What happens is the tax preparer sends it to the
8  software company, who sends it to the I. R. S.  Once
9  they receive an acknowledgement from the I. R. S., then
10  it's in turn sent to household.
11  Q  So you want to make sure that the I. R. S. is
12  actually going to issue the refund.
13  A  Correct.
14  Q  Now was it the regular practice of Household to
15  retain a copy of the rapid refund checks after they
16  cleared the banking system?
17  A  Yes, it is.
18  Q  And in the ordinary course of business, is it
19  possible to retrieve copies of those refund checks?
20  A  Yes, it is.
21  Q  And for checks issued in early two thousand for the
22  tax year nineteen ninety-nine, in what form are those
23  check copies kept?
24  A  We keep -- Originals are kept off-site in Iron
25  Mountain, and we also have images of them.  Iron

Page 97

1  Mountain is a storage facility.
2  Q  And in addition to the originals?
3  A  In addition to the originals we have images which
4  are basically a copy of all of the checks.
5  Q  Are those kept on microfilm?
6  A  Correct.
7     MR. SCHIFF:  May I approach the witness?
8     THE COURT:  Yes.
9  Q  Showing the witness Government's exhibits two B,
10  three B, four B, five B, six B, seven B, eight B, nine
11  B, ten B, eleven B and twelve B.  Now during the
12  investigation of this matter, was Household asked to
13  locate certain refund anticipation loan checks that were
14  issued back in two thousand for the tax year nineteen
15  ninety-nine?
16  A  Yes, we were.
17  Q  And have you had a chance before coming to court to
18  review the exhibits that are in front of you now?
19  A  Yes, I have.
20  Q  And are the last two pages of each of those
21  exhibits copies of the checks that were issued by
22  Household?
23  A  Yes, they are.
24  Q  Okay.  And prior to each check, Household attached
25  certain additional documents.  Can you describe what

Multi-Page

Page 98

1 these documents are?
2 A  These are the printouts of the information
3 contained in our system.
4 Q  In your computer system?
5 A  Correct.
6 Q  And was it the regular practice of Household to
7 prepare and maintain documents of this type?
8 A  Yes, we do.
9 Q  And are the computer entries on those documents
10 transmitted by a person with knowledge of the
11 information?
12 A  Yes, they are.
13 Q  And are the documents, again the documents stapled
14 to the checks, prepared pursuant to this computerized
15 process?
16 A  Yes, they were.
17    MR. SCHIFF:  The Government would move the
18 admission of exhibits two B, three B, four B, five B,
19 six B, seven B, eight B, nine B, ten B and eleven B.
20    THE COURT:  Admitted.
21    MR. SCHIFF:  And if I didn't already, I would
22 also move the admission of twelve B.
23    THE COURT:  Admitted, too.
24 Q  Now one of the checks turned out to be illegible,
25 is that correct?

Page 99

1 A  Correct.
2 Q  Is that the Martha Green check?
3 A  Yes, it was.
4 Q  Did you make any efforts -- You said you kept a
5 microfilm copy and the original.  Why did the microfilm
6 copy come out to be illegible?
7 A  The microfilm copy, it appears to be an image of a
8 document that was lost in transit.  What happens is they
9 send a photo in lieu, which indicates that they lost the
10 original check or it was either stolen in transit so
11 they no longer have the physical check.  So they make a
12 copy of it and they send it through for us to clear.
13 Q  And did you -- did Household attempt to locate the
14 original of the check in storage?
15 A  Yes, we did.  We pulled the Iron Mountain box and
16 that check was not listed.
17 Q  And Iron Mountain is a storage company?
18 A  That's a storage facility.
19 Q  Now looking at the -- Do the documents stapled to
20 eleven, to the check, allow you to identify the amount
21 of the check?
22 A  Yes, they do.
23 Q  Okay.  And can you -- Well, where should I point to
24 show the jury the amount?
25 A  The "check approved" amount.

Page 100

1 Q  Okay, right here?
2 A  Right underneath the "check number."
3 Q  That's the amount of the check that Household
4 issued?
5 A  That's correct.
6 Q  Okay.  And "check issue date," is that
7 self-explanatory?
8 A  Yes, it is.
9 Q  What does "check cleared" referred to?
10 A  That's the date that we cleared the check.
11 Q  That it cleared through the banking system?
12 A  That it cleared through the bank, correct.
13 Q  Now, can you tell who the check was payable to?
14 A  Yes, the name Martha A. Green.
15 Q  Now what is an E. F. I. N. number?
16 A  The E. F. I. N. number is an Electronic Filer's
17 Identification Number which is issued by the I. R. S.
18 Q  And is that one of the -- Is that a field in your
19 computer system?
20 A  Yes, it is.
21 Q  And do the documents that were attached to these
22 checks show the E. F. I. N. number?
23 A  Yes, they do.
24 Q  Okay.  And by way of example, on eleven, where
25 would we find- -- What should I point to?

Page 101

1 A  Right in the middle there, "E. F. I. N."
2 Q  On each one of the documents you've looked at there
3 would be a listing for the E. F. I. N. number?
4 A  Correct.
5 Q  Okay.  And then to know what business was
6 associated with that E. F. I. N. number, you'd have to
7 look at some other record?
8 A  Correct.
9    MR. SCHIFF:  That's all I have on direct.
10    THE COURT:  Okay.
11    MR. BRUNER:  I have no questions for this
12 witness, Your Honor.
13    MR. SCHIFF:  I have no redirect.
14    THE COURT:  You may step down.
15    (Whereupon the witness, Brian Wilson, stepped
16 down from the stand.)
17    THE COURT:  Next witness.
18    MR. SCHIFF:  The Government calls Louie
19 Wilson.
20    THE COURT:  How are we progressing with your
21 case?
22    MR. SCHIFF:  Fairly well.  Mr. Wilson will be
23 quite short, and I'd prefer, if possible, to break at
24 the end of his testimony.
25    THE COURT:  Will we finish with your evidence

## Page 102

1 tomorrow?
2    MR. SCHIFF: Oh, yes, if we go at the same
3 speed as today.
4    L O U I E   W I L S O N,
5 the witness herein, having first been duly sworn or
6 affirmed to tell the truth, was examined and testified
7 as follows:
8         DIRECT EXAMINATION
9         BY MR. SCHIFF OF LOUIE WILSON:
10 Q  Could you state your name, please.
11 A  Louie Wilson.
12 Q  How are you employed?
13 A  I'm employed as a special agent with the Internal
14 Revenue Service, Criminal Investigation Division
15 stationed here in Montgomery.
16 Q  So you work with Mr. Ellis?
17 A  Yes, sir.
18 Q  And how long have you been a special agent with the
19 I. R. S.?
20 A  I have been a special agent since nineteen
21 ninety-one.
22 Q  Now did you have occasion to interview the
23 defendant on April thirteenth, two thousand and six?
24 A  Yes, sir, I did.
25 Q  What were the circumstances of the interview?

## Page 103

1 A  I interviewed Mr. Okonkwo incident his arrest.
2 Q  And who else was present?
3 A  It was myself, Special Agent J. D. Martin and
4 Special Agent Quantina Jordon.
5 Q  Where did the questioning take place?
6 A  One oh six Belton Drive from Dothan, Alabama, which
7 was Mr. Okonkwo's place of residence.
8 Q  Now prior to beginning to question Mr. Okonkwo, did
9 any of the agents make any statements to him?
10 A  Yes.  Special Agent Martin advised him of his
11 Miranda rights by reading them from a card.
12 Q  Now did you ask Mr. Okonkwo any questions about
13 Jonathan Adewunmi?
14 A  I did.
15 Q  And when you asked Mr. Okonkwo about Jonathan
16 Adewunmi did you use Mr. Adewunmi's -- did you use the
17 first and last name of Mr. Adewunmi?
18 A  Yes, sir, I did.  I asked about Jonathan Adewunmi.
19 Q  And what was Mr. Okonkwo's -- Well what did you ask
20 him and what was his response?
21 A  I asked him if he knew of Mr. Adewunmi's current
22 whereabouts.  He stated that he had seen Mr. Adewunmi
23 approximately one week prior to the date of the arrest.
24 And at that time he had seen Mr. Adewunmi driving an ice
25 cream truck in the Rolling Hills section of Dothan,

## Page 104

1 Alabama.
2 Q  And did Mr. Okonkwo say anything about where Mr.
3 Adewunmi was living?
4 A  He did not know where Mr. Adewunmi was living at
5 that point.  He told me that he believed that Mr.
6 Adewunmi and his wife, Beatrice, had recently split.  I
7 don't know if it was divorced, but split up.  And he did
8 not know exactly where Mr. Adewunmi was living at that
9 time.
10    MR. SCHIFF: Nothing further on direct.
11    THE COURT: Cross?
12    MR. BRUNER: No questions for this witness,
13 Your Honor.
14    THE COURT: You may step down.
15    (Whereupon the witness, Louie Wilson, stepped
16 down from the stand.)
17    THE COURT: You should still have more
18 witnesses for us.  We still have half an hour to go.
19    MR. SCHIFF: I could call the case agent.  My
20 preface was to leave him until --
21    THE COURT: Why?  I want to finish this case
22 tomorrow, if possible.
23    MR. SCHIFF: Then I will call Larry Ellis.
24    THE COURT: We'll go 'til five and see if we
25 can finish it tomorrow.

## Page 105

1    L A R R I S   E L L I S,
2 the witness herein, having first been duly sworn or
3 affirmed to tell the truth, was examined and testified
4 as follows:
5         DIRECT EXAMINATION
6         BY MR. SCHIFF OF LARRY ELLIS:
7 Q  State your name, please.
8 A  Larry Ellis.
9 Q  And how are you employed today?
10 A  Today's my last day.  Today I'm employed as a
11 special agent with the Internal Revenue Service,
12 Criminal Investigation Division.
13 Q  You'll be ending your association with them today?
14 A  Mandatory retirement.
15 Q  How long have you been an I. R. S. special agent?
16 A  Since nineteen eighty-four.
17 Q  Now you are the primary agent working on this case?
18 A  Yes, I am.
19 Q  Can you describe the investigative step that you
20 took back on September twenty of two thousand?
21 A  That would be the day that we were doing some
22 surveillance in the Dothan area, and we did some
23 surveillance on an address Twelve oh eight Summitt
24 Street.  At that time we identified an ice cream -- what
25 we believed to be an ice cream truck, orange in color

Page 106

1  backed into a driveway and that a blue small sedan with
2  Florida license plate.
3  Q  Were you able to see the license plate on the ice
4  cream truck?
5  A  No, we weren't. It was backed in.
6  Q  Were you able to see the license plate on the blue
7  sedan?
8  A  Yes, I was.
9  Q  What state was it from?
10  A  Florida.
11  Q  As you were sitting there, did you make any effort
12  to ascertain who the sedan was registered to?
13  A  Yes. We were able to, through telephone contact,
14  determine that it was a vehicle registered to Jonathan
15  Adewunmi with an address of Two twelve Hickory Street,
16  Fort Walton Beach, Florida.
17  Q  Did you follow -- And what agency did you contact
18  to get that information?
19  A  Florida Department of Law Enforcement.
20  Q  And did you follow up with the Florida Department
21  of Highway Safety to obtain driver's license
22  information?
23  A  Yes, we did. We requested a driver's license.
24  Q  And I'll show you Government's exhibit one J
25  already in evidence.

Page 107

1  A  It is hard to see up here. But that is the copy of
2  the driver's license that we obtained.
3  Q  Okay. That's the Florida driver's license
4  information?
5  A  Correct. Jonathan Balagon Adewunmi, address Two
6  twelve Hickory Street, Fort Walton Beach, Florida.
7  Q  Now did there come a point on May fourteenth of two
8  thousand and one when you obtained a search warrant from
9  a federal magistrate here in Montgomery?
10  A  Yes, I did. Judge Walker.
11  Q  And what was the location to be searched?
12  A  Fifteen eighty-eight Montgomery Highway, Dothan,
13  Alabama. The business was Eagle Financial Services.
14  Q  And when did you execute the warrant that you got?
15  A  I picked the warrant up that morning here in
16  Montgomery, then drove to Dothan and we started
17  around probably eleven a.m.
18  Q  And when you got to Fifteen eighty-eight Montgomery
19  Highway in Dothan, what's there?
20  A  It was a one story small brown brick building with
21  identifying sign, "Eagle Financial Services" above the
22  door.
23  Q  When you went inside, who was there?
24  A  We were greeted by Matthew Okonkwo.
25  Q  Was there anybody else present?

Page 108

1  A  I believe there was a customer present at that
2  time. We might have identified the customer but I don't
3  remember the name.
4  Q  Did Mr. Okonkwo appear to be in charge of the place
5  of business?
6  A  Yes, he was the only person there other than the
7  customer.
8  Q  Did he have an office within that space?
9  A  Did he have an office?
10  Q  Yes.
11  A  Yes.
12  Q  And did you have a chance to interview Mr. Okonkwo?
13  A  Yes, we did, through myself and Agent Wilson.
14  Q  Did you make any statements to Mr. Okonkwo before
15  interviewing him?
16  A  It's I. R. S. policy that we read a non-custodial
17  rights. It's just like it sounds, just like a Miranda
18  washing but it doesn't refer to a Court-appointed
19  attorney. The same facts.
20  Q  So that's the warning you give when the person is
21  not under arrest?
22  A  Correct, a non-custodial arrest.
23  Q  Now during the interview did Mr. Okonkwo make a
24  statement about his relationship to Eagle Financial?
25  A  He said he was the president of Eagle Financial

Page 109

1  Services which is, I believe he mentioned, part of Eagle
2  International Group. And he said he had been so, seven
3  to eight years he had been in that business.
4  Q  Did he describe what the business of Eagle was?
5  A  He said it was a tax preparation business, Eagle
6  Financial.
7  Q  Did he make any statements regarding any other
8  entities he was involved with?
9  A  He mentioned he was also doing business as Rainbow
10  Tax Service.
11  Q  Did he say anything else about Rainbow Tax Service?
12  A  He mentioned that the E. F. I. N., which is the
13  Electronic Filing Identification Number, was in the name
14  of Yvette Thomas, an employee. But he also did business
15  as Rainbow Tax Service.
16  Q  Did Mr. Okonkwo say anything about how he learned
17  to become a tax preparer?
18  A  He said that he had attended our seminars that we
19  put on. The I. R. S. puts on throughout the country, as
20  well as taking business -- accounting and business
21  courses.
22  Q  Did Mr. Okonkwo describe the services that his
23  business provided?
24  A  He said that he prepared paper tax returns,
25  electronic tax returns. He offered refund anticipation

Multi-Page

Page 110

1 loans through Household Bank, probably five years during
2 that time period.
3 Q  Did he discuss who at his business electronically
4 transmitted the returns?
5 A  He said that he was the electronic transmitter in I
6 believe ninety-nine.  Then he mentioned that he and Kim
7 Starling were transmitters in the tax year two thousand.
8 Q  Okay.  When you said "ninety-nine" --
9 A  I meant -- There's the ninety-nine tax return which
10 is prepared and filed in two thousand, so he said that
11 he was the transmitter that year.  And then he and Kim
12 were the transmitter for the two thousand year tax
13 returns, which would have been in two thousand one.
14 Q  Now did Mr. Okonkwo say how many returns -- or did
15 he estimate how many returns Eagle had prepared for the
16 tax year nineteen ninety-nine?
17 A  Nine hundred plus.  Probably similar to around a
18 thousand, I believe.
19 Q  Did he discuss where Eagle did its banking?
20 A  I asked that question, and he said Eagle banks with
21 Regions Bank in Dothan.
22 Q  Now did you seize any records during the search?
23 A  Yes, we did.
24 Q  And in terms of the tax returns, what records did
25 you take?

Page 111

1 A  We took customer files that probably included tax
2 returns and identifying information that were in
3 folders.  We also took the computers which we -- our
4 computer people, I'm trying to think of the word for it,
5 interfaced, or --
6 Q  Imaged?
7 A  Imaged.  That's it.  You're right.  And those were
8 returned at a later date.
9 Q  Returned to Mr. Okonkwo?
10 A  Returned to his office, yes, to him.
11 Q  Now did you leave any customer files behind in his
12 office?
13 A  No, we did not.  We took all the paper.
14 Q  And after the search -- Where did you take the
15 files after the search?
16 A  We returned them to my office here in Montgomery,
17 Alabama.
18 Q  And after the search, did you have a chance to do a
19 review of the files that you had seized?
20 A  Yes, I did.
21 Q  And did you locate customer files for the tax year
22 nineteen ninety-nine?
23 A  Yes, hundreds of them.
24 Q  And did you look specifically for the taxpayers,
25 I'm not going to name them all, but Cynthia Dozer,

Page 112

1 Martha Green, Miss Fountain?
2 A  The ones that are in question, yes, I did.
3 Q  You looked for those?  Did you find any of those?
4 A  I didn't find any of those.
5     MR. SCHIFF:  Nothing further on direct.
6          CROSS EXAMINATION
7       BY MR. BRUNER OF LARRY ELLIS:
8 Q  Mr. Ellis, congratulations on your retirement.
9 A  Thank you.
10 Q  I just have a few questions.  First of all, what is
11 an E. F. I. N. transmitter?
12 A  An E. F. I. N. transmitter?
13 Q  You indicated someone was the E. F. I. N. operator,
14 transmitter.
15 A  The person that actually works the keyboard or
16 whatever transmits a return.
17 Q  What does it take to be able to do that?
18 A  What does it take?  I'm not sure what -- I mean
19 you've got a link -- computer with a link to I. R. S.
20 electronically.
21 Q  And you indicated that you asked Mr. Okonkwo who
22 was the transmitter?  Am I using the right term?
23 A  Yes, sir, we did in particular because that would
24 be the person that would be operating and transmitting
25 the returns.  And I believe he told us -- no, his

Page 113

1 testimony was -- excuse me, he did not tell us that he
2 did it daily.  One of the other witnesses, I believe,
3 told us that.
4 Q  Okay.  But is there anything -- I assume you have
5 to have a password, or a log-in code?
6 A  I assume you have to have the P. I. N. numbers.
7 The E. F. I. N. number and P. I. N. numbers, and I'm not
8 familiar with that.
9 Q  So as far as you know anyone with a password can
10 operate the keyboard, is that fair?
11 A  It has to be a particular password which is used
12 with that E. F. I. N. number to transmit to us.
13 Q  If that information is available, anyone can get on
14 a computer and transfer that information, isn't it?
15 A  Yes, sir, if they're computer savvy.  I don't know.
16 Q  Okay.  And that's -- Do y'all teach courses on
17 that?
18 A  On computer operation?
19 Q  Yes, sir.  If I wanted to become an electronic
20 filer, does I. R. S. teach a course on how to do that?
21 A  I don't know, sir.  I don't know.
22 Q  But there are courses available, I'm sure, aren't
23 there?
24 A  I know H & R Block does their own training.  I'm
25 familiar with them because I've dealt with them.  And

Page 114

1 they probably teach their people to operate. I've
2 attended some of our training, but I don't remember that
3 being discussed.
4 Q  Okay.  And you had indicated when you were down
5 there looking for the individual I call Jonathan, that
6 basically you were staking his house out, is that pretty
7 much --
8 A  We were in the area of the investigation.  We did
9 surveillance.  We drove by and the vehicles as I
10 described were there.
11 Q  And what triggered that investigation of Jonathan?
12 A  It was part of this investigation.  We had
13 information from our service center in Memphis, our
14 questionable refund document team, and they sent the
15 work to the field, to us.
16 Q  And that relates -- Correct me if I'm wrong, but
17 does that, you've heard the other woman's testimony here
18 about when she was looking at those documents and you
19 could tell if you had made withholdings for employees on
20 one page, and then on the other page it showed the W
21 twos that was issued throughout, and if that didn't
22 match it, it caused a problem, right?
23 A  I'm not sure.  Which witness are you talking about?
24 Q  Barham?
25 A  Okay, Ms. Barham.  And what was the question?

Page 115

1 Q  She had indicated that regarding Jonathan's Ice
2 Cream Company, on I believe page two, that he had an E.
3 I. N. but he didn't have any withholdings for any of his
4 employees.  Do you recall that?
5 A  You're talking about the nine forty-one.
6 Q  Correct.
7 A  Correct.  There were none reported to the I. R. S.
8 Q  But if it showed on the next page that W twos were
9 issued, that would cause a conflict, correct?
10 A  The nine forty-one is -- the nine forty is the
11 employment tax information.
12 Q  Right.
13 A  I mean that's where the information, we get I
14 believe transmitted electronically most of the time.
15 But we don't probably get an exact copy of a W two.  We
16 get that information off of a nine forty or nine
17 forty-one.
18 Q  I guess my question was, was the comparison or was
19 the receipt of those documents what caused that
20 investigation, this ice cream company?
21 A  You're talking about the lack of W twos?
22 Q  Correct?
23 A  No, sir, it was not.
24 Q  Not the lack of W twos, the actual fact that W twos
25 were issued and there were no withholdings.

Page 116

1 A  There were W twos associated with returns, and our
2 service center attempted to verify those W twos.
3 Q  Right.  Thank you.  You've done a much better job
4 explaining it than I could.
5 A  Okay.
6 Q  But that's so you started this investigation
7 investigating this ice cream company that had problems
8 with some W twos?
9 A  No, sir.  My investigation did not start there.  I
10 was investigating Eagle Financial Services prior to
11 that.
12 Q  Okay.  And but at some point you caused to be in
13 Dothan and you staked out Jonathan?
14 A  It was part of the investigation, yes, sir.
15 Q  Okay.  And what year was that?
16 A  Two thousand.  Fall of two thousand.  September of
17 two thousand, I believe.
18 Q  Okay.
19     MR. BRUNER:  Those are all my questions, Your
20 Honor.
21     THE COURT:  Redirect?
22     MR. SCHIFF:  Briefly.
23         REDIRECT EXAMINATION
24     BY MR. SCHIFF OF LARRY ELLIS:
25 Q  Mr. Ellis, you were asked what caused your office

Page 117

1 in Memphis to open up an investigation.  What in fact
2 did cause them to open up the investigation?
3 A  In fact, it was due to certain patterns that were
4 determined from returns being filed by Eagle Financial
5 Services.  A hundred percent, almost a hundred percent
6 refunds.  A very high percentage of earned income credit
7 returns.
8     There were returns with high schedule A
9 amounts in comparison to income.  Returns with schedule
10 Cs added to minimal income returns.  And all these of
11 course were the majority of them were earned income
12 credit returns.
13 Q  Nothing further on redirect.
14     THE COURT:  Thank you.
15     (Whereupon the witness, Larry Ellis, stepped
16 down from the stand.)
17     THE COURT:  Next witness.
18     MR. SCHIFF:  My next group of witnesses are
19 all coming up from Dothan.
20     THE COURT:  We'll start back, then, at nine
21 o'clock tomorrow.  Members of the jury, if you would be
22 here by no later than eight forty-five.  Meet in the
23 jury room in the other building and they will bring you
24 over here and then we'll start at nine.
25     Now you say you'll finish your case tomorrow

Page 118

1 morning?

2     MR. SCHIFF: Absolutely, yes.

3     THE COURT: Do you all see any reason why we

4 couldn't finish this case tomorrow?

5     MR. BRUNER: No, sir. Not at the pace we're

6 moving.

7     THE COURT: Very good.

8     You're not to discuss the case among

9 yourselves or with anyone else, and you should have no

10 contact with the attorneys or parties involved.

11     Leave your notes in your chairs. Don't forget

12 to turn them over. The clerk will take them up and then

13 return your notepads in the morning.

14     Thank you. I'll see you back here at eight

15 forty-five.

16     (Whereupon, the jury was escort the out of the

17 courtroom.)

18     THE COURT: Counsel, I ask that you be here at

19 least ten minutes early so we can start promptly at

20 nine.

21     (Whereupon, the proceedings were concluded.)

22

23

24     * * * * * * * * * *

25

---

Page 119

1

2     COURT REPORTER'S CERTIFICATE

3

4     I certify that the foregoing is a correct

5 transcript from the record of proceedings in the

6 above-entitled matter as prepared by me to the best of

7 my ability.

8

9     I further certify that I am not related to any

10 of the parties hereto, nor their counsel, and I have no

11 interest in the outcome of said cause.

12

13     Dated this 11th day of March 2007.

14

15     /s/ Mitchell P. Reisner

    MITCHELL P. REISNER, CM, CRR,

16     Official US Dist. Court Reporter

    Registered Professional Reporter

17     Certified Real-Time Reporter

18

19

20

21

22

23

24

25

---

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA

THE UNITED STATES
OF AMERICA

vs.                                    CRIMINAL ACTION NO.
                                       1:06-CR-101-MHT
MATTHEW OKONKWO

VOLUME II OF II
2nd DAY OF:
JURY TRIAL PROCEEDINGS

\* \* \* \* \* \* \* \* \* \*

BEFORE:          The Hon. Myron H. Thompson

HEARD AT:        Montgomery, Alabama

HEARD ON:        November 1, 2006

APPEARANCES:     Andrew O. Schiff, Esq.
                 Ben E. Bruner, Esq.

**Page 2**

T A B L E   O F   C O N T E N T S

ITEM DESCRIPTION                                    PAGE NO.

Title Page ....................................... 1

Table of Contents ............................ 2

Preliminary Discussion ....................... 4

James Harris - Direct Examination
    by Mr. Schiff ............................. 4

James Baris - Cross Examination
    by Mr. Bruner ............................ 9

Charlotte Green - Direct Examination
    by Mr. Schiff ............................ 10

Charlotte Green - Cross Examination
    by Mr. Bruner ............................ 15

Tawanna Campbell - Direct Examination
    by Mr. Schiff ............................ 17

Tawanna Campbel - Cross Examination
    by Mr. Bruner ............................ 23

Kim Starling - Direct Examination
    by Mr. Schiff ............................ 25

Kim Starling - Cross Examination
    by Mr. Bruner ............................ 31

Cynthia Dozer - Direct Examination
    by Mr. Schiff ............................ 35

Tia Doyle - Direct Examination
    by Mr. Schiff ............................ 40

Tia Doyle - Cross Examination
    by Mr. Bruner ............................ 47

Government Rests; Motion for Judgment
    as a Matter of Law in Open Court
    (The Jury is not Present) ................ 50

**Page 3**

# T A B L E   O F   C O N T E N T S

ITEM DESCRIPTION                    PAGE NO.

Closing Arguments
    by Mr. Schiff .................. 65

Closing Arguments
    by Mr. Bruner .................. 79

Rebuttal Closing Arguments
    by Mr. Schiff .................. 89

Jury Charge
    by the Court ................... 91

Verdict of the Jury ............... 111

Court Reporter's Certification ..... 116

-o0o-

**Page 4**

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
1 THE HON. MYRON H. THOMPSON ON NOVEMBER 1, 2007 AT THE

2 UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4          PRELIMINARY DISCUSSION:

5          THE COURT: The clerk will swear in these

6 witnesses.

7          (Whereupon, all prospective witnesses

8 currently present were duly sworn by the courtroom

9 deputy clerk.)

10          THE COURT: You may go to the witness room.

11          J A M E S   H A R R I S,

12 the witness herein, having first been duly sworn or

13 affirmed to tell the truth, was examined and testified

14 as follows:

15          DIRECT EXAMINATION

16          BY MR. SCHIFF OF JAMES HARRIS:

17          THE COURT: Proceed.

18          MR. SCHIFF: Thank you. Good morning.

19 Q    Could you state your name, please.

20 A    James L. Harris.

21 Q    And, Mr. Harris, where do you currently reside?

22 A    I live I live at One forty-five Kinsey, Alabama.

23 Wait. One forty-five Silverado, Kensey, Alabama.

24 Q    And, sir, where did you live back in nineteen

25 ninety-nine and two thousand?

**Page 5**

1 A    I lived in Corpus Cove, Texas. I don't know

2 exactly what address, but I live in Corpus Cove, Texas.

3 Q    Corpus Christie?

4 A    Corpus Cove, Texas.

5 Q    Did you return to the Dothan area after that?

6 A    Yes. I returned to the Dothan area in two

7 thousand.

8 Q    And --

9 A    But I was back and forth at one thirteen and Amby

10 Lane.

11 Q    Sometime in the beginning of two thousand did you

12 speak to anyone about doing your tax return for the

13 prior year, nineteen ninety-nine?

14 A    Yes, sir, to John. A guy named John.

15 Q    Okay. How did you get yourself to John?

16 A    I had met him once before at a place called Eagle

17 Finance. You know, that's how I met him before, at

18 Eagle Finance.

19 Q    And you had used Eagle Finance in a prior year?

20 A    Yeah. I think like it was earlier years. I dun

21 forgot exactly what years, but I had used them before.

22 Q    Okay. And do you know John's last name?

23 A    Still don't. No, sir.

24 Q    Okay. Did you meet with John in person?

25 A    Yeah, I met with him in person.

Page 6

1  Q  And what information did you give him so that he
2  could do your tax return?
3  A  I just told him -- I gave him a ten ninety-nine
4  form, and I gave him papers I had because I was back and
5  forth from Dothan, and, you know, and I had worked for
6  Herndon Electric like I still work for now.
7  Q  And how did you deliver your paperwork to John?
8  A  I dropped them off in an ice cream truck.
9  Q  Who told you to take the papers to an ice cream
10  truck?
11  A  John did.
12  Q  Sir, I'm going to put on the screen, and if you
13  could look at the screen in front of you, a document
14  that's been marked as Government's exhibit seven A and
15  ask if you could make out the Social Security number on
16  the upper right.  Don't read it into the record, but
17  just -- Do you see that number?
18  A  Social Security number?
19  Q  Yes.  Is that your Social Security number?
20  A  Yes, sir.
21  Q  And going to the middle of the page under
22  "dependents" it lists a daughter by the name of Candice
23  Wilson and a foster child by the name of Laura Smith.
24  A  Neither.
25  Q  Let me get a question out.

Page 7

1  A  Oh, I'm sorry.
2  Q  Did you have a daughter named Candice Wilson or a
3  foster child named Laura Smith?
4  A  No, sir.
5  Q  Did you tell John that you had a daughter named
6  Candice Wilson or foster child named Laura Smith?
7  A  No, sir.
8  Q  A W-two form from Herndon Electric, is that the
9  company you mentioned before?
10  A  Yes, sir, that's the company.
11  Q  Okay.  So this represents a real job that you had?
12  A  Right.
13  Q  There's another W-two form attached in the name of
14  C. J. B. Ice Cream Company.  Did you work for C. J. B.
15  Ice Cream Company?
16  A  No.
17  Q  Did you give John a W-two showing that you worked
18  for C. J. B. Ice Cream Company?
19  A  No, sir.
20  Q  Did you tell John that you worked for C. J. B. Ice
21  Cream Company?
22  A  No, sir.
23  Q  Now, sir, did you know that a tax return seeking a
24  refund of four thousand five hundred and nine dollars
25  was being filed in your name?

Page 8

1  A  No, sir, I did not.
2  Q  Okay.  Now did you get any refund that year?
3  A  No, because I was told I was broke even and that I
4  wouldn't get anything back.  He told me not to worry
5  about it.  So that's what I done, I didn't worry about
6  it.
7  Q  Who told you that?
8  A  John.
9  Q  In other words, you didn't owe but you weren't owed
10  anything?
11  A  Right, because I gave him the ten ninety-nine at
12  that time and I didn't see that.
13         MR. SCHIFF:  May I approach the witness?
14         THE COURT:  Yes.
15  Q  Showing the witness the last two pages of
16  Government's exhibit seven B, I'm showing you what
17  appears to be a check made payable to you in the amount
18  of four thousand three hundred and thirty-seven dollars
19  and five cents, and I would ask you to look at a copy of
20  the back of that check at the signature, "James Harris".
21  A  No, sir.
22  Q  Let me get a question out.  Is that your signature
23  on the back of the check?
24  A  No, sir.
25  Q  And what you just looked at is on the screen now,

Page 9

1  correct?
2  A  Right.
3  Q  Sir, that's all the questions I have.  But the
4  defense lawyer has a chance to ask you some questions
5  now.
6              CROSS EXAMINATION
7         BY MR. BRUNER OF JAMES HARRIS:
8  Q  Good morning, sir.
9  A  Good morning.
10  Q  My name is Ben Bruner.  I represent Matthew Okonkwo
11  in this case.  Do you know Matthew?
12  A  Not personally.
13  Q  Okay.  Did you ever do business with him in this
14  transaction to your knowledge?
15  A  Not in this transaction, I don't think I did.  Now
16  I dealt with a guy named John.
17  Q  Okay.  Thank you very much.  No more questions.
18         MR. SCHIFF:  No redirect.
19         THE COURT:  Thank you.  You may step down.
20         (Whereupon the witness, James Harris, stepped
21  down from the stand.)
22         MR. SCHIFF:  The Government would call
23  Charlotte Green.
24         Your Honor, may counsel approach for one
25  moment?

**MITCHELL P. REISNER, CM, CRR - (334) 265-2500**
**Total Computerized Litigation Support**

Page 10

1 THE COURT: Yes.
2 (Whereupon, an off-the-record bench conference
3 was held.
4 C H A R L O T T E   G R E E N,
5 the witness herein, having first been duly sworn or
6 affirmed to tell the truth, was examined and testified
7 as follows:
8 DIRECT EXAMINATION
9 BY MR. SCHIFF OF CHARLOTTE GREEN:
10 Q Good morning. Could you state your name, please.
11 A Charlotte Green.
12 Q And where do you reside now?
13 A Dothan, Alabama.
14 Q And is that where you lived back in nineteen
15 ninety-nine and two thousand?
16 A Yes.
17 Q Do you know the defendant, Mr. Okonkwo?
18 A I do.
19 Q When did you meet him?
20 A Eighty-seven, I believe.
21 Q Eighty-seven or ninety-seven?
22 A Eighty-seven.
23 Q Ten years ago or twenty years ago?
24 A Wait a minute. Yeah, eighty-seven.
25 Q Okay. Now at some point did you and Mr. Okonkwo

Page 11

1 discuss him preparing a tax return for you?
2 A Yes.
3 Q And can you describe what happened.
4 A Just took my taxes in to him.
5 Q What information did you give him?
6 A My kids' Social Security cards and my W-two's.
7 Q And that particular year, nineteen ninety-nine, you
8 had several different jobs, correct?
9 A Right.
10 Q Miss Green, I'm putting on the screen what's been
11 marked as Government's exhibit three A. And do you see
12 the Social Security number on the upper right portion?
13 A Yes, that's mine.
14 Q Is that your Social Security number?
15 A Yes.
16 Q Okay. And Curtis Green and -- the dependents,
17 Curtis Green and Lawanda Hawkins, those are your actual
18 children, correct?
19 A Yes.
20 Q Now there's a W-two form from R. B. N.
21 Manufacturing. Is that a job that you held?
22 A Yes.
23 Q And that's a W-two that you gave to Matthew?
24 A Yes.
25 Q Cracker Barrel, is that a job you held that year?

Page 12

1 A Yes.
2 Q And again, is that a form W-two that you gave to
3 Mr. Okonkwo?
4 A Yes.
5 Q Did you work at Publix back in nineteen
6 ninety-nine?
7 A Yes.
8 Q And did you give a Publix W-two to Mr. Okonkwo?
9 A Yes.
10 Q In nineteen ninety-nine did you work for a C. J. B.
11 Ice Cream Company?
12 A No.
13 Q Did you give Matthew a W-two from C. J. B. Ice
14 Cream Company?
15 A No.
16 Q Did you tell Matthew that you had worked for C. J.
17 B. Ice Cream Company?
18 A No.
19 Q Now did you know that a return was being filed for
20 you claiming a refund of two thousand eight hundred and
21 thirteen dollars?
22 A No.
23 Q Okay. Did you discuss with Matthew -- Before the
24 refund came in, did you discuss with Matthew about how
25 much you could expect?

Page 13

1 A Yeah, somewhere around a thousand dollars.
2 Q That's what he told you?
3 A Right.
4 Q And I'm putting on the screen what's been marked --
5 the second to the last page what's been marked as
6 Government's exhibit three B. It appears to be a check
7 made payable to you for two thousand six hundred and
8 forty-one dollars. At some point did you get this
9 check?
10 A Yes.
11 Q How did it come to you?
12 A Oh, I went to the office and picked it up and I was
13 excited about it.
14 Q Because it was more than you were expecting?
15 A Yes.
16 Q Okay. Who actually put it in your hands?
17 A I don't know if it was Matthew or the cashier lady,
18 the lady that was there.
19 Q After you got the check, did you have a discussion
20 with Matthew about it?
21 A Yes. They told me to go cash it and bring the
22 money back. They would give me mine out of it.
23 Q I'm showing you the back of the check at the top.
24 Is that your signature?
25 A It is.

Page 14

1 Q And in the middle, is that a photocopy of your
2 driver's license?
3 A It is.
4 Q And you cashed the check at a place called --
5 there's a stamp for Chandlers. What's Chandlers?
6 A It's a check cashing place.
7 Q Now did Matthew explain why if the check was for
8 two thousand six hundred and forty-one dollars, you were
9 only getting a thousand?
10 A Well he said it was for taxes.
11 Q I don't understand.
12 A That it was the money owed. All of it wasn't mine,
13 that I just was owed the thousand dollars that I was
14 promised.
15 Q And what was going to happen to the other one
16 thousand six hundred dollars?
17 A That it was tax money owed to the I. R. S.
18 Q Okay. That's what Mr. Okonkwo told you?
19 A Yes.
20 Q Okay. Now, sir -- excuse me -- ma'am, did you ever
21 meet any of the people that worked in Matthew's office?
22 A Yes.
23 Q Did you meet an individual named John?
24 A Yes.
25 Q And did John have anything to do -- Well first of

Page 15

1 all, the John that you knew, what can you tell us about
2 him?
3 A Well nothing, actually. I had just met him that
4 day.
5 Q Okay. Did you know anything, any relationship
6 between John and an ice cream truck?
7 A Just that his wife drives the ice cream truck.
8 Q Okay. And what was his wife's -- Did you meet the
9 wife of John?
10 A Pardon me?
11 Q Did you ever meet John's wife?
12 A Well yes, driving the truck.
13 Q And what was her name?
14 A Well we just called her Miss B.
15 Q Did she have any other business in Dothan?
16 A Yes, a boutique.
17 Q A clothing boutique?
18 A Right.
19 Q That's all I have on direct. Mr. Bruner may have
20 some questions for you.
21 A Okay.
22         CROSS EXAMINATION
23     BY MR. BRUNER OF CHARLOTTE GREEN:
24 Q Miss Green, I'm Ben Bruner. I represent Matthew in
25 this case. I've just got a few questions for you.

Page 16

1     You indicated you met John that day. What day
2 are we talking about here.
3 A When I brought my taxes in. When I brought the
4 paperwork in, my W-two's.
5 Q How did you come to meet John that day?
6 A He came in the office. He came in Matthew's office
7 while I was in there.
8 Q Okay. And did he introduce you to him?
9 A Yeah, told me this was John.
10 Q Okay. Did he tell you John was going to be
11 handling your case?
12 A I believe he did.
13 Q So your understanding was that he was going to turn
14 your paperwork over to John?
15 A Over to John, right.
16     MR. BRUNER: Judge, I have no more questions
17 for this witness.
18     THE COURT: Thank you. You may step down.
19     (Whereupon the witness, Charlotte Green,
20 stepped down from the stand.)
21     THE COURT: Next witness?
22     MR. SCHIFF: The Government would call Tawana
23 Campbell.
24     T A W A N N A   C A M P B E L L,
25 the witness herein, having first been duly sworn or

Page 17

1 affirmed to tell the truth, was examined and testified
2 as follows:
3         DIRECT EXAMINATION
4     BY MR. SCHIFF OF TAWANA CAMPBELL:
5 Q Could you state your name, please.
6 A Tawanna Tyler.
7 Q And what was your name back in nineteen ninety-nine
8 and two thousand?
9 A Tawanna Campbell.
10 Q And where do you live now?
11 A In Dothan, Alabama.
12 Q And where did you live back in ninety-nine and two
13 thousand?
14 A In Dothan, Alabama.
15 Q Do you know the defendant, Mr. Okonkwo?
16 A Yes.
17 Q And how did you meet him?
18 A I'm not really for sure, but I met him probably
19 like in ninety-seven. Somewhere back there.
20 Q At some point did you and Mr. Okonkwo discuss him
21 preparing a tax return for you?
22 A Making a false tax return?
23 Q About him helping you file your tax return, yes.
24 A Yes.
25 Q Okay. Did you give Mr. Okonkwo any information?

Page 18

1  A  Any information?
2  Q  Yeah, to help him prepare the return.
3  A  Yes, for me.
4  Q  What information did you give him?
5  A  The W-two forms that I had.
6  Q  Did you have children at the time?
7  A  Yes.
8  Q  And that year were other people going to be
9  claiming your children as dependents?
10 A  Yes.
11 Q  And what were your children's names?
12 A  Denesha Sentreka Tyson, and Shakoya Tyshwaka
13 Campbell.
14 Q  Now who was going to be claiming Denesha?
15 A  Dorothy Campbell.
16 Q  Okay.  That's your mother?
17 A  Yes.
18 Q  And who was going to be claiming Shakoya?
19 A  Terry Jefferson.
20 Q  What's the relationship of Terry Jefferson to
21 Shakoya?
22 A  He was my boyfriend.
23 Q  Now did you discuss with Mr. Okonkwo the fact that
24 other people were going to be claiming your children as
25 dependents?

Page 19

1  A  Not that I know of, because I know I didn't -- I
2  wasn't going to do it because someone else was already
3  doing it.  So no.
4  Q  Did you provide Mr. Okonkwo with the Social
5  Security numbers for your own children?
6  A  No.
7  Q  I'm going to put on the screen what's been marked
8  as Government's exhibit twelve A. And I'll call your
9  attention to the upper right portion.  Please don't read
10 it into the record, but is that your Social Security
11 number on the upper right?
12 A  Yes.
13 Q  In the middle of the page under "dependents,"
14 there's listed a daughter with the last name of Skipper,
15 and a daughter named Nicole Fowler.  Are either of these
16 your actual daughters?
17 A  No.
18 Q  Did you tell Mr. Okonkwo that you had daughters by
19 those names?
20 A  No.
21 Q  Now in nineteen ninety-nine did you work at
22 Hardee's?
23 A  Yes.
24 Q  And is that a -- Did you give Mr. Okonkwo a W-two
25 for Hardee's?

Page 20

1  A  Yes.
2  Q  Do you remember whether you worked for an entity
3  called Gallow Enterprises?
4  A  I think it was probably Subway.
5  Q  Okay.  You worked for a Subway franchise?
6  A  Yes.
7  Q  And did you give a W-two from your Subway job to
8  Mr. Okonkwo?
9  A  Yes.
10 Q  Did you work for Manpower International?
11 A  Yes.
12 Q  Is that the temp agency?  Is that the temporary
13 help agency?
14 A  Yes.
15 Q  And did you give this W-two to Mr. Okonkwo?
16 A  Yes.
17 Q  Did you work at Dairy Queen back in nineteen
18 ninety-nine?
19 A  Yes.
20 Q  Did you give the W-two for Dairy Queen to Mr.
21 Okonkwo?
22 A  Yes.
23 Q  Now, did you work at C. J. B. Ice Cream Company in
24 nineteen ninety-nine?
25 A  No.

Page 21

1  Q  Did you tell Mr. Okonkwo that you worked for C. J.
2  B. Ice Cream Company?
3  A  No.
4  Q  Did you give him a W-two form for C. J. B. Ice
5  Cream Company?
6  A  No.
7  Q  I want you to look at line -- If you can see line
8  forty-one A, "amount of refund," did you know that a tax
9  return was being filed in your name claiming a refund of
10 four thousand three hundred and eighty-seven dollars?
11 A  No.
12 Q  Now did you get a refund from Mr. Okonkwo that
13 year?
14 A  Yes.
15 Q  How much did he give you?
16 A  It was like two or three hundred dollars.
17     MR. SCHIFF:  May I approach the witness?
18     THE COURT:  Yes.
19 Q  Showing the witness the last two pages of
20 Government's exhibit twelve B.  It appears to be a check
21 made payable to you for four thousand two hundred and
22 fifteen dollars and five cents.  Did you get that check?
23 A  No.
24 Q  Going to the last page, the back of the check, is
25 that your signature at the top?

Multi-Page™

| Page 22 | Page 24 |
|---|---|
| 1 A No.<br>2 Q Okay. How many Ns in Tawanna?<br>3 A Two.<br>4 Q How many Ns in the Tawanna in that check?<br>5 A One N, and my middle initial is not T.<br>6 Q Okay. And just so the jury can see it, is that<br>7 what you just identified as not being your signature?<br>8 A Right.<br>9 Q Ma'am, did you ever get any money from Matthew<br>10 other than the three hundred dollar tax refund?<br>11 A Well, a couple of gifts whenever I seen him.<br>12 Q Did he ever pay your rent money?<br>13 A Yes.<br>14 Q How many months?<br>15 A Once.<br>16 Q About how much was the rent?<br>17 A Like two-eighty.<br>18 Q And what was the gift that he bought you?<br>19 A Well, a stereo set and I got some boots.<br>20 Q Some what?<br>21 A Boots.<br>22 Q Okay. How much would you estimate the stereo was<br>23 worth?<br>24 A Like three-fifty, four hundred probably.<br>25 Q That's all I have on direct. Mr. Bruner may have | 1 there. Okay. But you never saw him prepare your<br>2 return, did you?<br>3 A Well, no. He was sitting across from the desks and<br>4 doing his work and I was sitting there waiting.<br>5 Q It was a few days later before you were able to<br>6 pick up your check, wasn't it?<br>7 A No, I got it the same day.<br>8 Q Oh, that's right. You did some paperwork and you<br>9 got your money then. But you don't know when your<br>10 return was done, do you?<br>11 A No.<br>12 Q And you don't know who did your return, do you?<br>13 A No.<br>14 Q Those are my questions. Thank you.<br>15     MR. SCHIFF: No redirect.<br>16     THE COURT: Thank you. You may step down.<br>17     (Whereupon the witness, Tawanna Campbell,<br>18 stepped down from the stand.)<br>19     MR. SCHIFF: Government would call Kim<br>20 starling.<br>21     K I M    S T A R L I N G,<br>22 the witness herein, having first been duly sworn or<br>23 affirmed to tell the truth, was examined and testified<br>24 as follows:<br>25     DIRECT EXAMINATION |

| Page 23 | Page 25 |
|---|---|
| 1 some questions for you.<br>2     THE COURT: Cross?<br>3     CROSS EXAMINATION<br>4     BY MR. BRUNER OF Tawanna CAMPBELL:<br>5 Q Ma'am, I'm Ben Bruner. I represent Matthew in this<br>6 case. I have a few questions for you.<br>7     When did you get the money you said was your<br>8 tax refund from Matthew?<br>9 A Like the same day that he did them.<br>10 Q Okay. Did he have you do some paperwork at that<br>11 time?<br>12 A Well he was sitting at his desk doing whatever he<br>13 was doing. He was telling me that I get like two or<br>14 three hundred dollars and he gave it to me that day.<br>15 And he said "whenever".<br>16 Q But did he have you sign something or do any kind<br>17 of paperwork at that time?<br>18 A I really can't too much remember, but I want to say<br>19 I did.<br>20 Q That you had to sign something?<br>21 A Did I sign something?<br>22 Q Yes, ma'am.<br>23 A I want to say I did. Since I was doing my income<br>24 tax.<br>25 Q So you think you signed something for Matthew | 1     BY MR. SCHIFF OF KIM STARLING:<br>2 Q Could you state your name, please.<br>3 A Kim Starling.<br>4 Q And do you know Matthew Okonkwo?<br>5 A Yes.<br>6 Q How did you meet him?<br>7 A Through my brother-in-law and pastor.<br>8 Q Did there come a point when you started working for<br>9 him?<br>10 A I didn't hear you.<br>11 Q Did there come a time when you started working for<br>12 Mr. Okonkwo's business?<br>13 A Yes, shortly after I met him through him.<br>14 Q Can you give an estimate as to when that was?<br>15 A I think I worked with him probably about six years<br>16 total. Up to two thousand and three about six years.<br>17 Q Until when?<br>18 A Until two thousand and three.<br>19 Q And what was the name of the business?<br>20 A Eagle Financial Services.<br>21 Q What were your duties there?<br>22 A I started out working front desk doing paperwork,<br>23 and my second year I started preparing taxes with him.<br>24 Q Okay. So the first year you did paperwork; the<br>25 second year you prepared returns? |

Page 26

1  A  I did both.
2  Q  The year that you prepared returns, did Mr. Okonkwo
3  also prepare returns?
4  A  Yes.
5  Q  Now did you play -- At any time that you worked
6  there, did you play any role in actually electronically
7  filing the returns?
8  A  No.
9  Q  When you prepared a return that was going to be
10 electronically filed what would happen?
11 A  Well we worked in separate offices, and I would
12 prepare it on the computer and it was on a network
13 system so it would go directly to the computer that
14 transmitted it.
15 Q  When you say "it would go directly to a computer"
16 did --
17 A  It's like a server.
18 Q  Okay.  And then who would actually complete the
19 electronic filing?
20 A  Transmitting?
21 Q  Yes.
22 A  Matthew.
23 Q  Was that always the case?
24 A  Yes.
25 Q  Are you aware of anyone else other than Mr. Okonkwo

Page 27

1  electronically filing taxes at Eagle's business?
2  A  Well other people would be there.  I mean other
3  people outside who brought clients in, their own clients
4  in.  So I have no idea if he was the only one that
5  transmitted out of his office.
6  Q  Okay.  Did you ever see any of these other people
7  sit down at the computer and transmit returns?
8  A  We prepared them.  I wouldn't say transmit, but
9  prepare them.
10 Q  Which is what you were doing?
11 A  Yes.
12 Q  Did Eagle have arrangements to issue instant refund
13 checks?
14 A  Rapid refunds?
15 Q  Yes.
16 A  Yes.
17 Q  How did that work?
18 A  As far as when the clients came in, the process?
19 Q  Yes, please.
20 A  You come into the office.  You fill out your
21 paperwork.  Give your W-two's, your IDs and everything
22 that goes with it, and you would fill out a form doing
23 whether you were going to do it in twenty-four hours or
24 two weeks or direct deposit.
25 Q  And whose job was it to actually print out the

Page 28

1  checks?
2  A  Matthew.
3  Q  And what would happen to the checks?  In the
4  regular practice of Eagle, what would happen to the
5  checks after they were printed out?
6  A  Once the checks were printed they had to be
7  processed, which would come through the front desk.
8  Either Yvette or me would log the checks in, put them
9  back into the folders and then call the clients to come
10 and pick them up.
11 Q  When you say "the folders," what is are "the
12 folders"?
13 A  The client's file.  Every client that came in had a
14 file.
15 Q  Did you ever get a check to log in but there was no
16 customer file?
17 A  Yes.
18 Q  What would you do with those checks?
19 A  We would put them in Matthew's office.
20 Q  Okay.  Do you know what Matthew did with them?
21 A  Well, like I said, he had other people that would
22 come in and bring their returns so I guess they kept
23 their folders with them.  So we didn't have files.  He
24 would get them to them.
25 Q  So you're assuming the checks without a customer

Page 29

1  file were clients of these other people?
2  A  Yes.
3  Q  Now did you know an individual named John?
4  A  I met John before.
5  Q  Okay.  And what role did John play at Eagle?
6  A  He had outside customers.  He would come bring us.
7  He was one of the ones that came in and brought their
8  own folders in with them.  And had taxes prepared and
9  pick the checks up.
10 Q  Did you know his last name at the time?
11 A  No, I didn't know his last name.
12 Q  Do you know of any other business that he was
13 involved in besides tax preparing?
14 A  No.  Later I heard about his ice cream business he
15 had or something.
16 Q  You heard it.  But did you ever see him actually
17 driving his ice cream truck?
18 A  No.
19 Q  Did you know his wife?
20 A  Yes, Miss Bee.  I met her.
21 Q  And did she have any kind of business in town?
22 A  No -- Oh wait, did she have a business?
23 Q  Yes, ma'am.
24 A  I think she had a clothing store.
25 Q  Now while you were working there, did you ever see

Page 30

1  anything that related to Rainbow Tax Services?
2  A  I may have seen a package come in with some mail
3  probably from Household or something, but that's about
4  it.
5  Q  Okay.  Did you ask Matthew about the package?
6  A  I asked him about the package, yes.  I told him
7  this was for Rainbow, and he said it was another
8  business.
9  Q  Okay.  And, ma'am, I'm putting on the screen what's
10 been marked as Government's exhibit eleven A. Can you
11 see this is a tax return in the name of, it actually
12 says Martha Green?
13 A  Yes.
14 Q  And on the lower right under the preparer's Social
15 Security number, is that your Social Security number?
16 A  Yes, it is.
17 Q  Did you prepare that particular return?
18 A  No, I did not.
19 Q  How do you remember?
20 A  I pretty much remember people that I come into
21 contact with.  And all you have to do is meet the person
22 to know they didn't know me.
23 Q  So when you prepared a return, it was for someone
24 that you had met personally?
25 A  Yeah.  They actually come into the office and we do

Page 31

1  the paperwork.
2  Q  And you never met Mrs. Green?
3  A  I don't know Mrs. Green.
4  Q  Nothing further on direct.  Mr. Bruner may have
5  some questions.
6      THE COURT:  Cross?
7          CROSS EXAMINATION
8      BY MR. BRUNER OF KIM STARLING:
9  Q  Ma'am, I'm Ben Bruner.  I represent Matthew in this
10 proceeding here.
11 A  Okay.
12 Q  I just have a couple of questions.
13 A  Okay.
14 Q  The way you described it to me, and I'm not very
15 technological, but y'all are on a server system at this
16 office at this time, correct?
17 A  Yes.
18 Q  And your job was to prepare taxes, correct?
19 A  My job was to prepare taxes.
20 Q  At the time you were preparing taxes you'd prepare
21 someone's return on one computer?
22 A  Yes.
23 Q  And then you would basically transmit that to the
24 server system where it could be transmitted on for their
25 loan.

Page 32

1  A  No, you didn't transmit.  You actually filled the
2  return out, and at the time it was basically like
3  working from his computer.
4  Q  So you're basically working on his computer, is
5  what you're saying?
6  A  The server?
7  Q  Right.
8  A  It was basically working towards the one main
9  computer which was transmitted, which is Matthew's
10 computer.
11 Q  Right.  Once you were done, were there ever changes
12 that needed to be made on any of these returns?
13 A  Maybe sometimes.
14 Q  What would cause that?
15 A  If I wasn't sure about something.  But that would
16 be while the client was still there.  It wasn't anything
17 that happened afterwards.
18 Q  Did Matthew, though, review the work that showed up
19 on his computer to transmit?
20 A  Sometimes.
21 Q  And what would cause that?
22 A  Just basically I guess making sure all the
23 information was there when they go out.  But you mean as
24 far as they're getting ready to actually be transmitted
25 out?

Page 33

1  Q  Yes, ma'am.
2  A  I guess when they're ready to get transmitted, it's
3  fully done when it's ready to be transmitted.  And all
4  he has to do is to go in and make sure everything is
5  cued and it would go out.
6  Q  So it's really mechanical at that point?
7  A  Yes.
8  Q  In other words, it's just pushing a button and
9  saying send it?
10 A  Right, yes  He would go in and check everybody's
11 return.
12 Q  Okay.  And how did you get the tax returns that you
13 prepared there?
14 A  How I did get them?
15 Q  Yes, ma'am.
16 A  What do you mean?
17 Q  Did Matthew assign them to you?
18 A  Oh.  No.  Clients would just walk in and just
19 whoever was available would see them.
20 Q  Okay.  Did Matthew ever give you returns to do?
21 A  What do you mean give me returns to do?
22 Q  He had clients come in while he was there; did he
23 then give you and say hey, we had six people come in and
24 I need to you do some returns?
25 A  I mean we were just, you know, a day-to-day office.

**Page 34**

1 As people walked in, just whoever was available would
2 get them. It was his office.
3 Q  Okay.
4 A  Because the work came from the front desk. The
5 receptionist, you know, sent the customers in to see
6 whoever was available at that time.
7 Q  Okay. And the receptionist would say so and so is
8 free, you --
9 A  Yeah. Unless they specifically ask for someone.
10 Q  Right. Did Matthew take returns like that, or did
11 he -- or was he just the boss?
12 A  He was the boss, and he took returns that way, too.
13   MR. BRUNER: Okay. Those are my questions,
14 Your Honor.
15   Thank you, ma'am.
16   MR. SCHIFF: No redirect.
17   THE COURT: Thank you. You may step down.
18   (Whereupon the witness, Kim Starling, stepped
19 down from the stand.)
20   MR. SCHIFF: The Government calls Cynthia
21 Dozer.
22       C Y N T H I A   D O Z E R,
23 the witness herein, having first been duly sworn or
24 affirmed to tell the truth, was examined and testified
25 as follows:

**Page 35**

1       DIRECT EXAMINATION
2     BY MR. SCHIFF OF CYNTHIA DOZER:
3 Q  Could you state your name, please.
4 A  Cynthia Dozer.
5 Q  And, Miss Dozer, where do you currently live?
6 A  Eleven sixteen Cynthia Drive.
7 Q  Where is that?
8 A  Dothan, Alabama.
9 Q  And where did you live back in nineteen ninety-nine
10 and two thousand?
11 A  Dothan, Alabama.
12 Q  Did you contact anyone to help prepare your
13 nineteen ninety-nine income tax return?
14 A  No, I didn't. I didn't contact no one.
15 Q  Did you ultimately use someone to help you prepare
16 your taxes?
17 A  Yes, I did.
18 Q  Who did you use?
19 A  Jonathan.
20 Q  And where was John working out of?
21 A  Eagle Finance.
22 Q  And --
23   THE COURT: Was what?
24   THE WITNESS: Working at Eagle Finance.
25 Q  In Dothan?

**Page 36**

1 A  Mm-hmm.
2 Q  Why did you use Eagle?
3 A  Because my brother had told me it was a new place
4 and he was like, you know, "Let's try to help out the
5 blacks." And I was like, "Okay." I would go down to
6 give him some business, so I went down there.
7 Q  Do you know anything else about John besides the
8 fact that he worked at Eagle?
9 A  No.
10 Q  What about his wife, did you know her?
11 A  I only met her after I found out a year later what
12 went on. That was about it.
13 Q  And what's his wife's name?
14 A  Miss Bee. They called her Miss Bee.
15 Q  Now what information did you provide to John so
16 that he could do your tax return?
17 A  I gave him my W-two forms and my two dependents.
18 Q  I'm going to show you what's been marked as
19 Government's exhibit eight A and ask you to look at the
20 upper right under "Social Security number". Please
21 don't read it into the record, but can you confirm that
22 that is, in fact, your Social Security number?
23 A  Mm-hmm.
24 Q  Is that it?
25 A  Mm-hmm.

**Page 37**

1 Q  You have to say yes or no.
2 A  Yes.
3 Q  And the two dependents in the middle, Michael Hooks
4 and Glenda Curry, are those your actual children?
5 A  No. I know Glenda, but I don't know the first one.
6 Q  Okay. Well, did you have a foster child named
7 Glenda Curry?
8 A  No.
9 Q  Did you have a son named Michigan hooks?
10 A  No.
11 Q  Did you tell John that Michael Hooks was your son?
12 A  No.
13 Q  Did you tell him that Glenda Curry was your foster
14 child?
15 A  No.
16 Q  The address at the top, Twelve-oh-eight Summit
17 Street, was that your address?
18 A  No, sir.
19 Q  Now attached to this return -- is this W-two, C. J.
20 B. Ice Cream Company, did you work there in nineteen
21 ninety-nine?
22 A  No, sir.
23 Q  Did you tell John that you had worked there in
24 nineteen ninety-nine?
25 A  No, sir.

Page 38

1  Q  Did you give John a W-two from C. J. B. Ice Cream
2  Company?
3  A  No, sir.
4  Q  And did you know at the time -- I call your
5  attention to line sixty-five.  Did you know at the time
6  that a refund -- that a tax return was being filed in
7  your name seeking a refund of four thousand one hundred
8  and ninety dollars?
9  A  No, sir.
10     MR. SCHIFF:  May I approach?
11     THE COURT:  Yes.
12  Q  Showing you the last two pages of Government's
13  exhibit eight B.  I'm showing you what appears to be a
14  check made payable to you for four thousand eighteen
15  dollars and five cents.  Did you ever get that check?
16  A  No, sir.
17  Q  I'm showing you the back of the check.  There's a
18  signature at the top.  Is that your signature?
19  A  No, sir.
20  Q  Now did you get any refund that year?
21  A  I had got like three hundred dollars.
22  Q  How did you get the three hundred?
23  A  He came by my house.
24  Q  "He" being?
25  A  Jonathan.

Page 39

1  Q  Okay.  And he handed you three hundred dollars in
2  cash?
3  A  Yes.
4  Q  Okay.  Nothing further on direct.  Mr. Bruner may
5  have some questions for you.
6              CROSS EXAMINATION
7        BY MR. BRUNER OF CYNTHIA DOZER:
8  Q  Ma'am, I'm Ben Bruner and I represent Matthew
9  Okonkwo in this case.  Do you know Mr. Okonkwo?
10  A  No, sir.
11  Q  Okay.  To your knowledge did he have anything to do
12  with your tax return?
13  A  No, sir.
14     MR. BRUNER:  Those are my questions, Your
15  Honor.
16  Q  Thank you, ma'am.
17     THE COURT:  You may step down.
18     MR. SCHIFF:  No redirect.
19     (Whereupon the witness, Cynthia Dozer, stepped
20  down in the stand.)
21     MR. SCHIFF:  The Government would call Tia
22  Doyle.
23        T I A   D O Y L E,
24  the witness herein, having first been duly sworn or
25  affirmed to tell the truth, was examined and testified

Page 40

1  as follows:
2              DIRECT EXAMINATION
3        BY MR. SCHIFF OF TIA DOYLE:
4  Q  Would you state your name, please.
5  A  Tia Doyle.
6  Q  Okay.  And where do you live, Miss Doyle?
7  A  I live in John's home.  Seven sixteen Alabama
8  Avenue, apartment one thirty-seven.
9  Q  And is that in Dothan?
10  A  Yes.
11  Q  And where did you living back in nineteen
12  ninety-nine and two thousand?
13  A  Behind -- off of South Parks.
14  Q  Okay.  But also in Dothan?
15  A  Mm-hmm.
16  Q  How do you know the defendant, Matthew Okonkwo?
17  A  Yes.
18  Q  And how did you meet him?
19  A  At Dairy Queen.
20  Q  Where you were working?
21  A  Mm-hmm.
22  Q  And did the two of you begin a relationship of some
23  sort?
24  A  We started dating.
25  Q  Okay.  And at some point did the subject of taxes

Page 41

1  come up?
2  A  While I was working at Dairy Queen.
3  Q  Can you describe that conversation?
4  A  He asked was I filing my taxes that year, and I
5  told him I really wasn't because I hadn't worked but a
6  couple of months and I wasn't really getting any money
7  back.  So he asked me to bring my W-two's to the -- to
8  his office to see how much I would get back, and I did.
9  And he told me that I would only get back a hundred
10  dollars or so, and that's what I got back.
11  Q  Now I'll show you what's been marked as
12  Government's exhibit ten A. I'll ask you to look at the
13  Social Security number in the upper right.  Don't read
14  it out loud, but can you just confirm whether that's
15  your actual Social Security number?
16  A  Mm-hmm.
17  Q  You have to say yes or no.
18  A  Yes.
19  Q  Now going to the middle where it says "dependents,"
20  there's a son listed by the name of Ted Taylor.  Did you
21  have a son by the name of Ted Taylor?
22  A  No.
23  Q  And under -- There is also a Cosinda Pelham listed
24  as a foster child.  Did you have a foster child back
25  then named Cosinda Pelham?

Page 42

1 A No.
2 Q And how old were you back in nineteen ninety-nine?
3 A Twenty. I had just turned twenty-one. No, I was
4 twenty.
5 Q I call your attention to the last page of the
6 return. The return lists Ted Taylor as having been born
7 in nineteen ninety-nine. Did you have a baby of any
8 kind in nineteen ninety-nine?
9 A No.
10 Q And the return lists Cosinda Pelham as being a
11 twenty-eight year old under three B totally disabled
12 foster child of yours. Again, you didn't have any kind
13 of foster children or any kind of permanently disabled
14 foster children?
15 A No.
16 Q Did you tell Mr. Okonkwo that you had these
17 children?
18 A No.
19 Q Did Mr. Okonkwo -- was your relationship enough
20 that he would know whether or not you had children?
21 A Yes.
22 Q He knew that you didn't?
23 A He knew that I didn't, yeah.
24 Q Now attached to the tax return is a W-two from
25 Phillip Powell, Dothan Dairy Queen. That's the Dairy

Page 43

1 queen where you worked?
2 A Yes.
3 Q And is that the document that you gave to Mr.
4 Okonkwo? Well, did you give him a W-two from Dairy
5 Queen?
6 A Yes.
7 Q There is also a W-two attached from a C. J. B. Ice
8 Cream Company. Did you work for that company?
9 A No.
10 Q Did you give Matthew a W-two from that company?
11 A No.
12 Q Did you tell him that you worked for that company?
13 A No.
14 Q Now looking at -- Can you see line sixty-five on
15 the screen under "refund"?
16 A Mm-hmm.
17 Q Did you know that a tax return was being filed with
18 your name and Social Security number seeking a refund of
19 four though two hundred and eighty-nine dollars?
20 A No.
21 Q Did you get any money as a refund that year?
22 A No.
23 Q Did you get a hundred dollars?
24 A A hundred dollars.
25 Q Besides the hundred dollars did you get any money?

Page 44

1 A No.
2 Q How did you get the hundred dollars?
3 A Through a check. I don't remember if I picked the
4 check up or if it was sent in the mail, but I think it
5 did because I got like a twenty dollar state check,
6 so --
7 Q Okay.
8     MR. SCHIFF: May I approach the witness?
9     THE COURT: Yes.
10 Q Showing the witness the last two pages of
11 Government's exhibit ten B. There is a check payable to
12 you in the amount of four thousand one hundred and
13 seventeen dollars and five cents. Did you get that
14 check?
15 A No.
16 Q On the back is what appears to be the signature of
17 Tia Doyle. Is that your signature?
18 A No.
19 Q Just so the jury can see it, that's the signature
20 you confirmed as being not your signature.
21     Just to confirm to the jury, that's the
22 document you just identified as being not your
23 signature, correct?
24 A Correct.
25 Q Okay. Now do you know any of Matthew's friends or

Page 45

1 anyone he worked with?
2 A I just know of them from being around, but I don't
3 know them personally.
4 Q Did you know John?
5 A I knew of him.
6 Q Okay. Did you know his wife?
7 A I knew of her.
8 Q Do you know her name?
9 A Only thing I know is Bee.
10 Q Okay. Now at some point Mr. Ellis and another
11 agent came to your house to talk to you about your tax
12 return, correct?
13 A Mm-hmm.
14 Q And do you remember when that was? If you don't
15 remember you can just say that. Did you remember or
16 not?
17 A Him and Clark two weeks ago, a week ago.
18 Q Okay. But did they come several years prior to
19 that?
20 A Oh yeah, two thousand three.
21 Q Okay. They first came to you in two thousand and
22 three?
23 A Mm-hmm.
24 Q Now after they came to see you, did you speak to --
25 And they asked you questions about your tax return?

Page 46

1 A  Yes.
2 Q  The same tax return that I just showed you?
3 A  Yes.
4 Q  After they came to see you, did you reach out to
5 Matthew Okonkwo?
6 A  I called him to ask him did he do it, and he said,
7 "No."
8 Q  Okay.  After he said, "No," did you follow up with
9 any additional information?
10 A  No, nothing but what they told me.
11 Q  Did you tell him that they had showed you the fake
12 W-two forms?
13 A  Yes.
14 Q  And what was his response to that?
15 A  It was a lie.
16 Q  It was a what?
17 A  A lie.
18 Q  Was there a point where you asked him a question
19 and he just fell silent?
20 A  Yes.
21     MR. BRUNER:  Objection, Your Honor.  I don't
22 see where in line of questioning is going.  I don't see
23 the relevance of any of this.
24     THE COURT:  How is this relevant?
25     MR. SCHIFF:  After the fact she confronts the

Page 47

1 defendant with what the agents said, and --
2     MR. BRUNER:  If he's going to testify to it,
3 we should do this outside the presence of the jury.
4     THE COURT:  Overruled.  Go ahead.
5 Q  What did you say to Matthew and what did he remain
6 silent to?
7 A  I told him that I had to come to court for jury
8 duty, and he didn't say anything.
9 Q  Nothing further.  Mr. Bruner may have some
10 questions for you.
11     THE COURT:  Go ahead.
12         CROSS EXAMINATION
13     BY MR. BRUNER OF TIA DOYLE:
14 Q  Ma'am, I'm Ben Bruner and I represent Matthew in
15 this case.
16     Do you recall how long it was between the time
17 you took his paperwork to Matthew's office and the time
18 you got some money?
19 A  In ninety-nine?
20 Q  Yes, ma'am.
21 A  It was in ninety-nine.  I don't recall what date.
22 Q  I think you testified, didn't you, that he asked
23 you about your tax returns and y'all had met, and he
24 asked you to bring some documents by his office, your
25 W-two?

Page 48

1 A  Mm-hmm.
2 Q  So you took them by his office?
3 A  Mm-hmm, after work.
4 Q  After work one day.
5     And then how long between that time did you
6 get -- You said you got about a hundred dollars?
7 A  Mm-hmm.
8 Q  How long between the time you took papers there,
9 how long did it take for you to get your hundred
10 dollars?
11 A  A few weeks.
12 Q  And you said you got a state check too?
13 A  Mm-hmm.
14 Q  And how did you get your money?
15 A  How did I get it?
16 Q  Yes, ma'am.  Did Matthew give it to you?
17 A  No.  I got a check.  I don't remember if I picked
18 it up.  I think it came in the mail.  I remember my
19 state check coming in the mail.
20 Q  Okay.  But you got a check from somebody?
21 A  Yeah, out of the mail.
22 Q  Was it from the Government?
23 A  Yeah.
24 Q  But you never saw the check that Mr. Schiff asked
25 you about, did you?

Page 49

1 A  No.
2 Q  And you don't know what Matthew did with that
3 information after you gave it to him, if he's the one
4 who prepared your taxes or not, do you?
5 A  No.
6     MR. BRUNER:  Those are my questions, Your
7 Honor.  Thank you.
8     MR. SCHIFF:  No redirect.
9     (Whereupon the witness, Tia Doyle, stepped
10 down from the stand.)
11     MR. SCHIFF:  That's the Government's last
12 witness.
13     THE COURT:  That's your last witness?
14     MR. SCHIFF:  Yes.
15     THE COURT:  So you rest?
16     MR. SCHIFF:  The Government would rest.
17     THE COURT:  I'll excuse the jury.  It's
18 actually ten-thirty so it's near our morning recess.
19 This recess will be at least for fifteen minutes.
20     Again, do not discuss the case among
21 yourselves or with anyone else, and don't forget to turn
22 over your notes, your pads in your chairs.  Just leave
23 them there.  Thank you.
24     (Whereupon the jury was escorted out of the
25 courtroom, and the following colloquy ensued):

Page 50

```
 1              MOTION FOR JUDGMENT AS A MATTER OF LAW
 2                       IN OPEN COURT
 3                 (THE JURY IS NOT PRESENT)
 4      THE COURT:  Okay.
 5          MR. BRUNER:  Judge, we would make a motion
 6   under rule twenty-nine for judgment; that there has been
 7   -- the evidence here is lacking for both the conspiracy
 8   charge and the eleven individual charges.  There frankly
 9   has been no showing of anything resembling a conspiracy
10   in this case.  And I believe the cases, and I'll give
11   you one, which is United States vs. Sorrows, seven
12   forty-two F.2d twelve eighty-six, "knowing about the
13   existence of a conspiracy."  Presence, when overt acts
14   were committed is simply insufficient to support a
15   conspiracy count.
16          He's not shown that these two people had any
17   contact with each other regarding these W-two forms
18   which appear to be from Jonathan's business.  And there
19   is just simply no showing of conspiracy and it's just as
20   likely that Jonathan filed these by himself without Mr.
21   Okonkwo's knowledge, or in the inverse that Mr. Okonkwo
22   filed them without Jonathan's knowledge.
23          THE COURT:  What evidence do you have of a
24   conspiracy?
25          MR. SCHIFF:  Your Honor, we have eleven cases
```

Page 51

```
 1   of apparently coordinated action.  Each of these --
 2   whether or not it's Mr. Okonkwo who originally deals
 3   with the customer or Mr. Adewunmi originally deals with
 4   a customer, a tax return ends up being filed with the
 5   exact same fake information.  When it's Mr. Okonkwo's
 6   initial customer, the money ends up in his bank account.
 7   When it's Mr. Adewunmi's initial customer, sometimes the
 8   money ends up in Mr. Okonkwo's account and sometimes the
 9   money ends up in one of his wife's accounts.
10          THE COURT:  What evidence do you have that
11   they were working together, though?
12          MR. SCHIFF:  Mr. Adewunmi works at the very
13   business at the Eagle Financial location.  All of the
14   returns, every single return, even the ones that were
15   Mr. Adewunmi has the contact with the customer are filed
16   with one of Mr. Okonkwo's E. F. I. N. numbers.
17          Now the Defense has suggested that Mr.
18   Adewunmi somehow got access to those numbers for filing,
19   but there is no evidence that that happened.  The
20   Government had evidence that these were the two -- that
21   Rainbow Tax Services and Eagle Financial Services which
22   filed each and every one of these returns were the names
23   of the businesses used by Mr. Okonkwo.
24          Mr. Okonkwo personally filed for the Eagle
25   Financial E. F. I. N. number, and his employee, Yvette
```

Page 52

```
 1   Thomas, had the Rainbow Tax Services.  You'll recall
 2   Miss Thomas was the witness who testified that she may
 3   have had that E. F. I. N. number but she certainly did
 4   not know how to prepare a return or transmit.  So every
 5   single one of these returns -- In addition, Mr. Okonkwo,
 6   when he was interviewed by the agents back in two
 7   thousand one, transmitted returns to the I. R. S.
 8          He said that for nineteen ninety-nine tax
 9   season, he was the one who transmitted returns.  He
10   never mentioned anyone else as transmitting returns,
11   except that he did say for the subsequent year, two
12   thousand, Kim Starling.  He certainly never mentions
13   Jonathan Adewunmi as being a preparer -- excuse me, as
14   being a filer of tax returns.
15          So I certainly think these are arguments that
16   Mr. Bruner can make to the jury, but there is certainly
17   sufficient evidence from which jury could find --
18          THE COURT:  The motion is denied.
19          How much evidence do you have, Mr. Bruner?
20          MR. BRUNER:  Judge, if it's all right, the
21   only thing we would have would be the possible testimony
22   of my client.  I would like five minutes to discuss that
23   with him.
24          THE COURT:  Oh, certainly.  I'll give you ten
25   minutes to do that.
```

Page 53

```
 1          MR. BRUNER:  Thank you.
 2          THE COURT:  Certainly.
 3          Before I come out, let my courtroom deputy
 4   know whether he's going to testify or not.
 5          MR. BRUNER:  I will.
 6          THE COURT:  So that would be your only
 7   testimony, if he testifies?
 8          MR. BRUNER:  That would be correct, Your
 9   Honor.
10          THE COURT:  Very good.  Court's in recess.
11          (Whereupon, a recess was taken.)
12                       IN OPEN COURT
13                 (THE JURY IS NOT PRESENT):
14          THE COURT:  Okay.  I understand, Mr. Bruner,
15   that the defendant, Mr. Okonkwo, does not wish to
16   testify, is that correct?
17          MR. BRUNER:  Judge, we have discussed that.  I
18   have told Mr. Okonkwo that he has every right to testify
19   no matter what I recommend.
20          THE COURT:  I need you to put all of this on
21   the record.  The clerk will swear in Mr. Okonkwo.
22          (Whereupon, the defendant was duly sworn by
23   the courtroom deputy clerk.)
24          THE COURT:  Mr. Okonkwo, I just want to make
25   sure that your waiver of your right to testify is
```

Multi-Page

Page 54

1  knowing and voluntary. Do you understand that having
2  been sworn, your answers to my questions will subject
3  you to the penalties of perjury or of making a false
4  statement if you fail to answer the questions
5  truthfully? Do you understand that?
6      THE DEFENDANT: Yes.
7      THE COURT: Would you bring him to the
8  lectern, there?
9      MR. BRUNER: Yes.
10     THE COURT: What is your full name.
11     THE DEFENDANT: Matthew Sunday Okonkwo.
12     THE COURT: And your age?
13     THE DEFENDANT: Fifty.
14     THE COURT: And how far did you go in school?
15     THE DEFENDANT: Fourth degree.
16     THE COURT: Are you able to read, write and
17 understand the English language?
18     THE DEFENDANT: Yes, sir.
19     THE COURT: Now I notice that you speak with
20 an accent. I assume that English is your first language
21 though.
22     THE DEFENDANT: English is my second language.
23     THE COURT: This is your second language? But
24 you understand English fully?
25     THE DEFENDANT: Yes.

Page 55

1      THE COURT: Now, have you recently seen a
2  physician or a psychiatrist?
3      THE DEFENDANT: Yes, I have. Not a
4  psychiatrist, but a physician.
5      THE COURT: For what?
6      THE DEFENDANT: For chest pain. Heart
7  problem.
8      THE COURT: Have you recently been
9  hospitalized or treated for any type of narcotic
10 addiction?
11     THE DEFENDANT: No.
12     THE COURT: Are you now under the influence of
13 any drugs or alcohol?
14     THE DEFENDANT: Pardon? I didn't understand.
15     THE COURT: Are you taking any drugs or
16 alcohol, even prescription drugs?
17     THE DEFENDANT: Yes, I'm taking prescription
18 high blood pressure.
19     THE COURT: For what?
20     THE DEFENDANT: For high blood pressure.
21     THE COURT: Now are you suffering from any
22 type of mental or physical disability?
23     THE DEFENDANT: Mentally I'm all right,
24 physically I'm not. Physically I'm sick, so I have
25 problems.

Page 56

1      THE COURT: This is your high blood pressure?
2      THE DEFENDANT: Mm-hmm.
3      THE COURT: Anything else?
4      THE DEFENDANT: No.
5      THE COURT: Now, Mr. Bruner, do you know of
6  any reason to doubt Mr. Okonkwo's competency to waive
7  his right to testify?
8      MR. BRUNER: No, Your Honor.
9      THE COURT: Does the Assistant United States'
10 Attorney, Mr. Schiff?
11     MR. SCHIFF: I do not know of any reason.
12     THE COURT: Now, Mr. Okonkwo, do you realize
13 that you do have a right to testify in this case?
14     THE DEFENDANT: Yes, sir.
15     THE COURT: And -- But you also have a right
16 not to testify.
17     THE DEFENDANT: Yes, sir.
18     THE COURT: And you've conferred with your
19 lawyer, is that correct?
20     THE DEFENDANT: Yes, sir.
21     THE COURT: And is it your decision not to
22 testify?
23     THE DEFENDANT: Yes, sir.
24     THE COURT: Now has anyone coerced you or
25 promised you anything to get you not to testify?

Page 57

1      THE DEFENDANT: Nobody.
2      THE COURT: Do you have any questions for me
3  regarding the proceedings?
4      THE DEFENDANT: No, sir.
5      THE COURT: Is it your desire to waive your
6  right to testify in this case?
7      THE DEFENDANT: Yes.
8      THE COURT: The Court finds based upon the
9  representations to the Court that the defendant is
10 competent to waive his right to testify and that his
11 decision not to testify is a knowing and voluntary
12 decision.
13     Anything else, Counsel?
14     MR. BRUNER: No, Your Honor.
15     THE COURT: How long do you need for your
16 closing arguments?
17     MR. BRUNER: Half an hour.
18     THE COURT: Half an hour?
19     MR. SCHIFF: Yes.
20     THE COURT: It's now eleven o'clock and we
21 still have the Court charge to go over. What I thought
22 I would do is let the jury go until twelve-thirty, and
23 we will come back at twelve-thirty and start with the
24 closing arguments and then my charge on the law. It
25 will take me about fifteen minutes to finish up the

Page 58

1  Court's charge. At that point I will give it to you,
2  and then we can go over the charge. And that will get
3  us to about eleven-thirty, and then we can go to lunch
4  from eleven-thirty to twelve.
5      Would you have the security officer bring in
6  the jury? And I'll let them go until twelve-thirty.
7      (Whereupon, the jury was escorted into the
8  courtroom.)
9      THE COURT: Members of the jury you may remain
10  standing.
11      Members of the jury, the evidence portion of
12  the trial is over. The next part will be the closing
13  arguments of the lawyers, which will take approximately
14  an hour, thirty minutes to each side. Then my charge to
15  you on the law, which will take about twenty minutes.
16  However, we need about another twenty minutes to get
17  ready for that. Then also as you can see it's eleven
18  o'clock, so we would go into lunch as well.
19      What I've decided to do is to let you go until
20  one-thirty. At one-thirty when you come back, we'll
21  have the -- I'm sorry, twelve-thirty. Not one-thirty,
22  twelve-thirty. When you come back at twelve-thirty
23  we'll have the closing arguments and then I'll charge
24  you as to the law. You're to use this hour and-a-half
25  now as your lunch break. So that when you come back at

Page 59

1  twelve-thirty, we can start promptly with the remainder
2  of the trial.
3      Again, do not discuss the case among
4  yourselves or with anyone else, and leave your notes in
5  your chairs. I'll see you back here at twelve-thirty.
6      Do you want them to meet downstairs in this
7  room here?
8      COURTROOM DEPUTY CLERK: Just in the jury
9  room.
10      THE COURT: So you're to meet back in the jury
11  room at twelve-thirty. This is your lunch break.
12      (Whereupon, the jury was escorted out of the
13  courtroom, and the following colloquy ensued):
14      THE COURT: Yes?
15      MR. BRUNER: Your Honor, I don't know that
16  I've officially rested my case, so I would like to do
17  that at this point in time.
18      THE COURT: Do you want to renew your motion
19  as well?
20      MR. BRUNER: I want to renew my motion for
21  rule twenty-nine for judgment of acquittal.
22      THE COURT: Motion for judgment of acquittal
23  is denied.
24      Give me about fifteen minutes and I'll have
25  the jury charge ready for your review. We'll try to do

Page 60

1  that before lunch.
2      MR. SCHIFF: Your Honor, the Government
3  submitted a supplemental --
4      THE COURT: I saw that already.
5      (Whereupon, a recess was taken.)
6          IN OPEN COURT
7      (THE JURY IS NOT PRESENT):
8      THE COURT: Counsel, I wanted to take up the
9  jury charge. I'll hear from the Government first.
10      MR. SCHIFF: Yes, Your Honor. The
11  Government's only suggestion was the removal of the two
12  paragraphs on page eight.
13      THE COURT: Page eight?
14      MR. SCHIFF: Page eight.
15      THE COURT: And they are?
16      MR. SCHIFF: The paragraphs related to --
17      THE COURT: Technical?
18      MR. SCHIFF: Yes.
19      THE COURT: Do you wish to have that in there
20  or not?
21      MR. BRUNER: Judge, I have no opinion on that.
22      THE COURT: Well I'll take out the two
23  paragraphs regarding technical subject matter. The
24  shorter the charge is, the better.
25      Is that it for you?

Page 61

1      MR. SCHIFF: That's all for me.
2      THE COURT: Okay. Now for the defendant?
3      MR. BRUNER: Judge, you have my copy up there.
4      THE COURT: Oh, really?
5      MR. BRUNER: Yes, sir.
6      THE COURT: You should have another copy. Can
7  you look on with his copy?
8      MR. BRUNER: Yes.
9      THE COURT: I think your first objection was
10  to --
11      MR. BRUNER: A supplemental instruction, is
12  what I thought it was essentially.
13      THE COURT: Yeah. I think it was at page
14  fifteen. That's the Government's special request.
15      MR. BRUNER: Right.
16      THE COURT: Okay, what's your problem with
17  that?
18      MR. BRUNER: Judge, first, my problem is where
19  it says Mr. Adewunmi is not on trial. Well he has been
20  indicted; that makes it sound like he's not guilty, and
21  I think that has a very bad suggestion to the jury that
22  you should disregard anything he might have done that
23  might be criminal in nature.
24      THE COURT: Okay. And what else? What about
25  anything else on that page?

| Page 62 | Page 64 |

**Page 62**

1 MR. BRUNER: Not on that page, Your Honor.
2 And the possible guilt of others is no defense to a
3 criminal charge. I disagree with that because if this
4 man is found to have acted on his own, it would be a
5 defense to the conspiracy charge.
6 THE COURT: Okay. What about the following
7 paragraph?
8 MR. BRUNER: Basically that would take care of
9 that paragraph, Your Honor.
10 THE COURT: Okay. What about "The guilt of a
11 defendant in a criminal case may be proved without
12 evidence"?
13 MR. BRUNER: Well that may technically be
14 true, Your Honor, but it also seems to say that my
15 client didn't have to do anything except be there. And
16 that would --
17 THE COURT: I specifically say "presence",
18 don't I? "Mere presence at the scene of a crime, or
19 even knowledge that a crime is being committed, are not
20 sufficient to establish a defendant either directed or
21 aided, or abetted the crime."
22 MR. BRUNER: I agree, but I tend to think --
23 and this is just my reading it -- that that is
24 contradictory to that statement or could be interpreted
25 as contradictory to that present.

**Page 63**

1 THE COURT: Okay.
2 MR. BRUNER: If the mere present statement was
3 at that location, it might make it more viable.
4 THE COURT: This really only applies to counts
5 two through --
6 MR. BRUNER: Two through twelve.
7 THE COURT: Okay. Anything else?
8 MR. BRUNER: No, sir. Those would be my
9 objections to those two paragraphs.
10 THE COURT: I guess we're really talking about
11 the phrase "the guilt of the defendant" really goes on
12 to the end of that section, doesn't it?
13 MR. BRUNER: Yes, sir.
14 THE COURT: Pardon me?
15 MR. BRUNER: Yes, sir.
16 THE COURT: Okay. What I will do is this.
17 I'm going to sustain the objection to the Government's
18 special charge. I'm going to begin the section that
19 says, "The guilt of a defendant," I'm keeping that in,
20 however I'm going to preface it by saying "with regard
21 to counts two through twelve, the following instructions
22 apply." And that will be all the way through the end
23 and that's it.
24 MR. SCHIFF: Was it Your Honor's intention to
25 strike the Government's proposed charge in its entirety,

**Page 64**

1 or simply the particular section --
2 THE COURT: I actually think it's redundant,
3 to be quite honest with you. But there is a pattern
4 charge at the end that talks about the fact that if you
5 hold one defendant guilty, I believe --
6 MR. SCHIFF: That's a charge on one count.
7 Here only one defendant is on trial, is charged, and I
8 think Mr. Bruner's concerns --
9 THE COURT: I don't think anyone's going to
10 make that argument anyway. What you've done is you've
11 taken it out of the language of the case book, and I'm
12 very reluctant because I haven't thought it through.
13 When we write opinions we don't necessarily write them
14 as charges, and I just prefer not to give it.
15 So I will start out, though, with the
16 remainder with regard to counts two through twelve, "The
17 jury is instructed as follows," and I'll give the rest
18 of that charge all the way through the end to the three
19 elements at the end.
20 MR. BRUNER: Judge, we'd be satisfied if the
21 Court does that.
22 THE COURT: Very good. That's what I'm going
23 to do.
24 Ready to bring the jury in? I need about
25 three minutes and we can put the jury in the box.

**Page 65**

1 (Whereupon, a recess was taken.)
2 THE COURT: You may present your case to the
3 jury, Mr. Schiff.
4 CLOSING ARGUMENTS:
5 MR. SCHIFF: Good afternoon, Your Honor.
6 May it please the Court, ladies and gentlemen
7 of the jury, good afternoon.
8 Thank you for your time and attention the last
9 two days. We're going to ask to you pay very close
10 attention for the next hour or so while the lawyers
11 close and the judge instructs you on the law.
12 Two preliminary things. I want to show you --
13 You will have back in the jury room the indictment and
14 the exhibits. And the indictment, as you will hear, is
15 not evidence, it's simply a roadmap of the charges in
16 this case. And you'll see in the indictment there is
17 count one which charges conspiracy, and then there's
18 counts two through twelve which allege the aiding and
19 assisting in the filing of a false tax return.
20 What you'll see in the indictment is that the
21 taxpayers are identified for privacy reasons by their
22 initials rather than their full names. And I would
23 suggest to you that it will be easier for to you follow
24 along during your deliberations if the first thing you
25 do is just pencil in the name of the actual taxpayer

Page 66

1 rather than trying to figure out each time that M. J. R.
2 is Mary Rumph.
3        I also wanted to make a quick comments about
4 the Government's numbering system in the exhibits. The
5 Government had several exhibits beginning with one.
6 Those are general exhibits didn't pertain to any
7 particular count, but to the case as a whole.  Then for
8 each taxpayer and for each count, the Government had
9 exhibits labeled two A, two B, two C for count two;
10 three A, three B, three C and so forth.
11        All of the A documents are the tax returns
12 themselves that you saw.
13        All of the B documents are the copies of the
14 refund checks, the instant refund checks that were
15 issued by Household.
16        And all of the C documents are a copy of the
17 deposit slip showing where the refund check was
18 deposited.  And there is a C document for each count,
19 except for the Charlotte Green count.  She was the woman
20 who testified that she cashed her check at
21 a Chandlers's check cashing place, so there is no bank
22 deposit slip.  The only other one we don't have a
23 deposit slip for is Martha Green.  That's the one where
24 the person from Household testified that the copy of the
25 check is illegible.

Page 67

1        Now with those preliminaries out of the way, I
2 want to talk about the evidence in this case.  This is
3 my chance to summarize the evidence and to argue why it
4 supports a verdict of guilty in this case.
5        Now in this case the Government and the
6 Defense appear to agree that a crime was committed and
7 that Jonathan Adewunmi was a part of it.  The Defense's
8 contention is that Mr. Adewunmi was the only player in
9 this scheme.  And if they're right, Mr. Okonkwo should
10 be found not guilty.
11        But as I will argue, the evidence is very
12 clear that Mr. Okonkwo was a full participant in this
13 scheme, and that really the decision for you is whether
14 Mr. Okonkwo was acting jointly with Mr. Adewunmi, in
15 which case Mr. Okonkwo would be guilty of all of the
16 counts in the indictment, or Mr. Okonkwo and Adewunmi
17 somehow independently operating the same scheme in two
18 different locations, with Mr. Okonkwo having the Dothan
19 franchise, and Mr. Adewunmi having the Fort Walton Beach
20 franchise.  In which case perhaps Mr. Okonkwo would be
21 perhaps only be guilty of the certain counts where he
22 himself dealt with the taxpayer.
23        My argument will be first that the evidence
24 clearly shows and rejects the Defense theory that Mr.
25 Adewunmi is the only player in this case.  Secondly,

Page 68

1 that the evidence shows that this was joint conduct by
2 both defendants, and that Mr. Okonkwo is guilty not only
3 of the counts where he directly dealt with the taxpayer,
4 but all of the counts of this indictment.
5        Now let's look at first the four returns where
6 Mr. Okonkwo is the person who deals with the taxpayer.
7 First I want to talk about Charlotte Green.  She was the
8 one who testified this morning that she cashed the check
9 at Chandlers's Check Cashing.  She gives Okonkwo, not at
10 Adewunmi her W-twos.  She's the one who -- excuse me,
11 Mr. Okonkwo is the one who transmits her return to the
12 I. R. S.
13        How do we know that he's the one that
14 transmits the return?  Well you had his own statement to
15 Agent Ellis when he was interviewed back in two thousand
16 and one.  He said that for the nineteen ninety-nine tax
17 season, he was the only one who transmitted returns.
18 When the money comes in and Miss Green is very happy
19 because she thinks she's gotten lucky and gotten a
20 twenty-six hundred dollar refund.
21        Mr. Okonkwo said no, no, no, it's the thousand
22 dollar we talked about.  You go cash this check and
23 bring me back the sixteen hundred dollars.  And he gives
24 her some story about how the money is needed to pay
25 taxes.  That story didn't make any sense; that was just

Page 69

1 a way -- she wasn't going to ask any questions, she was
2 very happy to have her thousand dollars and she was
3 going to do what she was told.  And she did what she was
4 told.  She cashed the check and put the money in Mr.
5 Okonkwo's hands.
6        The next taxpayer, again, no money on Mr.
7 Adewunmi on that one.
8        Tia Doyle has a dating relationship with Mr.
9 Okonkwo, not Mr. Adewunmi.  Mr. Okonkwo knows that Tia
10 Doyle only worked only for Dairy Queen and not C. J. B.
11 Ice Cream.  Mr. Okonkwo knows that Ms. Doyle, twenty
12 years old, didn't have a new baby and didn't have a
13 twenty-eight year old permanently disabled foster child.
14 Mr. Okonkwo is the one who tells Ms. Doyle that she's
15 going to be getting a refund of about a hundred dollars.
16 And most importantly, when the money comes in, the big
17 check, the four thousand dollar check, what happens to
18 it?  It goes into Mr. Okonkwo's bank account at Eagle,
19 Eagle's bank account at Regions Bank.
20        You may remember at the very beginning of the
21 case a lot of documents were entered by stipulation.
22 One of those documents was the signature card from
23 Regions Bank.  Eagle Financial Services, Matthew
24 Okonkwo, president.  Now on Ms. Doyle's check we have
25 the testimony yesterday of Miss Thomas, the employee.

Page 70

1  She said she ran to the bank occasionally, but that it
2  was Mr. Okonkwo who always did the deposit slips.  So
3  it's not like -- And here's a deposit slip.  It doesn't
4  show up too well on the screen, but you'll see when you
5  go through it, you'll see that attached to the deposit
6  slip that was prepared by Mr. Okonkwo is the check to
7  Miss Doyle.
8          Now think about Mr. Okonkwo's reaction when
9  that check comes in if he's not involved in the scam
10 versus he is involved in the scam.  He's dating this
11 woman and all of a sudden, who he thinks if he's not
12 involved in the scam is getting a hundred dollar refund,
13 and all of a sudden a check shows up for forty-three
14 hundred dollars.  Now if he's not involved in the scam,
15 you would expect a call to Miss Doyle, hey, guess what,
16 you got more money.  Something.  Something other than
17 simply just taking the check and putting it in his bank
18 account.
19         That's what you do if you know you're in on
20 the fraud; you don't tell Ms. Doyle, you just take the
21 money and put it in your bank account and keep it
22 because you're expecting the big money.  You're not
23 expecting a hundred dollars, he knows the big check is
24 coming in because he knows perfectly well that a false
25 return was filed on Ms. Doyle's behalf.

Page 71

1          Tawanna Campbell is virtually the same story
2  as Miss Doyle.  She's the one who knows Mr. Okonkwo.  He
3  seems to buy her gifts and pay her rent occasionally.
4  She's the one who gives her real W-two's Okonkwo.  She's
5  the one who doesn't give him her children's Social
6  Security numbers because she knows that she has an aunt
7  and her mother who are going to be declaring her
8  children as dependents.  It's Mr. Okonkwo who transmits
9  that return to the I. R. S., and it's Mr. Okonkwo who
10 tells Miss Campbell, now known as Mrs. Tyler, that she's
11 getting a refund of about three hundred dollars.
12         Once again, the big check comes in, the four
13 thousand dollar check.  Once again, no call to
14 Miss Campbell saying guess what, we did much better than
15 we thought.  Nope, that's just money going into Mr.
16 Okonkwo's bank account at Eagle with Mrs. Campbell never
17 the wiser.  Only someone who was involved in the scam
18 and knew it was going on would act like that,
19 particularly now it's a third time.  Ms. Green's
20 oversized the check, Ms. Doyle's oversized check, Ms.
21 Green's oversized check and Miss Campbell's oversized
22 check.  All on people who Mr. Okonkwo dealt with
23 directly.
24         Martha Green.  Now she doesn't deal with Mr.
25 Okonkwo at all, but her husband had.  Now I can't show

Page 72

1  you where her money went, but what I can show is that on
2  that particular tax return we know Mr. Okonkwo
3  transmitted it because he transmitted all the returns.
4  But in addition, the notion that Mr. Adewunmi somehow
5  did this, if Mr. Green dealt only with Matthew Okonkwo
6  -- and on that particular tax return, that's the one
7  that I showed to Kim Starling, the employee who
8  testified this morning, that's the one that had her
9  Social Security number as the tax preparer.  She said
10 she didn't do that return, and she said she remembered
11 the people that she did returns for.
12         To believe this Adewunmi theory, Mr. Adewunmi
13 must have been some kind of evil genius, because he's
14 able to get people -- to get not only Mrs. Green's
15 Social Security number when Mr. Green had dealt only
16 with Matthew, he got Matthew Okonkwo's employees' Social
17 Security numbers, all for the purpose of filing tax
18 returns which for the most part benefit Mr. Okonkwo
19 through the filing -- through deposits into his bank
20 account at Regions Bank.
21         Now this evidence clearly refutes any notion
22 that Mr. Adewunmi was a lone ranger on this.  In fact,
23 on any of these particular taxpayers, it would seem that
24 the only significant involvement of Mr. Adewunmi was to
25 provide the information that allows Mr. Okonkwo to put

Page 73

1  in the fake C. J. B. Ice Cream W-two information.  This
2  evidence is clearly sufficient to support a verdict of
3  guilty on the counts relating to Charlotte Green, Tia
4  Doyle, Tawanna Campbell and Martha Green.
5          Judge Thompson will instruct you -- And,
6  again, I'm going to be anticipating Judge Thompson's
7  instructions.  But when it comes to the law, the judge
8  has the final say.  If anything I say anything is
9  different, listen to his instructions.  But I anticipate
10 that you'll be instructed that to find Mr. Okonkwo
11 guilty of any false tax return, the Government will have
12 to prove that Mr. Okonkwo aided or assisted in the
13 preparation and filing of an income tax return that was
14 false in a material way as charged in the indictment and
15 that Mr. Okonkwo did so knowingly and willfully.
16         Here Mr. Okonkwo clearly assisted in the
17 preparation and filing of these returns.  He's the one
18 who -- again, we're talking about those first four.
19 He's the one that takes the information, he's the one
20 that transmits the information to the I. R. S.  The
21 returns were false.  And it's really not really disputed
22 that they're false.  The C. J. B. Ice Cream W-two's are
23 admitted to be fakes, the children, except in the
24 case of Charlotte Green, the children could not exist,
25 or at least they don't belong to these particular

Page 74

1  taxpayers.
2        These false statements were material.
3  "Material" means they had the ability of influencing the
4  I. R. S. You heard the testimony from the I. R. S.
5  representative that there was a sweet spot, so to speak,
6  for the earned income tax credit. That if you had
7  income between roughly eight and twelve thousand dollars
8  and two dependents, that's where you would get the
9  maximum earned income tax credit. That's why you needed
10 to put down children that didn't exist, and that's why
11 you needed W-two's from C. J. B. Ice Cream to boost the
12 income into that sweet spot.
13       Now finally, and probably the most disputed
14 element in this case, is that Mr. Okonkwo -- whether Mr.
15 Okonkwo knew that these returns were false. And the
16 evidence I just summarized I think shows pretty clearly
17 that he knew that these returns were false. He's given
18 the true information by the taxpayer, the return is
19 filed through his business with completely false
20 information, and he gets the money. Money that's way
21 out of size for the information that he's been given.
22       So, again, this evidence shows that Mr.
23 Okonkwo was guilty on count three relating to Charlotte
24 Green; count ten, relating to Tia Doyle; count eleven,
25 relating to Martha Green; and count twelve, related to

Page 75

1  Tawanna Campbell.
2        Now this leaves the conspiracy count and the
3  counts relating to the returns where Mr. Adewunmi is the
4  one who has the contact with the taxpayer. And, again,
5  the question will arise, is this joint conduct? For a
6  conspiracy there has to be an agreement to commit a
7  crime and action by at least one of the conspirators in
8  furtherance of the crime. It seems agreed upon that Mr.
9  Adewunmi is running a scam. As I've just argued to you,
10 Mr. Okonkwo was running a scam. The question is, is
11 this one scam being operated out of two locations, or is
12 this two separate and independent scams? And I think
13 the evidence shows joint action by the two of them.
14       Here's the evidence that shows that they were
15 working together. First of all, each one of these
16 returns, whether it's an Okonkwo client or an Adewunmi
17 client, is filed through Mr. Okonkwo's business using
18 one of the two E. F. I. N. numbers. You remember that
19 term, there was one for Eagle Financial and one for
20 Rainbow Tax using one of those two E. F. I. N. numbers.
21 Several of Jonathan's clients -- Yvette have Mr.
22 Okonkwo's employee, Yvette Thomas's Social Security
23 number used.
24       But the most significant piece of evidence on
25 joint action is what happens to the money. This is a

Page 76

1  very strange scam if Mr. Adewunmi is doing it on his
2  own. It's a scam that he's committing to benefit Mr.
3  Okonkwo if he's doing it on his own. Because even with
4  Mr. Adewunmi's clients, on three separate occasions
5  Eagle is the one who gets the money.
6        Robin Hill, the very first witness from -- no,
7  excuse me, the third witness from yesterday from
8  Jacksonville. She said that she had used Jonathan
9  Adewunmi on two different years and had no dealings --
10 Mr. Bruner was very careful to point out that the people
11 from Fort Walton Beach had no dealings with Matthew
12 Okonkwo. But yet where does her four thousand three
13 hundred and thirty-seven dollar check end up? You'll
14 see exhibit seventeen, a deposit slip filled out by Mr.
15 Okonkwo putting that money in his bank account.
16       James Harris testified this morning. He's the
17 one who dealt with Mr. Adewunmi and John told him put
18 the papers in my ice cream truck. Miss Hill's check was
19 for three thousand nine hundred forty-nine, Mr. Harris
20 has the four thousand three hundred and thirty-seven
21 dollar check. His check ends up in the bank account of
22 Eagle Financial. Adewunmi contact, Eagle gets the
23 money.
24       Finally, Quincy Campbell. He was our second
25 witness from yesterday. His wife was Shonda, and then

Page 77

1  him. She's the one who testified that she made all the
2  arrangements. And what's interesting about their
3  situation is that she makes the arrangements for both
4  her and her husband. Her four thousand dollar check
5  ends up in one of Mr. Adewunmi's accounts, one of his
6  wife's accounts, yet the four thousand check payable to
7  her husband ends up in the Eagle bank account. Once
8  again, an Adewunmi contact results in money in Mr.
9  Okonkwo's bank account.
10       Think of it this way. Suppose someone
11 reported their credit card was stolen and had been used
12 to buy merchandise. And then you go to the person's
13 house and find out that the merchandise is in their
14 house. You have to conclude that either they had made a
15 false police report, or were in on the theft in some
16 way. Well that's what's happening here. A scam is
17 being committed and it's being committed for the benefit
18 of both Adewunmi and Mr. Okonkwo. Even when it's Mr.
19 Adewunmi's client.
20       Mr. Adewunmi had a way to get these checks
21 cashed. You'll see that on some of the taxpayers,
22 Lashonda Lee and three of the others, the check ends up
23 in his wife's account. If he was doing this on his own,
24 he would simply have put all of these checks in his
25 wife's account. There was no reason for him to cut

**Page 78**

1 Matthew in, unless Matthew is in on it too.

2     This evidence is sufficient, is more than

3 sufficient to prove beyond a reasonable doubt joint

4 action, conspiracy between Mr. Okonkwo and Mr. Adewunmi

5 to file false income tax returns with the United States

6 and your verdict should be guilty on count one,

7 conspiracy.

8     As a result of this same evidence, your

9 verdict should be guilty on the counts related to the

10 particular returns where Mr. Adewunmi is the contact

11 person. Robin Hill, count four; James Harris, count

12 seven; and Quincy Campbell, count nine. Those are the

13 counts where Mr. Adewunmi has the contact but the money

14 goes into Eagle bank account. Mr. Okonkwo furthers the

15 conspiracy on those people by filing their tax returns

16 and transmitting them to the I. R. S. and depositing the

17 checks into his account.

18     On the other three, Mary Rumph, count two;

19 lashonda Lee, count five; and Tenesia Fountain, count

20 six. Mr. Okonkwo furthered the conspiracy by filing the

21 returns and giving the rapid refund checks to Mr.

22 Adewunmi to do with as he pleased.

23     In summary, there is overwhelming evidence

24 that Mr. Okonkwo presented false returns, both with

25 respect to the people that he dealt with directly and

**Page 79**

1 with respect to the people that were brought to him --

2 or whose checks were brought do him by Mr. Adewunmi.

3 The motive is simple and obvious, money. Each time they

4 do this it's anywhere from a two, or three or four

5 thousand dollar payday.

6     Thank you for your time and attention. I'll

7 have one last brief chance to address you after Mr.

8 Bruner's argument.

9     Thank you.

10     THE COURT: Mr. Bruner?

11       CLOSING ARGUMENTS:

12     MR. BRUNER: Thank you, Your Honor.

13     Ladies and gentlemen, I told you at the

14 beginning of this case that I'm a pretty simple person.

15 I like to break things into simple ideas. I'm not real

16 good at all with these computers and this type of stuff,

17 so for my mind I'm going to break it down as simple as I

18 can get it. And some of y'all can probably understand

19 this stuff a lot better than me.

20     What we have here is very simply a situation

21 where my client, Matthew Okonkwo, had a successful tax

22 business. By the testimony of the Government, you know,

23 they had a thousand tax returns that year. That's a lot

24 of tax returns. Don't know how much they're charging on

25 each one, but if you figure fifty dollars, that's fifty

**Page 80**

1 thousand dollars you're making right there. It's a lot

2 of money for Dothan, Alabama. Out of those thousand,

3 the Government here as eleven where there is a problem.

4 The problem is Jonathan got a business and got his W-two

5 attached to these eleven.

6     You will all get a copy of this indictment to

7 take back in the jury room with you. Now it's important

8 that you read the exact language in the indictment. And

9 I have to disagree with my friend Mr. Schiff here, who

10 said this indictment is a roadmap to what happened.

11 This is not a roadmap, this is a charge. This is what

12 my client has been accused of. If they can't prove

13 what's in this indictment, then the Government can't win

14 this case and they can't sustain this prosecution. It's

15 not a roadmap to anywhere. This is a charge. It's an

16 allegation. It's an accusation against my client.

17     Now like I said, I'm not going to put this on

18 the screen, I'm not that literate, but I'm going to read

19 something to you. And this is about a six or seven page

20 document. The first thing we've got is my client being

21 charged with a conspiracy with Jonathan. I like to use

22 common sense when I think about what's in a conspiracy.

23     The simplest kind of conspiracy is where I go

24 up to somebody and I say hey, let's get together and

25 let's do X, Y and Z. And they go great, let's do it.

**Page 81**

1 Why don't we create false tax returns and make a lot of

2 money. Yeah, let's do that. That's the simplest kind.

3 That's not the kind the Government is going to argue

4 here because it doesn't make sense. Because think about

5 it, how would that work?

6     Jonathan comes up to Matthew. Matthew, I've

7 got an E. I. N., that's an Employer Identification

8 Number, we can put false tax returns together and we can

9 put my E. I. N. on them. And that's going to make us

10 more money and we'll just keep those checks. He goes

11 great, let's do that. Well whose are we going to do

12 them on? Well I don't know. You didn't see any

13 splitting of money here. You've got money going into

14 different accounts. There is no doubt about that. What

15 you don't have in the Government's case is the money

16 coming out of those accounts. We don't know how much

17 money Jonathan received or took or otherwise procured

18 from that Regions Bank account.

19     What we do know is that in all but four of

20 those transactions, Jonathan was the only person that

21 dealt with the individuals who had their tax returns

22 misused. The only person. Didn't even know. You heard

23 me stand here and probably got tired of hearing me ask

24 but do you know my client? Never seen him before. They

25 had no knowledge of him. What Jonathan was doing was

Page 82

1 Jonathan needed to get these loans from Household
2 finance. He wasn't set up to do that. He needed
3 somebody to work with who did that. And my client, as
4 you heard Kim, his former office manager, said he had
5 several people who worked for him and had their own
6 clients. And he allowed them to use that filing system.
7       MR. Schiff makes a big deal about well, he's
8 the one who transmitted it. You heard Kim say well,
9 everything goes in there. You just push a button.
10 That's all it is, is pushing a button. It's where you
11 hit transmit on your computer and that's what he did.
12 He didn't verify that those returns were correct, he
13 didn't verify and go through and look at the ten
14 ninety-nines. Didn't have ten ninety-nines and W-two's.
15 This is a computer operation. He had a bunch of numbers
16 in there. Jonathan comes in and says hey, do it, get
17 this one. Okay, here it is, you put it in the computer.
18 All right, it's gone.
19       Now there is a problem here when these checks
20 come in. I believe Mr. Schiff referred to it as
21 strange. Well it is, and that's one reason for
22 reasonable doubt, ladies and gentlemen. Something
23 strange, that means it doesn't make good common sense.
24 We don't know where the money is going or why it's going
25 different places. It's a little bit confusing. It

Page 83

1 needs to be looked at deeper. But that's not our job to
2 show, that's Mr. Schiff's job. If it's strange to him,
3 that's reasonable doubt to you.
4       Let's get back to conspiracy. Conspiracy is
5 joint. That means we're doing something in some sort of
6 coordinated fashion with knowledge. What in the world
7 is coordinated about any of this? You know, it's one
8 thing if you see a pattern, a pattern would show
9 coordination. Every tenth tax return had one of these
10 W-two's put on it. It would be coordinated or it had
11 some suspicious activity that only females above
12 the age of fifty had these W-two's put on.
13       You could show that every third day Mr.
14 Adewunmi was in my client's office and suspicious things
15 happen. We don't have anything like that. We have a
16 bunch of random acts here. Do you wake up one morning
17 and say yeah, this is a tax return, let's put that false
18 W-two on it? It doesn't make sense. It doesn't show
19 coordination. It doesn't show a scheme. What you've
20 got here is Jonathan using this computer system for his
21 own gain.
22       You're not going to find in any of this
23 evidence when you take it back there and look at it any
24 W-two's with my client's E. I. N. on it, it's Jonathan's
25 E. I. N. that's on these tax returns. It's Jonathan who

Page 84

1 dealt with all these people or did their returns. You
2 heard Miss Green, I believe, when I asked her on the
3 witness stand, I said she dealt directly with Matthew
4 and Matthew's office. She said Matthew called in
5 Jonathan and introduced him to her and said, "He's going
6 to be the one handling your return."
7       Ladies and gentlemen, this is tax season.
8 They have a thousand returns to do. My client has a
9 business to run. He's going to distribute returns that
10 come in that he hasn't got time to do. So that's what
11 he did. He called Jonathan in and said, "Hey, I'm going
12 to have Jonathan here handle your return." And Jonathan
13 handled it. And that was his W-two with his E. I. N.
14 that was on her return. Nothing regarding Matthew
15 Okonkwo or Eagle Financial. Nothing.
16       Now I keep coming back to the conspiracy. Of
17 course there's a conspiracy here? They haven't shown
18 them splitting the money. They haven't shown them both
19 doing anything. There's no conspiracy because they
20 can't show an agreement. The fact that there is
21 coordination is very important to conspiracy theory and
22 conspiracy law.
23       Let me tell you something that the judge will
24 instruct you on a little bit. Inferences. We all draw
25 inferences, and you should draw inferences from the

Page 85

1 evidence you've seen. Now what's an inference? An
2 inference is if I go to sleep the night of December
3 twenty-third and it's a beautiful night outside, I wake
4 up in the morning and walk out my door and there is
5 white cold stuff all over the ground. I can infer that
6 it snowed last night. That's permissible for a jury to
7 make those sorts of inferences. Speculation, however,
8 or guessing, is something else.
9       What's speculation and guessing? That's where
10 you've got no reasonable basis to make an assumption.
11 Now the problem we have here, nobody knows what went on
12 in that office with Jonathan. You've got a gap there
13 between Jonathan and my client. It's my suggestion to
14 you that to speculate that well, they must be working
15 together, I mean this kind of went in his bank account,
16 well Matthew interviewed this person then turned it over
17 to him. That puts knowledge on my client. I would
18 argue to you that's speculation. You're guessing at
19 that point in time. You're just saying well, it kind of
20 looks like it.
21       This isn't C. S. I., or one of these crime
22 shows these days that are out there, but you didn't see
23 any experts in here on handwriting. Didn't have any
24 computer experts tearing down computers saying this
25 transmission came from this location at that particular

Page 86

1 time. You could make some assumptions if they had that
2 evidence, but they don't have any evidence. It's the
3 Government's burden to have that evidence, it's not the
4 defendant's.
5     Like I said, this isn't a roadmap, this is an
6 allegation. It's a charge, and that's all it is. But I
7 want you to read it carefully when you go into that jury
8 room because it's critical. No one should be convicted
9 for something that you think this says, because it's
10 complicated. Like Mr. Schiff has said, they have used
11 abbreviations and different terms and they have kind of
12 got schedules out in here -- and I apologize for going
13 back to my glasses, but you need to read the words.
14 Object of the conspiracy, it's on page two. What it
15 says is, "On or about the dates set forth below," that's
16 in Mr. Schiff's schedule down here, Okonkwo and Adewunmi
17 caused to be filed federal income tax returns.
18     Mr. Okonkwo and Mr. Adewunmi both. That's the
19 conspiracy charge.
20     Then it says number six, at or about the same
21 time of the filing of the returns, Okonkwo dispersed the
22 proceeds, the Household proceeds from the anticipation
23 loan, approximately about four percent. Did you all
24 hear anything about that? The checks came in. He
25 didn't make out any checks.

Page 87

1     Then they have overt acts in here. I don't
2 know if y'all -- The judge will instruct you on what an
3 overt act is, but an overt act basically is something my
4 client did in the furtherance of a conspiracy, so they
5 say. It says one of the eight, on or about February
6 twenty-fifth, two thousand Adewunmi obtained a W-two
7 form. And that's an overt act on my client? My client
8 had no idea he had obtained a W-two form on that date.
9 Is that somehow an overt act on my client?
10     Then we get to counts two through twelve, and
11 these are the single counts. That's where they're
12 charging everybody out here saying you defrauded the
13 Government in this case. Not that y'all agreed to it,
14 but my client specifically defrauded the person in the
15 particular case. And in here it says Matthew and
16 Jonathan, while aiding and abetting each other, did
17 willfully aid and assist and procure, counsel and advise
18 the preparation and presentation to the I. R. S. of
19 these tax returns. Aiding and abetting each other.
20 Counseling each other. Working with each other. It's a
21 little more than just knowing.
22     The judge is going to instruct you on what's
23 called mere presence. Mere presence can mean just
24 because I'm there, I don't have to worry about it if
25 somebody else is committing a crime necessarily. I

Page 88

1 don't even -- you know, I can know they're committing a
2 crime in a lot of cases and not even do anything. There
3 is no obligation on a person just because they're
4 present when a crime is being committed. They're not
5 liable for that crime, the person who commits it is.
6 Jonathan is in this case. So read the indictment. It's
7 critical.
8     Now I want to talk to you about something else
9 that the judge is going to charge you about, reasonable
10 doubt. And what is reasonable doubt? The judge is
11 going to charge you something to the effect, it's the
12 type of certainty you need for the most important
13 decisions in your life. Who are you going to leave the
14 children with? Are you sure they're good people? You
15 want to have certain certainty, more than just going
16 buying a Coca-Cola and being sure that it's good Coke.
17     I always use this explanation, and it's a
18 little trivial but I think it kind of gets my point
19 across. Got an engineer. The engineer has to design a
20 bridge, and he goes on one of these computers and he
21 figures out that he is going to need, in order to build
22 this bridge, posts. They are twenty-four inches in
23 diameter in order to hold the weight of this bridge
24 because people are going to be coming back and forth
25 across it. Now does he go and buy twenty-four inch

Page 89

1 posts? No.
2     He buys thirty-six inch posts because he wants
3 to be sure that anybody crossing that bridge is not
4 going to be at risk. He wants to go that extra step to
5 make sure that his decisions are correct ones and
6 everything is done correctly because the risks are too
7 great. That's what I think reasonable doubt is. I
8 would ask for you to consider it.
9     Ladies and gentlemen, I appreciate your
10 attention during this. And Matthew Okonkwo appreciates
11 it. It's a great country we live in. We have an
12 election coming up. Voting is a great privilege in
13 America. Jury service is the other great privilege. I
14 thank you for your time and patience with me and God
15 speed.
16     Thank you, Your Honor.
17 THE COURT: You're welcome.
18     Mr. Schiff.
19     REBUTTAL CLOSING ARGUMENTS:
20     MR. SCHIFF: Just a couple of points. Lots of
21 returns done that year, but no files for these
22 particular people. No files for the ones where Mr.
23 Okonkwo had the direct contact with the people. Because
24 if there was a file, that person would have gotten --
25 the receptionist would have called the person to come

Multi-Page

Page 90

1 get the check. Mr. Okonkwo made sure that there was no
2 file.
3        Now in his opening statement Mr. Bruner asked
4 where did the money go. Well, the money went to Mr.
5 Okonkwo, into his bank account on five different
6 occasions A check is deposited into the Eagle account,
7 and on one occasion Miss Charlotte Green cashes the
8 check and gives him the money. And in his closing, the
9 defense counsel said well, we don't know what happened
10 to the money after. There is no evidence -- I suppose
11 the theory is that Mr. Adewunmi somehow raided the bank
12 account and took out the money for himself. Well there
13 is no evidence of that happening.
14        I showed you the signature card that Mr.
15 Okonkwo was the only signer on that bank account. The
16 deposit tickets are all filled out by him personally.
17 That's his account. The money -- It's his business.
18 Once the money has gotten into his business, it's his.
19 No evidence that any money got out of that account to
20 Mr. Adewunmi.
21        Now in terms of something being strange, what
22 would be strange is that if Mr. Adewunmi was taking
23 money and giving it to Mr. Okonkwo to put in the Eagle
24 account without Mr. Okonkwo being involved in the scam.
25 That would be a strange turn of events. What would be

Page 91

1 perfectly normal or understandable is that the reason
2 Mr. Adewunmi is taking money that he's managed to scam
3 and giving it to Mr. Okonkwo to put in the Eagle
4 account, is that Mr. Okonkwo is in on it, too. He's in
5 on it both for his own clients, the ones I talked about
6 first, and he's in on it with respect to the people that
7 Mr. Adewunmi was dealing with as well.
8        Ladies and gentlemen, you're about to make a
9 very important decision, whether or not Mr. Okonkwo is
10 guilty of the offenses charged. Just because a decision
11 is important doesn't mean that it's difficult. Here the
12 scam is clear. Eleven fake tax returns, all filed
13 through the business with a good chunk of the money,
14 more than half of it, going directly to Mr. Okonkwo
15 through people he dealt with and people he didn't deal
16 with. The verdict on all counts should be guilty.
17        Thank you again for your time and attention.
18             JURY CHARGE:
19        THE COURT: Anthony, will you pass out copies
20 might have charge.
21        Members of the jury, you now have before you
22 my instructions on the law. I'm going to ask that you
23 read these instructions along with me.
24        It is my duty to instruct you on the rules of
25 law that you must follow and apply in deciding this

Page 92

1 case. When I have finished, you will go to the jury
2 room and begin your discussions, what we call your
3 deliberations. It will be your duty to decide whether
4 the Government has proved beyond a reasonable doubt the
5 specific facts necessary to find the defendant guilty of
6 the crimes charged in the indictment. You must make
7 your decision only on the basis of the testimony and
8 other evidence presented here during the trial, and you
9 must not be influenced in any way by public opinion or
10 by the sympathy or prejudice for or against the
11 defendant or the Government.
12        Both the defendant and the Government expect a
13 fair trial at your hands, and that you will carefully
14 and impartially consider this case without prejudice or
15 sympathy. You must also follow the law as I explain it
16 to you, whether you agree with that law or not. And you
17 must follow all of my instructions as a whole. You may
18 not single out or disregard any of the Court's
19 instructions on the law.
20        Now the indictment or formal charge against
21 the defendant is not evidence of guilt. Indeed, every
22 defendant is presumed by the law to be innocent. The
23 law does not require a defendant to prove innocence or
24 to produce any evidence at all. And if a defendant
25 elects not to testify, you should not consider that in

Page 93

1 any way during your deliberations. The Government has
2 the burden of proving a defendant guilty beyond a
3 reasonable doubt, and if it fails to do so, you must
4 find that defendant not guilty.
5        When a defendant is placed on trial charged
6 with the commission of a public offense, the law says
7 that he is presumed to be innocent of the offense. A
8 defendant enters this trial with a presumption of
9 innocence in his favor, and it is a fact which is to be
10 considered as evidence and should not be disregarded.
11 And this presumption of innocence remains with a
12 defendant during the trial until overthrown by evidence
13 which convinces you, the jury, of a defendant's guilt
14 beyond a reasonable doubt.
15        While the Government's burden of proof is a
16 strict or heavy burden, it is not necessary that a
17 defendant's guilt be proved beyond all possible doubt.
18 It is only required that the Government's proof exclude
19 any reasonable doubt concerning the defendant's guilt.
20        A "reasonable doubt" is a real doubt based
21 upon reason and common sense after careful and impartial
22 consideration of all the evidence in the case. "Proof
23 beyond a reasonable doubt," therefore, is proof of such
24 a convincing character that you would be willing to rely
25 and act upon it without hesitation in the most important

Page 94

1 of your own affairs. If you are convinced that the
2 defendant has been proved guilty beyond a reasonable
3 doubt, say so. If you are not so convinced, say so.
4 As stated earlier you must consider only the
5 evidence that I have admitted in the case. The term
6 "evidence" includes the testimony of the witnesses and
7 the exhibits admitted in the record. Remember that
8 anything the lawyers say is not evidence in the case.
9 It is your own recollection and interpretation of the
10 evidence that controls. What the lawyers say or have
11 said is not binding upon you. Also, you should not
12 assume from anything I may have said that I have any
13 opinion concerning any of the issues in this case.
14 Except for my instructions to you on the law, you should
15 disregard anything I may have said during the trial in
16 arriving at your own conclusion concerning the facts.
17 In considering the evidence you may make
18 deductions and reach conclusions which reason and common
19 sense lead you to make. And you should not necessarily
20 be concerned about whether the evidence is direct or
21 circumstantial. "Direct evidence" is the testimony of
22 one who asserts actual knowledge of a fact, such as an
23 eyewitness. "Circumstantial evidence" is proof of a
24 chain of facts and circumstances tending to prove or
25 disprove any fact in dispute. The law makes no

Page 95

1 distinction between the weight you may give to either
2 direct or circumstantial evidence.
3 Now in saying that you must consider all of
4 the evidence, I do not mean that you must accept all of
5 the evidence as true or accurate. You should decide
6 whether you believe what each witness had to say and how
7 important that testimony was. In making that decision
8 you may believe or disbelieve any witness in whole or in
9 part. Also, the number of witnesses testifying
10 concerning any particular dispute is not necessarily
11 controlling. You may decide that the testimony of a
12 smaller number of witnesses concerning any fact in
13 dispute is more believable than the testimony of a
14 larger number of witnesses to the contrary.
15 In deciding whether you believe or do not
16 believe any witness, I suggest that you consider which
17 side called the witness, as well as the demeanor and
18 manner in which the witness testified, and that you ask
19 yourself a few questions.
20 Did the witness impress you as one who was
21 telling the truth?
22 Did the witness have any particular reason not
23 to tell the truth?
24 Did the witness have a personal interest in
25 the outcome of the case?

Page 96

1 Did the witness seem to have a good memory?
2 Did the witness have the opportunity and
3 ability to observe accurately the things he or she
4 testified about?
5 Did the witness appear to understand the
6 questions clearly and answer them directly?
7 Did the witness's testimony differ from other
8 testimony or other evidence?
9 You should also ask yourself whether there was
10 evidence tending to prove that a witness testified
11 falsely concerning some important fact, or whether there
12 was evidence that at some other time a witness said or
13 did something, or failed to say or do something which
14 was different from the testimony the witness gave before
15 you during the trial.
16 You should keep in mind, of course, that a
17 simple mistake by a witness does not necessarily mean
18 that that witness was not telling the truth as he or she
19 remembers it, because people naturally tend to forget
20 some things or remember other things inaccurately. So
21 if a witness has made a misstatement, you need to
22 consider whether it was simply an innocent lapse of
23 memory or an intentional falsehood. And the
24 significance of that may depend upon whether it has to
25 do with an important fact or with only an unimportant

Page 97

1 detail.
2 You should not give extra credence to a
3 person's testimony just because of his or her status as
4 a law enforcement officer. You must consider him or her
5 as any other witness. Under the laws of the United
6 States witnesses, including law enforcement officers,
7 are the same. Feelings of support for law enforcement
8 officers, right or wrong, have no place under our system
9 of justice.
10 Now the defendant in this case is Matthew
11 Okonkwo. He is charged in a multicount indictment which
12 you will take to the jury room with you. The indictment
13 contains twelve counts. Count one charges the defendant
14 with conspiring to violate the laws of the United
15 States. Counts two through twelve each charge the
16 defendant with aiding and assisting in the preparation
17 and presentation of fraudulent United States individual
18 income tax returns, forms ten forty and ten forty A.
19 I will now explain to you what the counts are
20 in the indictment and what the law says with respect to
21 the offenses charged in each count.
22 Count one. Conspiracy to defraud the United
23 States. Count one of the indictment charges the
24 defendant with violating Title Eighteen United States
25 Code, Section three seven one. This count of the

Page 98

1  indictment alleges in relevant part that from at least
2  as early as in or about January two thousand through at
3  least as late as April fifteen two thousand, the exact
4  dates being unknown to the grand jury, the defendant
5  Matthew Okonkwo did conspire to defraud the United
6  States and an agency thereof for the purpose of
7  impeding, impairing, obstructing and defeating the
8  lawful Government functions of the Internal Revenue
9  Service, the I. R. S., in the ascertainment,
10 computation, assessment and collection of revenue, that
11 is income taxes, in violation of Title Eighteen United
12 States Code, Section three seven one.
13      Title Eighteen United States Code, Section
14 three seven one makes it a separate federal crime or
15 offense for anyone to conspire or agree with someone
16 else to do something which if actually carried out would
17 amount to another federal crime or offense.  Under this
18 law, conspiracy is an agreement or a kind of partnership
19 in criminal purposes in which each member becomes the
20 agent or partner of every other member.
21      In order to establish a conspiracy offense it
22 is not necessary for the Government to prove that all of
23 the people named in the indictment were members of the
24 scheme, or that the members had entered into any formal
25 type of agreement, or that those who were members had

Page 99

1  planned together all of the details of the scheme, or
2  the overt acts that the indictment charges would be
3  carried out in an effort to commit the intended crime.
4      Also, because the essence of a conspiracy
5  offense is the making of the agreement itself followed
6  by the commission of any overt act, it is not necessary
7  for the Government to prove that conspirators actually
8  succeeded in accomplishing their unlawful plan.
9      What the evidence must show beyond a
10 reasonable doubt is first, that two or more persons in
11 some way or manner came to a mutual understanding to try
12 to accomplish one or more of the common and unlawful
13 plans charged in the indictment, that is aiding and
14 assisting in the preparation and presentation of
15 fraudulent income tax returns; and, second, that the
16 defendant knowingly -- that the defendant knowing the
17 unlawful purpose for the plan willfully joined in it.
18 And, members of the jury, there should be another "and"
19 there because all of these must be proved.  And, third,
20 that one of the conspirators during the existence of the
21 conspiracy knowingly committed at least one of the
22 methods or overt acts described in the indictment; and,
23 fourth, that such overt act was knowingly committed at
24 or about the time alleged in an effort to carry out or
25 accomplish some object of the conspiracy.

Page 100

1      An overt act is any transaction or event, even
2  one which may be entirely innocent when considered alone
3  but which is knowingly committed by a conspirator in an
4  effort to accomplish some object of the conspiracy.  A
5  person may become a member of a conspiracy without
6  knowing all of the details of the unlawful scheme and
7  without knowing who all the other members are.  So if a
8  defendant has a general understanding of the unlawful
9  purpose of the plan, and knowingly and willfully joins
10 in that plan on one occasion, that is sufficient to
11 convict that defendant for conspiracy even though he did
12 not participate before, and even though he played only a
13 minor part.
14      Of course mere presence at the scene of a
15 transaction or event, or the mere fact that certain
16 persons may have associated with each other and may have
17 assembled together and discussed common aims and
18 interests does not, standing alone, establish proof of a
19 conspiracy.
20      Also, a person who has no knowledge of a
21 conspiracy but who happens to act in a way which
22 advances some purpose of one does not thereby become a
23 conspirator.
24      Counts two through twelve, aiding and
25 assisting in the preparation and presentation of

Page 101

1  fraudulent income tax returns.  Counts two through
2  twelve summarized.  Counts two through twelve of the
3  indictment each charge the defendant with aiding and
4  assisting in the preparation and presentation of
5  fraudulent income tax returns in violation of Title
6  Twenty-six United States Code, Section seven two oh six
7  two.
8      These counts of the indictment allege in
9  relevant part that on or about January twenty-four, two
10 thousand and continuing up to on or about the fifteenth
11 day of April two thousand in the Middle District of
12 Alabama the defendant, Matthew Okonkwo, while aiding and
13 abetting Jonathan Adewunmi did willfully aid and assist
14 in and procure counsel and advise the preparation and
15 presentation to the Internal Revenue Service of U. S.
16 individual income tax returns, forms ten forty and ten
17 forty A for the calendar year nineteen ninety-nine for
18 taxpayers set forth in the indictment which were false
19 and fraudulent as to material matters and in which they
20 made the false representations set forth in the
21 indictment which cause the I. R. S. to pay refunds that
22 the taxpayers either were not entitled to at all or in
23 an amount significantly in excess of the amount they
24 were entitled to.
25      Title Twenty-six United States Code, Section

Page 102

1   seven two oh six two makes it a federal crime or offense
2   for anyone to willfully aid or assist in the preparation
3   and filing of a federal income tax return knowing it to
4   be false or fraudulent in some material way.
5       The defendant can be found guilty of that
6   offense only if all of the following facts are proved
7   beyond a reasonable doubt.  First, that the defendant
8   aided or assisted in the preparation and filing of an
9   income tax return which was false in a material way as
10  charged in the indictment; and, second, that the
11  defendant did so knowingly and willfully.
12      A declaration is false if it was untrue when
13  made, and was then known to be untrue by the person
14  making it.  A declaration contained within a document is
15  false if it was untrue when the document was used and
16  was then known to be untrue by the person using it.  A
17  declaration is material if it relates to a matter of
18  significance or importance as distinguished from a minor
19  or insignificant or trivial detail.  It is not
20  necessary, however, that the Government be deprived of
21  any tax by reason of the filing of the false return, or
22  that it be shown that any additional tax is due.  Only
23  that the defendant willfully aided and abetted the
24  filing of a materially false return.
25      Also, with regard to counts two through twelve

Page 103

1   you are instructed as follows.  The guilt of a defendant
2   in a criminal case may be proved without evidence that
3   the defendant personally did every act involved in the
4   commission of the crime charged.  The law recognizes
5   that ordinarily anything a person can do for oneself may
6   also be accomplished through the direction of another
7   person as an agent, or by acting together with or under
8   the direction of another person or persons in a joint
9   effort.
10      So if the acts or conduct of an agent,
11  employee or other associate of the defendant are
12  willfully directed or authorized by the defendant, or
13  the defendant aids and abets another person by willfully
14  joining together with that person in the commission of a
15  crime, then the law holds the defendant responsible for
16  the conduct of the other person just as though the
17  defendant had personally engaged in such conduct.
18      However, before a defendant can be held
19  criminally responsible for the conduct of others, it is
20  necessary that the defendant willfully associate in such
21  a way with the crime and willfully participate in it.
22  Mere presence at the scene of a crime, and even
23  knowledge that a crime is being committed are not
24  sufficient to establish that a defendant either directed
25  or aided and abetted the crime.  You must find beyond a

Page 104

1   reasonable doubt that the defendant was a willful
2   participant and not merely a knowing spectator.
3       In some instances a spectator may be held
4   responsible under the law for a substantive offense in
5   which he or she had no direct or personal participation
6   if such offense was committed by other members of the
7   conspiracy during the course of such conspiracy and in
8   furtherance of its objects.
9       So in this case with regard to counts two
10  through twelve are concerned, if you have first found
11  Mr. Okonkwo guilty of the conspiracy offense as charged
12  in count one of the indictment, you may also find him
13  guilty of any of the offenses charged in counts two
14  through twelve, even though he did not personally
15  participate in such offense, if you find beyond a
16  reasonable doubt first, that the offense charged in such
17  count was committed by a conspirator during the
18  existence of the conspiracy and in furtherance of its
19  objects; second, that Mr. Okonkwo was a knowing and
20  willful member of the conspiracy at the time of the
21  commission of such offense; and, third, that the
22  commission of such offense by a conspirator was a
23  reasonably foreseeable consequence of the conspiracy.
24      You will note that the indictment charges that
25  the offense was committed on or about a certain date.

Page 105

1   The Government does not have to prove with certainty the
2   exact date of the alleged offense, it is sufficient if
3   the Government proves beyond a reasonable doubt that the
4   offense was committed on a date reasonably near the date
5   alleged.
6       The word "knowingly" as that term has been
7   used from time to time, has been used in the indictment
8   and in these instructions means that the act was done
9   voluntarily and intentionally, and not because of
10  mistake or accident.
11      The word "willfully" as that term has been
12  used in the indictment and in these instructions means
13  that the act was committed voluntarily and purposely
14  with the specific intent to do something the law
15  forbids, that is with bad purpose either to disobey or
16  disregard the law.
17      A separate crime or offense is charged in each
18  count of the indictment.  Each charge, and the evidence
19  pertaining to it, should be considered separately.  The
20  fact that you find the defendant guilty or not guilty as
21  to one of the offenses charged should not affect your
22  verdict as to any other offense charged.
23      I caution you, members of the jury, that you
24  are here to determine from the evidence in this case
25  whether the defendant is guilty or not guilty.  The

## Page 106

1 defendant is on trial only for the specific offenses
2 alleged in the indictment.
3         Also, the question of punishment should never
4 be considered by the jury in any way in deciding the
5 case. If the defendant is convicted, the matter of
6 punishment is for the judge alone to determine.
7         Any verdict you reach in the jury room,
8 whether guilty or not guilty, must be unanimous. In
9 other words, to return a verdict you must all agree.
10 Your deliberations will be secret. You will never have
11 to explain your verdict to anyone. It is your duty as
12 jurors to discuss the case with one another in an effort
13 to reach agreement if you can do so.
14         Each of you must decide the case for yourself,
15 but only after full consideration of the evidence with
16 the other members of the jury. While you are discussing
17 the case do not hesitate to reexamine your own opinion
18 and change your mind if you become convinced that you
19 were wrong. But do not give up your honest beliefs
20 solely because the others think differently or merely to
21 get the case over with. Remember, that in a very real
22 way you are judges, judges of the facts. Your only
23 interest is to seek the truth from the evidence in the
24 case.
25         Now when you go to the jury room you should

## Page 107

1 first select one of your members to act as your
2 foreperson. The foreperson will preside over your
3 deliberations and will speak for you here in
4 considerate.
5         Verdict forms have been prepared for your
6 convenience. You will take the verdict forms to the
7 jury room, and when you have reached unanimous
8 agreement, you will have your foreperson fill in the
9 appropriate verdict forms, date and sign them and then
10 you will return to the courtroom.
11         If you should desire to communicate with me at
12 any time please write down your message or question and
13 pass the note to the marshal, actually that would be the
14 security officer, who will bring it to my attention. I
15 will then respond as promptly as possible either in
16 writing or by having you returned to the courtroom so
17 that I can address you orally. I caution you, however,
18 with regard to any message or question you might send,
19 that you should not tell me your numerical division at
20 that time.
21         Now at this time I'm going to ask that you
22 take all of your personal belongings, including -- well
23 first of all I need to explain the verdict form to you.
24 I'm sorry.
25         Now I mentioned in my charge that there are

## Page 108

1 verdict forms, but there is actually only one verdict
2 form. It's a fairly simple and straightforward verdict
3 form.
4         Now the verdict form has twelve questions.
5 Each question corresponds to a count in the indictment.
6 So question one, which is the conspiracy count, says "As
7 to the charge in count one of the indictment we, the
8 jury, find the defendant Matthew Okonkwo not guilty" or
9 "guilty." Obviously your foreperson would check "not
10 guilty" as to count one if that's what all twelve of you
11 find, or "guilty" as to count if all of you so find.
12 All of the other twelve questions correspond to the
13 other twelve counts of the indictment and you'll need to
14 either check "guilty" or "not guilty" as to each one.
15         Then after you've made a determination as to
16 all twelve counts, that is as to whether he is not
17 guilty or guilty, you will have your foreperson at the
18 end date the form and sign it.
19         Now you have white copies of the verdict form.
20 I've given you those. The cream copy which I have here
21 is your official copy. Have your foreperson fill out
22 only this cream colored copy. I'll let you take the
23 white copies back there just so you can use them as
24 working copies, but make sure you only return one
25 verdict form with twelve questions on it. Actually it

## Page 109

1 would be only this cream colored copy, which is the one
2 that your foreperson should return after you have
3 reached your verdict as to all twelve counts. You will
4 take this cream colored copy back there with you, and it
5 is only this form which is the official form that you
6 will have your foreperson fill in, date and sign.
7         Now I'm going to ask that you step out of the
8 room. If you'll step back here. You will be out for
9 approximately five seconds. You won't even have time to
10 go to the restroom. However, I'm going to ask that you
11 take your notes, your personal items, because when you
12 come back out you're going to stand in front of the jury
13 box right across here. Just come out and stand in front
14 of the jury box and you'll be out here for about five
15 seconds again. So please step out for five seconds. Do
16 not discuss the case. Take everything with you
17 including your notes.
18         (Whereupon the jury was escorted out of the
19 courtroom.)
20     THE COURT: Does the Government have any
21 problems with the Court's charge?
22     MR. SCHIFF: No, Your Honor.
23     THE COURT: Defendant, any problems?
24     MR. BRUNER: Judge, I believe on page sixteen,
25 I believe --

Page 110

1   THE COURT: Did I say something wrong?
2   MR. BRUNER: I believe you misspoke and you
3   said in some instances a "spectator" in the last
4   paragraph instead of a conspirator.
5   THE COURT: Oh, I did?
6   MR. SCHIFF: Yes. You said the word
7   "spectator".
8   THE COURT: Well I'll tell them. Obviously
9   they're reading it, so they know I meant conspirator but
10  I'll make that correction. Anything else?
11  MR. BRUNER: Well spectator and conspirator
12  are a little far apart for me.
13  THE COURT: Right. Well that's true, I did
14  say a spectator may be held responsible. It's actually
15  the opposite.
16  MR. BRUNER: Exactly.
17  THE COURT: But I will make that correction.
18  MR. BRUNER: Otherwise we're satisfied.
19  THE COURT: In fact I think that was obvious
20  to the jury that was a misstatement.
21  Bring the jury back in.
22  (Whereupon the jury was escorted into the
23  courtroom.)
24  THE COURT: Members of the jury, I think it's
25  probably obvious to you that I misspoke on page sixteen.

Page 111

1   I said, "In some instances a spectator may be held
2   responsible under the law," and I should have said a
3   conspirator may be held responsible under the law. In
4   fact, a spectator could not be held just because they're
5   a spectator. That's on page sixteen at the bottom. I
6   think it was obvious to you that I just misread that.
7   But with that correction, you now have the
8   case except our thirteenth juror is Mr. Elmer Price,
9   Junior. Mr. Price, you would have served in case one of
10  the other twelve could not have served. I know this has
11  been an inconvenience to you, but I thank you very much
12  for your service and you are excused at this time.
13  The remaining twelve jurors, you may now begin
14  your deliberations.
15  Court will be in recess until we have a
16  verdict from the jury.
17  (Whereupon, the jury was escorted out of the
18  courtroom to enter into its deliberations at two-fifteen
19  p.m.)
20  VERDICT OF THE JURY
21  (AT THREE-TWENTY FIVE P.M.):
22  THE COURT: I understand we have a verdict.
23  Will you bring in the jury.
24  (Whereupon, the jury was escorted into the
25  courtroom):

Page 112

1   THE COURT: Please have a seat in the jury box
2   with the foreperson coming forward. Please remain
3   standing.
4   I understand you've reached a verdict, is that
5   correct?
6   THE FOREPERSON: Yes, Your Honor, we have.
7   THE COURT: Will you hand the verdict to the
8   Clerk of the Court.
9   (Whereupon, the Court examined said
10  document.)
11  THE COURT: The Clerk of the Court will file
12  the verdict and read it.
13  COURTROOM DEPUTY CLERK: As to the charge in
14  count one of the indictment we, the jury, find the
15  defendant, Matthew Okonkwo, guilty.
16  As to the charge in count two of the
17  indictment we, the jury, find the defendant, Matthew
18  Okonkwo, guilty.
19  As to the charge in count three of the
20  indictment we, the jury, find the defendant, Matthew
21  Okonkwo, guilty.
22  As to the charge in count four of the
23  indictment we, the jury, find the defendant, Matthew
24  Okonkwo, guilty.
25  As to the charge in count five of the

Page 113

1   indictment we, the jury, find the defendant, Matthew
2   Okonkwo, guilty.
3   As to the charge in count six of the
4   indictment we, the jury, find the defendant, Matthew
5   Okonkwo, guilty.
6   As to the charge in count seven of the
7   indictment we, the jury, find the defendant, Matthew
8   Okonkwo, guilty.
9   As to the charge in count eight of the
10  indictment we, the jury, find the defendant, Matthew
11  Okonkwo, guilty.
12  As to the charge in count nine of the
13  indictment we, the jury, find the defendant, Matthew
14  Okonkwo, guilty.
15  As to the charge in count ten of the
16  indictment we, the jury, find the defendant, Matthew
17  Okonkwo, guilty.
18  As to the charge in count eleven of the
19  indictment we, the jury, find the defendant, Matthew
20  Okonkwo, guilty.
21  As to the charge in count twelve of the
22  indictment we, the jury, find the defendant, Matthew
23  Okonkwo, guilty.
24  So say we all. James wheeler, foreperson,
25  dated November one, two thousand six.

Multi-Page

Page 114

1    THE COURT: Would the Government like anything
2  else from this jury, that is would the like the jury
3  polled?
4    MR. SCHIFF: Not necessary from the
5  Government.
6    THE COURT: Would you like the jury polled?
7    MR. BRUNER: Yes, Your Honor.
8    THE COURT: Okay. I'm going to ask the clerk
9  of the court to poll you. What that means is that he
10 will call each of your last names. As your last name is
11 called, answer yes if the verdict is yours, answer no if
12 the verdict is not yours.
13    (Whereupon the jury was duly polled, and each
14 and every juror confirmed the verdict as read.)
15    THE COURT: Anything else from this jury?
16    MR. SCHIFF: Nothing from the Government.
17    THE COURT: Anything else from this jury, Mr.
18 Bruner?
19    MR. BRUNER: No, Your Honor.
20    THE COURT: Members of the jury, I'd like to
21 thank you very much for your service. As I told the
22 alternate just before he left, I know we've taken you
23 away from your family and friends, and I know it's been
24 an inconvenience to you, but when you consider how other
25 people serve their jury, including giving their lives

Page 115

1  for their country, serving on a jury is a pretty minor
2  inconvenience. I'd like to thank you very much. You've
3  reached a fair verdict.
4    Thank you very much. You are excused at this
5  time.
6    (Whereupon, the jury was escorted out of the
7  courtroom.)
8    THE COURT: Will the defendant come forward.
9    Based upon the verdict of the jury it is the
10 order, judgment and decree of the Court that you are
11 guilty of all counts.
12    Your sentencing is set for January eighteen,
13 two thousand and seven at ten a.m.
14    Anything else, Counsel?
15    MR. SCHIFF: Nothing from the Government.
16    THE COURT: You will continue in the custody
17 of the marshal.
18    Court's in recess.
19    (Whereupon, the proceedings were concluded.)
20
21
22
23    * * * * * * * * * *
24
25

Page 116

1
2      COURT REPORTER'S CERTIFICATE
3
4      I certify that the foregoing is a correct
5  transcript from the record of proceedings in the
6  above-entitled matter as prepared by me to the best of
7  my ability.
8
9      I further certify that I am not related to any
10 of the parties hereto, nor their counsel, and I have no
11 interest in the outcome of said cause.
12
13      Dated this 16th day of March 2007.
14
15      /s/  Mitchell P. Reisner
        MITCHELL  P.  REISNER,  CM, CRR,
16      Official US Dist. Court Reporter
        Registered Professional Reporter
17      Certified  Real-Time  Reporter
18
19
20
21
22
23
24
25

# EXHIBIT E

**FILED**

# *United States District Court*

MAY 1 6 2001

__MIDDLE__ _____ DISTRICT OF _____ __ALABAMA__

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

### In the matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

**Eagle Financial Services
1588 Montgomery Highway
Dothan, Alabama 36301
(See Attachment C)**

CASE NUMBER: *M 01-63-S*

I, ___Larry J. Ellis_____ being duly sworn depose and say:

I am a(n) __Special Agent, IRS, Criminal Investigation Division_____ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

> **Eagle Financial Services
> 1588 Montgomery Highway
> Dothan, Alabama 36301
> (See Attachment C)**

in the _____Middle_____ District of ____Alabama_____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

### (See Attachment B)

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

**property that constitutes evidence of the commission of a criminal offense,**

concerning a violation of Titles __18 USC § 287; and  26 USC § 7206(2)._____

The facts to support the issuance of a Search Warrant are as follows:

### See Attached Affidavit (Attachment A)

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Signature of Affiant

Sworn to before me and subscribed in my presence,

__May 14, 2001_____ at ___Montgomery, Alabama_____
Date                                                                    City and State

__Susan Russ Walker, U.S. Magistrate Judge___        _____
Name & Title of Judicial Officer                                    Signature of Judicial Officer

1                                    ATTACHMENT A

2                                        AFFIDAVIT

3           I, Larry J. Ellis, state that I am employed as a Special Agent with the

4    Internal Revenue Service, Criminal Investigation Division (IRS-CID).  I have been

5    employed as a Special Agent with IRS-CID for approximately 16 years.  During

6    that timespan, I have conducted investigations of subjects engaged in criminal

7    violations of Title 18, Title 26, and Title 31 of the United States Code.  My duties

8    as a Special Agent of the IRS-CID include investigating criminal violations of the

9    federal income tax laws and related offenses, as well as violations of the federal

10   money laundering statutes. Pursuant to my duties, I have conducted several

11   investigations of subjects involved in illegal schemes to file for and receive false

12   and fraudulent federal income tax refunds in violation of Title 18, United States

13   Code, Sections 286 and 287 and/or Title 26, United States Code, Section

14   7206(2).

15          Following the 2000 filing season, I was contacted by the Questionable

16   Refund Detection Team  (QRDT) at the Memphis Fraud Detection Center in

17   Memphis, Tennessee regarding suspicious 1999 federal income tax returns

18   prepared and electronically transmitted to the IRS by Eagle Financial Services

19   (hereinafter referred to as Eagle), 1588 Montgomery Highway, Dothan, Alabama

20   36301.  The QRDT had detected a large number of returns prepared by Eagle

21   with questionable Schedules A and C. Many of the returns bearing Schedule As

22   had relatively low incomes and substantial itemized deductions, severely

23   reducing the amount of taxable income. Many of the returns with attached

1    Schedule Cs had Forms W-2 showing incomes of approximately $3,000.00. The

2    attached Schedule Cs included additional income of approximately $8,000.00 to

3    $9,000.00, usually earned through barbering or hairdressing. The additional

4    income on the Schedule Cs enabled the taxpayers to claim an Earned Income

5    Credit (EIC) that was much greater than that to which they would have been

6    otherwise entitled. The QRDT was also suspicious because 99.48% of the 964

7    1999 federal income tax returns electronically transmitted to the IRS through

8    Electronic Filing Identification Number (EFIN) 633889 (registered to Matthew S.

9    Okonkwo dba Eagle Financial Services) were refund returns. Of the 964 returns,

10   798 identified Matthew S. Okonkwo (SSN:            ) as the preparer.

11        In addition to the questionable returns transmitted under Okonkwo's EFIN

12   (633889), the QRDT also identified eighty (80) 1999 federal income tax returns

13   electronically transmitted to the IRS under EFIN 633246 (registered to Evette

14   Michele Thomas, SSN            , dba Rainbow Tax Service). Of the eighty

15   returns, seven listed Okonkwo's SSN (            ) as the preparer. All eighty

16   of the returns transmitted through EFIN 633246 claimed refunds.

17        Based upon my previous investigative experience, I am aware it is highly

18   unusual for the percentage of refund returns filed by a particular return preparer

19   to exceed 90%. I am also aware that such high percentages are often an

20   indicator of a potential refund scheme being perpetrated by an unscrupulous

21   return preparer. Additionally, I am also aware that unscrupulous return preparers

22   often utilize fraudulent or fictitious Forms Schedule A or Schedule C in an effort

23   to inflate client refunds.

1       I subsequently ordered a copy of Matthew Okonkwo's Alabama driver's

2     license from the Alabama Department of Public Safety. The license (AL DL#

3     5399185 ) further identified Okonkwo as Matthew Sunday Okonkwo, a five-foot-

4     six inch, one hundred seventy-five-pound, black male with brown eyes and black

5     hair. The license confirmed Okonkwo's social security number ( █████████ , as

6     previously provided by the QRDT, and listed Okonkwo's date of birth as

7     December 15, 1951. I then requested a criminal history check on Okonkwo

8     through NCIC. The NCIC report listed no previous arrests. However, at my

9     request, IRS-CID Special Agent Louie Wilson contacted Immigration and

10    Naturalization Service Special Agent John Buis in an effort to determine

11    Okonkwo's immigration status. After reviewing his files, Buis advised that he had

12    located a subject using the same name and SSN, but with a birth date of

13    December 15, 1957. According to Buis, on October 23, 1990, an individual

14    identified as Okonkwo had been arrested in Brussels, Belgium in possession of

15    775 grams of heroin. The INS records further indicated that Okonkwo had been

16    deported from Belgium to Nigeria in December 1990 and forever barred from

17    entering the United States. (The heroin was apparently destined for the United

18    States.) Subsequent contact with the Drug Enforcement Administration (DEA)

19    office in Brussels confirmed the 1990 arrest.

20       I also requested a copy of Evette Michele Thomas' Alabama driver's

21    license from the Alabama Department of Public Safety. The license (AL DL#

22    █████████ ) further identified Thomas as a five-foot-six-inch, one hundred forty

23    three pound, black female with brown eyes and black hair. The license confirmed

1    Thomas' SSN ▮▮▮▮▮▮) as previously provided by the QRDT and listed her

2    date of birth as November 21, 1972. I subsequently requested a criminal history

3    check on Thomas through NCIC and received negative results.

4          In August 2000, I was notified by IRS Revenue Agent Susan Tyson

5    (Dothan, Alabama) that she had initiated a review of ten 1998 federal income tax

6    returns prepared by Eagle. Her review identified several returns with false

7    dependents. Tyson was also able to identify three additional Eagle employees,

8    Freedom Ebikake, John Onadeko, and Kimberly Starling. Further research by

9    Tyson revealed that several returns prepared by Eagle had directed refund

10   checks be sent to Route 3, Box 201, Ozark, Alabama 36360 and P.O. Box 30,

11   Midland City, Alabama 36350. According to the United States Postal Service,

12   both of these boxes are assigned to Freedom Ebikake. Tyson also reviewed the

13   1998 return of Mina Tamunosiki which had been prepared by Eagle. A Form W-2

14   attached to the return listed Tamunosiki's home address as 1208 Summit Street,

15   Dothan, Alabama 36303. The Dothan City directory shows the occupants of 1208

16   Summit Street as John and Beatrice Onadeko. Based upon Tyson's findings, I

17   requested that she suspend her review and forward her findings to CID.

18         Based on Tyson's findings, I requested copies of Alabama driver's

19   licenses on Freedom Ebikake, John Onadeko and Kimberly Starling. The results

20   were as follows:

21                     Freedom Oweikeme Ebikake

22                     AL DL: ▮▮▮▮▮▮

23                     SSN: ▮▮▮▮▮▮ /DOB: ▮▮▮▮▮▮

4

1                    Black Male, 5'08", 185 lbs.

2                    Black Hair, Brown Eyes

3

4                    John Akin Onadeko

5                    AL DL#█████

6                    SSN:█████/DOB:█████

7                    Black Male, 5'10", 150 lbs.

8                    Black Hair, Brown Eyes

9

10                 Kimberly Reed Starling

11                 AL DL#█████

12                 SSN:█████DOB:█████

13                 Black Female, 5'03", 135 lbs.

14                 Black Hair, Brown Eyes

15

16       I then requested criminal history checks through NCIC on the three Eagle

17  employees. The NCIC reports listed the following arrests:

18

19            Freedom Ebikake -  08/04/89 – Assault 3rd

20                         05/27/90 – DUI

21                         08/05/92 – Negotiating Worthless Instruments

22                         03/29/97 – Probation Violation

23                         10/13/97 – Trafficking in Counterfeit Goods

1        John Onadeko -       No Previous Arrests

2        Kimberly Starling -  No Previous Arrests

3

4        Special Agent Louie Wilson subsequently contacted Special Agent Buis at

5   INS and inquired about the immigration status of Ebikake and Onadeko. Buis

6   advised that Ebikake is a lawful permanent resident. Buis further advised that

7   INS records indicated Onadeko entered the United States on a student visa in

8   the 1980's and that the visa is expired.

9        In August 2000, I was informed by the QRDT that a total of twenty-four of

10  the 1999 returns that had been submitted to the IRS via either EFIN 633246

11  (Thomas) or EFIN 633889 (Okonkwo) had false Forms W-2 attached. All of the

12  false Forms W-2 purported to be from a company called CJB Ice-Cream Co., 212

13  Hickory Street, Fort Walton Beach, Florida 32548. The IRS had received no

14  verification of the wages from the employer and had been unable to locate the

15  employer in an effort to verify the wages. The Forms W-2 list the employer

16  identification number (EIN) as 62-1716582. A review of IRS records revealed that

17  EIN 62-1716582 is assigned to CJB Ice-Cream Co., Louise A. William-

18  Adewunmi, General Partner, 212 Hickory Street, Fort Walton Beach, Florida

19  32548-3824. An IRS-CID special agent was sent to 212 Hickory Street in an

20  attempt to verify the wages. The address turned out to be the residence of a Ms.

21  Elizabeth Bethune. Ms. Bethune advised that a man named John LNU operated

22  an ice cream truck in the area and sometimes left it parked next to her house

23  when it was not in use.

6

1    On September 20, 2000, Special Agent Louie Wilson and I conducted

2    surveillance at 1208 Summit Street, Dothan, Alabama, the residence of John

3    Onadeko. In the driveway of the residence we observed an orange "ice cream"

4    van. We were unable to see the license plate, but did see the license plate of a

5    blue Hyundai in the driveway (FL tag# D94RWP). A check with the state of

6    Florida revealed that this vehicle was registered to a Johnathon Balogun

7    Adewunmi, 212 Hickory Street, Fort Walton Beach, Florida 32548-3824.

8    On September 29, 2000, Special Agent Louie Wilson conducted an

9    interview with Tameaka Rahmaan. Rahmaan advised that she had her 1999

10    federal income tax return prepared at the This Is It Shop, 504 N. Cherry Street,

11    Dothan, Alabama. Rahmaan's return was prepared by a white female named

12    Gayle. A black male Rahmaan now knows as Freedom was also present.

13    Rahmaan stated that Gayle asked her some basic questions about her return

14    and typed the information into a computer on her desk. Gayle told Rahmaan that

15    she was entitled to a federal income tax refund of $205.00. Gayle then told

16    Rahmaan that she would instead give her $250.00. Rahmaan asked Gayle if the

17    extra money had anything to do with an EIC and Gayle informed her that it did

18    not. Gayle then gave Rahmaan a business card bearing the name Eagle

19    Financial Service and told her to call back the next day. Rahmaan stated she did

20    not recall signing any paperwork in relation to her return. Rahmaan called Gayle

21    back two days later and then went to the This Is It Shop to pick up her refund.

22    Gayle went to a cash drawer and retrieved approximately $250.00 in United

23    States currency which she then gave to Rahmaan. Rahmaan then departed.

7

1    In July 2000, Rahmaan began filling out paperwork to obtain a Pell Grant

2    and discovered she needed a copy of her 1999 federal income tax return. On

3    July 10, 2000, Rahmaan went to the IRS office in Dothan, Alabama and

4    requested a copy of her return. An IRS employee provided Rahmaan with a

5    computer printout of her return. The printout indicated Rahmaan had received a

6    refund of approximately $2,600.00. Rahmaan explained to the IRS employee that

7    this was not correct. The IRS employee then reviewed the printout with Rahmaan

8    and discovered that the return included two dependents, an EIC and a Schedule

9    C. Rahmaan was unaware that any of these items had been placed on her

10    return.

11    On August 1, 2000, Rahmaan drove to the This Is It Shop and met with

12    Gayle and Freedom regarding her return. Unknown to Gayle and Freedom,

13    Rahmaan recorded the entire conversation on a cassette tape (Rahmaan later

14    turned the tape over to the IRS). Gayle initially explained to Rahmaan how she

15    had arrived at the $205.00 refund, by figuring the return with no dependents or

16    Schedule C. Gayle then explained she had filed Rahmaan's return claiming two

17    dependents and showing Schedule C income from hairdressing. Gayle explained

18    that the dependents cost $600.00 a piece and the charge for the Schedule C was

19    an additional $500.00. Gayle then stated that after everyone was paid there was

20    only $300.00 that cleared. Rahmaan asked Gayle what gave her the right to file

21    the return in this manner.  Gayle replied that a lot of people file this way. After

22    additional complaint by Rahmaan, Gayle stated that it was out of her hands.

23    Gayle later told Rahmaan that she had illegally been paid $250.00 for her SSN.

8

1   Rahmaan continued to complain that the return filed by Gayle was going to

2   prevent her from getting a Pell Grant. At that point, Freedom interjected into the

3   conversation and offered to fill out Rahmaan's Pell Grant application. He further

4   offered to amend Rahmaan's return to make it appear that she had suffered a

5   business loss rather than the originally reported gain. Freedom then instructed

6   Gayle to give Rahmaan $400.00 to make her happy. Gayle said the bank was

7   closed and they would have to get the money the following day. Freedom then

8   told Rahmaan to return the following day to pick up her money and to bring her

9   Pell Grant forms so he could fill them out. Rahmaan departed the business and

10  never returned.

11       A review of the filing records reveals that Tameaka Rahmaan's 1999

12  return was included in the 964 federal income tax returns transmitted to the IRS

13  through EFIN 633889 (registered to Okonkwo). The SSN of Kimberly Starling

14  [redacted] appears as the paid preparer.

15       Through subsequent investigation, I was able to determine that Gayle

16  was, in fact, Gayle Bond Hoang and that Freedom was Freedom Oweikeme

17  Ebikake. I subsequently requested a copy of Hoang's Alabama non-driver

18  identification card from the Alabama Department of Public Safety. The ID card

19  (# I198666) provided Hoang's SSN as [redacted] and lists her date of birth as

20  March 2, 1959. The ID card further identifies Hoang as a five-foot-eight-inch, one

21  hundred sixty-five pound, white female with blonde hair and brown eyes. I have

22  since become aware that Hoang is now identifying herself as Gayle Ebikake.

9

1      On April 5, 2001, IRS-CID initiated an undercover operation targeting

2    Matthew Sunday Okonkwo and Eagle Financial Services. At approximately

3    10:02 a.m., an IRS-CID special agent, acting in an undercover capacity

4    (hereinafter referred to as UCA), entered the offices of Eagle Financial Services,

5    1588 Montgomery Highway, Dothan, Alabama. The UCA was initially greeted by

6    Matthew Okonkwo in the waiting room area. Okonkwo explained he was with

7    another client and he would be with the UCA shortly. After a lengthy wait,

8    Okonkwo returned to the waiting area and escorted the UCA to his office. The

9    UCA told Okonkwo he/she wished to have a return prepared. Okonkwo took the

10    UCA's Form W-2 and asked some standard questions (dependents, SSN, DOB,

11    telephone number, etc.). Okonkwo then figured the UCA's return using a

12    computer on his desk. Okonkwo informed the UCA that he/she owed the IRS an

13    additional $113.00 in tax. Okonkwo stated his fee for preparing the return would

14    be an additional $26.00. Okonkwo explained to the UCA that he/she owed

15    additional taxes because his/her employer had not withheld enough during the

16    year. The UCA explained to Okonkwo that he/she was experiencing some

17    financial hardships and asked Okonkwo if there was anything that he/she could

18    do about the balance due. Okonkwo then asked the UCA about the address on

19    his/her Form W-2 versus his/her current address. The UCA explained the original

20    Form W-2 had been sent to an old address and he/she had obtained a duplicate

21    copy with the prior address. Okonkwo told the UCA that he wanted to help and

22    he would see what he could do. Okonkwo told the UCA that he would try to help,

23    but he needed to make some phone calls in order to see if he could help.



1   Okonkwo then made a copy of the UCA's identification and returned it to the

2   UCA. The UCA then asked Okonkwo how much he would charge. Okonkwo

3   replied that the fee would be based on whether or not the UCA got anything

4   back. Okonkwo gave the UCA his cellular telephone number and told the UCA to

5   call him the following Monday afternoon. The UCA departed the offices of Eagle

6   Financial Services at approximately 11:02 p.m.

7       On April 5, 2001, at approximately 4:27 p.m., the UCA placed a monitored

8   telephone call to Okonkwo's cellular telephone. The UCA inquired as to whether

9   or not Okonkwo had determined if he would be able to assist him/her. Okonkwo

10  advised the UCA that he was not yet sure and instructed the UCA to call him

11  back on April 9, 2001, after 2:30 p.m. The call was terminated at approximately

12  4:31 p.m.

13      On April 9, 2001, at approximately 3:02 p.m., the UCA placed a second

14  monitored telephone call to Okonkwo on his cellular telephone. Okonkwo advised

15  the UCA that he had not yet completed the return, but told the UCA that they

16  could look at the return in his office on the afternoon of April 10, 2001. The call

17  was terminated at approximately 3:08 p.m.

18      On April 10, 2001 at approximately 2:28 p.m., the UCA returned to the

19  offices of Eagle Financial Services and was met by Matthew Okonkwo. After a

20  long wait, Okonkwo again escorted the UCA to his office. Okonkwo pulled up the

21  UCA's previously prepared return on his computer. Okonkwo then asked the

22  UCA if he/she attended church and the UCA responded in the affirmative.

23  Okonkwo then told the UCA that he would place $3,730.00 in contributions on

1   his/her Schedule A. The UCA advised Okonkwo that his/her contributions to the

2   church amounted to approximately $300.00. Okonkwo then told the UCA that he

3   would use a figure of 16,000 miles to determine the amount of mileage to claim

4   on his/her Schedule A. Okonkwo then advised the UCA that he/she would

5   receive a federal income tax refund of $521.00 and a state income tax refund of

6   $119.00. Okonkwo told the UCA that the fee for preparing both returns would be

7   $50.00. Okonkwo advised the UCA that he would file the returns electronically

8   and had the UCA sign a Form 8453 (U.S. Individual Income Tax Declaration for

9   an IRS e-file Return) and a Refund Anticipation Loan (RAL) Application.

10  Okonkwo provided the UCA with unsigned copies of these same documents, as

11  well as, an IRS e-file Signature Authorization form. The signature authorization

12  form identified the electronic return originator as Rainbow Tax Service. Okonkwo

13  did not provide the UCA with a copy of the returns. Okonkwo advised the UCA

14  that he/she could pick up his/her refund the following day. The UCA departed the

15  offices of Eagle Financial Services at approximately 3:08 p.m.

16          Immediately following the UCA's departure from Eagle Financial Services,

17  I contacted the QRDT and advised them to stop payment on the UCA's refund.

18  Special Agent Louie Wilson contacted the Alabama Department of Revenue and

19  advised them to stop the state refund as well.

20          On April 12, 2001, the QRDT faxed me a copy of the UCA's return which

21  had been electronically transmitted to the IRS via EFIN 633246 (assigned to

22  Evette Thomas dba Rainbow Tax Service). The return included a Schedule A

23  claiming fictitious state income taxes of $362.00, charitable contributions of

1    $3,730.00 and miscellaneous expenses of $4,647.00. The return claimed a

2    refund of $521.00.

3        On May 7, 2001, I requested that the QRDT research the number and

4    characteristics of returns prepared by Eagle Financial Service and Rainbow Tax

5    Service for the tax years 1998 and 2000. The QRDT provided the following

6    information:

7        For tax year 1998, a total of 450 returns were prepared utilizing EIN

8    63-1084444 (Eagle) as the preparer EIN. All 450 returns claimed refunds and

9    370 claimed an EIC. Twenty-three (23) of the 450 returns filed identified

10   Okonkwo as the preparer. Figures relating to the number of Schedule A and

11   Schedule C returns were not available.

12       For tax year 2000, a total of 684 returns were transmitted to the IRS via

13   EFIN 633889 (assigned to Okonkwo). All 684 claimed refunds and 538 claimed

14   an EIC. One hundred seventeen (117) of the returns included a Schedule A and

15   sixty-six (66) included a Schedule C. A total of 97 returns were transmitted to the

16   IRS via EFIN 633246 (assigned to Thomas). All 97 claimed refunds and 74

17   claimed an EIC. Fourteen of the returns (14) included Schedule A and twelve

18   (12) included Schedule C.

19       Based on the above stated facts, I have probable cause to believe

20   Matthew Sunday Okonkwo and others are knowingly and willfully defrauding the

21   United States of America by preparing and transmitting fraudulent federal income

22   tax returns to the Internal Revenue Service. As a result, I also have probable

23   cause to believe there is now evidence of violations of Title 18, United States

13

1    Code Sections 286 and 287 and/or Title 26, United States Code, Section 7206(2)

2    located within the premises at 1588 Montgomery Highway, Dothan, Alabama,

3    which houses Eagle Financial Services.

4

5

6

7    _____

8    Larry J. Ellis

9    Special Agent, IRS-CID

10

11   Sworn and attested before me on this day

12   May 14, 2001.

13   _____

14   SUSAN RUSS WALKER

15   UNITED STATES MAGISTRATE JUDGE

ATTACHMENT B

ITEMS TO BE SEIZED

1.    Any and all documents (including copies of such documents) which were
      used in the preparation of federal income tax returns, including, but not
      limited to:

                 Form W-2          Form 1099
                 Form 1098         Form K-1

           For the tax years 1997, 1998, 1999 and 2000

2.    Any and all federal income tax returns and all other related documents
      and schedules (including copies of such documents) necessary for filing
      and/or electronically transmitting a federal income tax return, including, but
      not limited to:

                 Form 1040           Form 1040A
                 Form 1040 EZ        Form 1120
                 Form 1120-S         Form 1165
                 Schedule A          Schedule D
                 Schedule B          Schedule E
                 Schedule C          Schedule F
                 Schedule EIC        Form 2441
                 Form 8863           Form 8839
                 Schedule SE         Form 8812
                 Form 4562           Form 1040-V
                 Form 8453           IRS e-file Signature Authorization Form

           For the tax years 1997, 1998, 1999 and 2000

3.    Any and all documents related to refund anticipation loans (including
      copies of such documents), including, but not limited to:

                 RAL Applications
                 RAL Checks and associated check stubs

           For the tax years 1997, 1998, 1999 and 2000

4.    Any and all social security cards (including copies)

5.   Any and all customer information sheets (including copies)

6.   Photocopies of any and all customer identification

7.   Any and all customer files

8.   Any and all state income tax returns and associated schedules (including copies of such documents)

     For the tax years 1997, 1998, 1999 and 2000

9.   Any and all checks, checkbooks, cancelled checks, deposit slips, withdrawal slips or bank statements on accounts in the names of Eagle Financial Services, Rainbow Tax Service, Matthew S. Okonkwo, Kimberly Starling, Angelia D. Okonkwo (wife of Matthew), Evette Michele Thomas

10.  Any and all documents which provide the identities of current or former employees of Eagle Financial Services

11.  Any and all of the above described records and information that may be stored on computer storage media. This includes information stored on computer hard drives, diskettes, tapes, CD-ROM, or any other media capable of storing information in a form readable by a computer. This also includes all copies of the information described above that may be maintained as archive or backup copies. The agents searching for such information are authorized to search any desktop, or other "personal computer" or pc located on the premises to be searched and to copy all above-described information stored on such computer. The Computer Investigative Specialist, when searching for evidence authorized under the warrant, will take reasonable steps to avoid searching for and viewing documents which are not authorized under the warrant. These steps include the identification of non-pertinent directories and files. The Computer Investigative Specialist will not disclose the content of any file not covered under the warrant to the investigators. In addition, if the files and records described above cannot be read and understood without the software or programs that created those files, the agents are authorized to seize such software and any documentation and manuals that describe the software and give instruction on its installation and use.

2

## COMPUTER RELATED EVIDENCE

During the course of this investigation, I consulted with Special Agent Wanda J. Elkourie, a computer specialist, regarding the seizing of computers.  Agent Elkourie has been a Special Agent for over 17 years and has received advanced training at the University of North Texas, Denton, Texas, as a Computer Investigative Specialist. She has also received extensive training at the Customs and Excise College in Rigaud, Quebec, Canada, and the Federal Law Enforcement Training Center in Brunswick, Georgia, in the execution of search warrants involving computers and related equipment, electronic data preservation, and the recovery, documentation and authentication of evidence.

Based on my knowledge, training and experience, and after having consulted with Special Agent Elkourie, I know that computer hardware, peripheral devices, software, documentation and passwords may be important to a criminal investigation in three distinct and important respects:

1.  the objects themselves may be instrumentalities used to commit the crime
2.  the objects may have been used to collect and store information about crimes (in the form of electronic data).
3.  the objects may be contraband or fruits of the crime.

Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, and passwords which are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about a crime.

Based upon my consultation with Special Agent Elkourie, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices to be imaged and searched later by a qualified computer specialist in a laboratory or other controlled environment.  This requirement is due to the following:

Technical requirements. Images or backups of computer data need to be restored to a separate computer and verified to ensure that the files restore or copy properly. Additionally, evidence may be encrypted, password protected, or may be in a format that could result in evidence being overwritten  and/or destroyed electronically should an attempt be made to examine the electronic evidence on site.

The volume and nature of electronic evidence.  A seemingly small media storage device can store the equivalent of thousands of pages

3

ATTACHMENT C

LOCATION TO BE SEARCHED

The location to be searched is 1588 Montgomery Highway, Dothan, Alabama 36303. This is the address of Eagle Financial Services. The location is a free standing brown brick building with beige trim located on the north side of Montgomery Highway. The office has a glass front door trimmed in brown. There is a red, white and blue sign hanging above the office which reads "Eagle Financial Services". Location is shown in photograph below.



# EXHIBIT F

## Schiff, Andrew O. (USAALM)

| | |
|---|---|
| **From:** | Schiff, Andrew O. (USAALM) |
| **Sent:** | Friday, September 22, 2006 5:07 PM |
| **To:** | brunercrimlaw@aol.com |
| **Subject:** | Okonkwo, Matthew |

Ben:

I have attached a plea agreement, which as we discussed is contingent upon his proffer. However, even absent a 5K, since he has been in custody since April 14, 2006, assuming a sentence of a year and a day and the maximum good time credits, he would be released in early March.

Because of the number of out-of-town non-law enforcement witnesses, I would need to begin trial preparations relatively shortly. Therefore, this offer will expire unless Mr. Okonkwo's motion to change plea is filed on or before October 3, 2006.

Please contact me after you have reviewed this with your client.

Andrew O. Schiff
Deputy Chief, Criminal Division
United States Attorney's Office
Middle District of Alabama
One Court Square--Suite 201
Montgomery AL 36104
(334) 223-7353 (voice)
(334) 223-7135 (fax)
andrew.schiff@usdoj.gov



pleaagreement_oko
nkwo.pdf

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 1:06cr101-T |
| | ) | |
| MATTHEW OKONKWO | ) | |

## PLEA AGREEMENT

DEFENSE COUNSEL:          Ben E. Bruner

ASSISTANT U.S. ATTORNEY:    Andrew O. Schiff

## COUNT AND STATUTES CHARGED

Count 6:     26 U.S.C.  § 7206(2) (aiding filing of false tax return)

## STATUTORY MAXIMUM PENALTIES

Sentence: a term of imprisonment of not more than three years, and a fine of not more than $250,000, or both; a term of supervised release of not more than one year; an assessment fee of $100; and an order of restitution.

## ELEMENTS OF THE OFFENSE

First:          The Defendant aided or assisted in the preparation and filing of an income tax return which was false in a material way as charged in the indictment; and

Second:      The Defendant did so knowingly and willfully
*******************************************************************************

Andrew O. Schiff, Assistant United States Attorney, and Ben E. Bruner, attorney for the defendant, pursuant to Rule 11(c)(1)(A) and 11(c)(1)(C), Federal Rules of Criminal Procedure, as Amended, have, with the authorization of the undersigned defendant, heretofore entered into discussions with a view towards reaching a pretrial conclusion of the charges pending in the Indictment and a Plea Agreement has been reached by said parties. The plea is being submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A) and 11(c)(1)(C), and the

parties understand that, if the terms of the Plea Agreement are not accepted by the Court, the defendant will be allowed to withdraw the defendant's plea of guilty and will proceed to trial.

## GOVERNMENT'S PROVISIONS

1.    For purposes of the calculation of defendant's offense level under the United States Sentencing Guidelines, the Government agrees that:

    a.    The Federal Sentencing Guidelines Manual in effect on April 15, 1999 is applicable.

    b.    The offense level is 13, calculated as follows:

        (i)    base offense level is 13 (U.S.S.G. §§ 2T1.4(a)(1), 2T4.1(H));

        (ii)    increase by two levels because the defendant was in the business of preparing tax returns (U.S.S.G. § 2T1.4(b)(1)(B)); and

        (iii)    decrease by two levels for acceptance of responsibility (U.S.S.G. § 3E1.1(a)).

2.    The Government agrees that the appropriate sentence is a sentence at the low end of Guideline Range determined at offense level 13 and the Criminal History Category applicable to the defendant, except that if the low end is 12 months, then the Government agrees that the appropriate sentence is 12 months and 1 day.

3.    The Government reserves all rights with respect to the amount of the fine and/or restitution.

4.    The Government will dismiss Counts 1-9 and 11-12 at sentencing.

5.    Should the defendant complete the defendant's obligations contained within the Cooperation Agreement as set forth herein, the Government will move at sentencing for a downward departure pursuant to U.S.S.G. § 5K1.1 to reflect the defendant's substantial assistance.  In that

motion, the Government will recommend a downward departure to an offense level that would permit a sentence of time served.  Determination of whether the defendant has met the defendant's obligations to qualify for the reduction pursuant to U.S.S.G. § 5K1.1 is at the sole discretion of the United States.  The failure of the Government to make such a motion, or the failure of the Court either to grant the motion or to depart to the extent recommended by the Government shall not entitle defendant to withdraw from the plea agreement.

6.      The Government reserves the right to inform the Court and the Probation Department of all facts pertinent to the sentencing process, including all relevant information concerning the offenses and the defendant's background.

## DEFENDANT'S PROVISIONS

1.      The defendant agrees to plead guilty to Count 10 of the Indictment.

2.      Defendant agrees with the calculation of the Guideline Range and the appropriate sentence as set forth in paragraphs 1 and 2 of the Government's provisions, except that if the Court does not sentence defendant to a sentence of time served pursuant to a motion for downward departure for substantial assistance (either because the Government does not make such a motion, or the Court does not grant the motion), defendant reserves the right to argue, subject to the Government's right of opposition, for a variance below the Guideline Range to a sentence of time served.

3.      Defendant reserves all rights with respect to the amount of the fine and/or restitution.

4.      Defendant agrees not to commit any other federal or state criminal offenses while awaiting sentencing.

## COOPERATION AGREEMENT

1.     The defendant agrees to cooperate fully and testify truthfully against any and all persons as to whom the defendant may have knowledge at the grand jury, trial, or whenever called upon to do so. The defendant understands that this agreement requires the defendant to be truthful and to testify truthfully whenever called upon. The defendant agrees to be available for the review of documents and other materials and for interviews by law enforcement officers and attorneys for the Government upon reasonable request and to fully and truthfully respond to all questions asked of the defendant by law enforcement officers and attorneys for the Government.

2.     The defendant agrees to fully and truthfully disclose to the Government everything the defendant knows about any and all documents and materials in the defendant's possession that relate to the violations charged in this Information and any other criminal violations in the Middle District of Alabama and elsewhere. The defendant agrees to submit to a polygraph examination conducted by the Government if requested to do so.

3.     If the defendant has failed or should fail in any way to fulfill completely the defendant's obligations under this agreement, then the Government will be released from its commitment to honor all of its obligations to the defendant, without the defendant being allowed to withdraw the guilty plea. Thus, if at any time the defendant should knowingly and willfully withhold evidence from, or is found to have provided false information to, the Government investigators or attorneys prior to or during the defendant's testimony before grand juries or in trials, or fails to return to the Middle District of Alabama for any scheduled court appearance or any scheduled meeting with law enforcement agents in the Middle District of Alabama, then the Government will be free: (1) to prosecute the defendant for perjury, false declaration, false statement, and/or obstruction of justice

-4-

(18 U.S.C. Sections 1621, 1623, 1001, 1503); (2) to prosecute the defendant for all violations of federal criminal law which the defendant has committed; (3) to use against the defendant in all of those prosecutions and sentencing the information and documents that the defendant has disclosed or furnished to the Government during the course of the defendant's cooperation; (4) to recommend a maximum sentence; and, (5) to seek forfeiture of any and all forfeitable properties of the defendant. The parties agree to submit to the court, to be decided by a preponderance of the evidence standard, the question of whether defendant has breached this agreement.

## FACTUAL BASIS

The defendant admits the allegations charged in Count 10 of the Indictment and understands that the nature of the charge to which the plea is offered involves proof as to Count 10:

In 2000, Matthew Okonkwo was the proprietor of Eagle Financial Services and Rainbow Tax Services in Dothan, Alabama. On or about April 5, 2000, in the Middle District of Alabama, Okonkwo caused to be filed with the Internal Revenue Service a tax return in the name of Teah C. Doyle. The return falsely claimed dependants that Doyle was not entitled to claim, and the return included a Form W-2 that falsely stated that CJB Ice Cream Co. had paid Doyle wages of $8,015 and had withheld federal income tax of $420. Okonkwo knew the information to be false at the time he caused the return to be filed. Based on the false return, the IRS issued a tax refund to Doyle substantially in excess of the refund, if any, that was actually owed.

## DEFENDANT'S WAIVER OF APPEAL AND COLLATERAL ATTACK

Understanding that 18 U.S.C. § 3742 provides for appeal by a defendant of the sentence under certain circumstances, the defendant expressly waives any and all rights conferred by 18 U.S.C. § 3742 to appeal the sentence. Defendant further expressly waives the right to appeal the

conviction and sentence on any other ground and waives the right to attack the conviction and sentence in any post-conviction proceeding. This waiver does not include the right to appeal on the ground of ineffective assistance of counsel or prosecutorial misconduct. In return for the above waiver by the defendant, the Government does not waive its right to appeal the sentence imposed in the instant case. The Government does not waive its right to appeal any order dismissing the Indictment, vacating a sentence, or otherwise terminating the prosecution at any stage of the proceedings. Further, the parties agree that nothing in this agreement shall affect the Government's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b). However, if the United States appeals the defendant's sentence pursuant to 18 U.S.C. § 3742(b), the defendant is released from this waiver.

## DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT

1.      The defendant, before entering a plea of guilty to Count 1 of the Indictment as provided for herein by said Plea Agreement, advises the Court that:

        a.      The discussions between the attorney for the government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent.

        b.      Other than as provided for under Rule 11(c)(1)(C), *Federal Rules of Criminal Procedure*, the Defendant acknowledges that a breach of this Plea Agreement will not entitle him to withdraw his guilty plea in this case. Defendant understands and acknowledges that defendant's guilty plea will remain in full force and effect upon any breach of this agreement by the defendant.

        c.      The defendant further understands that, pursuant to Title 18, United States Code, Section 3013, said $100.00 assessment fee is to be paid by the defendant on the date of sentencing. The defendant will make an honest, good faith effort to pay said fine as directed by the

-6-

Financial Litigation Section of the United States Attorney's Office. The defendant further understands that by completing and submitting to the court or the government any financial statements, the defendant is representing that the statement is true and accurate to the best of the defendant's information, knowledge, and belief.

d.    The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney.

e.    The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court.

f.    The defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

g.    The defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart

-7-

from the aforesaid Plea Agreement. The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the government, and the attorney for the defendant, all conducted with the defendant's authorization, knowledge, and consent.

        h.      The defendant further advises the Court that the defendant's understanding of this Plea Agreement is as set forth in this document.

        i.       The defendant further advises the Court that it is understood that the government can only make a recommendation which is not binding on the respective Court.

        j.       The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crimes charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant. However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Indictment herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel.

        k.      The defendant is satisfied that defense counsel has been competent and effective in representing defendant.

        2.      The undersigned attorney for the government and for the defendant represent to the Court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11, Federal Rules of Criminal Procedure, as Amended. The attorney for the defendant further advises the Court that the defendant

-8-

has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind. Further, the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

3.      The defendant understands that the United States Probation Office will prepare a presentence investigation report for the Court. The Probation Officer will consider the defendant's conduct related to the offense to which the plea is offered, as well as the defendant's criminal history. The offense level or criminal history category, as calculated by the Probation Officer and determined by the Court, may differ from that projected by defendant's counsel or the United States Attorney. In the event that the Court imposes a sentence in excess of that agreed to in paragraph 1 on page 2, the defendant will have the right to withdraw the plea on that basis.

This _____ day of October, 2006            LEURA G. CANARY
                                             UNITED STATES ATTORNEY


                                             _____
                                             Andrew O. Schiff
                                             Deputy Chief, Criminal Division

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL.


_____
Matthew Okonkwo
Defendant


_____
Date


_____
Ben E. Bruner
Attorney for the Defendant


_____
Date

-10-

# EXHIBIT G

# BEN E. BRUNER
ATTORNEY AT LAW

Zelda Executive Suites, Ste. 8
2835 Zelda Road
Montgomery, Alabama 36106

Tel. (334) 323-4462
FAX (334) 323-4463

Andrew O. Schiff
Assistant U.S. Attorney
P.O. Box 197
Montgomery, Alabama  36101

Dear Mr. Schiff:

**RE:**    United States v. Matthew Okonkwo
CR No. 06 - 101 T

After numerous conversations with Mr. Okonkwo, he has elected to go to trial in this
cause.  It is my understanding that we will begin jury selection on October 30, 2006.  If
there are any ways to streamline the trial given the numerous records in this case, I will
be glad to work with you to the extent I can.

Sincerely,

Ben Bruner
10/05/06

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA

THE UNITED STATES
OF AMERICA

     vs.

MATTHEW OKONKWO

CRIMINAL ACTION NO.
1:06-CR-101-MHT

SENTENCING

\* \* \* \* \* \* \* \* \* \*

BEFORE:     The Hon. Myron H. Thompson

HEARD AT:    Montgomery, Alabama

HEARD ON:    January 18, 2007

APPEARANCES:  Andrew O. Schiff, Esq.
              Ben Bruner, Esq.

Page 2

1  WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
   THE HON. MYRON H. THOMPSON ON JANUARY 18, 2007 AT THE
2  UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4          THE COURT:  The Court calls the case of United

5  States of America vs. Matthew Okonkwo, criminal action

6  number one zero six CR one oh one M. H. T.

7          Will the defendant come forward with his

8  attorney.

9          MR. BRUNER:  Good afternoon, Your Honor.

10         THE COURT:  Now is this Mr. Okonkwo?

11         MR. BRUNER:  Yes, sir.

12         THE COURT:  Now, Mr. Okonkwo, have you and

13  your attorney reviewed the Presentence Report, including

14  any revisions that may have been made after the initial

15  disclosure?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Now was there a plea in this case?

18         MR. BRUNER:  No, sir.  This case was tried.

19         THE COURT:  It was tried.  So there is no plea

20  agreement as well.

21         MR. BRUNER:  Correct.

22         THE COURT:  Now I understand that the

23  Government has no objections to the Presentence Report?

24         MR. SCHIFF:  That's correct.

25         THE COURT:  I understand that the defendant

Page 3

1  has no objections.

2          MR. BRUNER:  That's correct.

3          THE COURT:  Now what is Probation recommending

4  as a sentence?

5          THE PROBATION OFFICER:  Eighteen months, Your

6  Honor.

7          THE COURT:  Okay.  Now why are you

8  recommending eighteen months?

9          THE PROBATION OFFICER:  Your Honor, this is

10  Mr. Okonkwo's first offense, as far as I know.  He has

11  no priors.  Quite simply, he most likely will be

12  deported following completion of the sentence.  I think

13  eighteen months is a sufficient sentence.

14         THE COURT:  What is the Government's position?

15         MR. SCHIFF:  Your Honor, we do not agree with

16  the recommended sentence.

17         THE COURT:  Of eighteen months?

18         MR. SCHIFF:  Correct, we do not agree with the

19  recommended sentence of eighteen months.  My feeling is

20  that the low end of the guideline range in the ordinary

21  course at least should be reserved for defendants who

22  accept responsibility in a timely fashion.  Eighteen

23  months is only six months more than the sentence that --

24         THE COURT:  I can't hear you.

25         MR. SCHIFF:  Eighteen months is only six

Page 4

1  months greater than the sentence the defendant would

2  have likely received had he pled guilty, and the

3  defendant would receive a sentence either at the mid or

4  high end of the guideline range.

5          THE COURT:  Now I know that he defrauded the

6  United States, but were any of the people -- how were

7  they affected?

8          MR. SCHIFF:  If I recall the testimony, at

9  least one or two of the -- none of the individuals lost

10  any money.  I think a couple of them testified as to

11  some hassles they had vis-a-vie the I. R. S. getting the

12  problem straightened out.

13         THE COURT:  Do you remember what the nature of

14  the hassle was?

15         MR. SCHIFF:  Well, I think because a refund

16  had already been issued in their names, when they later

17  tried to obtain a refund they were entitled to they had

18  to -- the computer was rejecting it and they needed to

19  straighten that out.

20         THE COURT:  And the reason you're asking for

21  more than eighteen the months is because of just the

22  nature -- because he went to trial?  But I didn't give

23  him acceptance of responsibility anyway.

24         MR. SCHIFF:  Well I understand that he's not

25  getting the adjustment for acceptance of responsibility,

Page 5

1  but there still goes the question of where within the

2  guideline range the sentence should fall.  And I believe

3  that it's appropriate --

4          THE COURT:  Now these people, if I remember

5  from the evidence, were not educated people.

6          MR. SCHIFF:  That's correct.

7          THE COURT:  And in some measure I am concerned

8  that he took advantage of poor and uneducated people.

9  So it's not merely a defrauding, but could it be viewed

10  as a defrauding of people who were vulnerable.  I'll

11  hear from counsel on that.

12         MR. BRUNER:  Judge, we would disagree with

13  that on the basis that I think the testimony was that in

14  all but a few of these cases there was another

15  individual who has yet to be brought before this Court

16  that they dealt with.  And I don't think there has been

17  sufficient testimony, either in this trial or certainly

18  in the trial I suppose that will come, to be able to

19  make that decision as to whom, assuming that that's a --

20         THE COURT:  Well it may be that someone else

21  is culpable, but my question is, weren't the people who

22  were taken advantage of vulnerable in the sense that

23  they were uneducated and poor?  I think some of the

24  witnesses fell into that category, did they not?

25         MR. BRUNER:  I do not recall exactly what the

Page 6

1 circumstances were. I think in some cases there were --
2     THE COURT: If I remember correctly -- What
3 type of business did he have, or what type of business
4 did the other person who was involved have, these
5 people?
6     MR. BRUNER: They were both in the tax
7 preparation business.
8     THE COURT: They did something else, they were
9 available. That's why the people had equal ready access
10 to them.
11     MR. BRUNER: I believe they cashed checks and
12 did some things like that. The other gentleman I
13 believe had at least purportedly had an ice cream
14 vendor's dealership.
15     THE COURT: That's right, an ice crime vendor.
16 Because I remember a lot of people kept saying it was
17 the ice cream vendor. And I kept wondering what would
18 an ice cream vendor be doing taxes for. Not that there
19 is anything wrong with that, but obviously the nature of
20 the transaction was such that these people were not
21 going -- well, what would at least appear on the surface
22 would be reputable tax preparers, or that someone who
23 heard that they were preparing taxes might wonder
24 whether they were competent to do so, if that was their
25 major business, being an ice cream vendor.

Page 7

1     And that's my concern here. He defrauded
2 people, or at least he used these people. And if he had
3 used more educated people, he could not have carried out
4 this scheme. I think they would have questioned it more
5 rigorously. And does eighteen months adequately reflect
6 that?
7     MR. BRUNER: Judge, we would contend the
8 minimum sentence would be the appropriate sentence in
9 this case, because if the Court does consider this is
10 his first offense, that the role of the ice cream vendor
11 who has yet been brought to justice is uncertain at this
12 time, and it has not been determined by either a plea of
13 guilty and a statement to the United States or by trial
14 in front of the jury.
15     THE COURT: But is there any evidence before
16 the Court that he is not fully culpable? As I said
17 before, the ice cream vendor may be equally culpable,
18 but is your client any less culpable?
19     MR. BRUNER: Judge, I don't think we know that
20 yet, to be honest, without the other individual's
21 testimony or the other individual's statement as to what
22 his role in this was. I think it's hard to assign
23 culpability without knowing that.
24     THE COURT: Now the sentencing range is
25 eighteen to twenty-four months. Is there any contention

Page 8

1 that I should give him more than twenty-four months from
2 the Government?
3     MR. SCHIFF: The Government is not seeking an
4 above guideline sentence.
5     THE COURT: And what sentence are you seeking,
6 are you seeking a sentence below the eighteen months?
7     MR. BRUNER: Judge, we're seeking the minimum
8 sentence allowable.
9     THE COURT: Oh, is this a mandatory minimum?
10     MR. BRUNER: No, sir, I don't believe so, but
11 I would tend to think that no more than -- we have no
12 evidence to put forth that would, I think under Booker
13 or something, justify taking the case outside the
14 guidelines.
15     THE COURT: So you're not seeking a variance
16 under three five five three?
17     MR. BRUNER: No, sir.
18     THE COURT: So you want the Court to stay
19 within the guideline range?
20     MR. BRUNER: We want the minimum sentence,
21 yes, sir.
22     THE COURT: Well the minimum sentence can be
23 below the guideline range, unless there is a mandatory
24 minimum here.
25     MR. BRUNER: Yes, sir, I understand that.

Page 9

1 Obviously, we would request the lowest sentence possible
2 by the Court. We have no evidence as to why the
3 guidelines would not be applicable in this case or
4 should not be considered by the Court.
5     THE COURT: There is no statutory minimum
6 here, is there, Counsel?
7     MR. SCHIFF: No, Your Honor.
8     THE COURT: Probation?
9     THE PROBATION OFFICER: No, Your Honor.
10     MR. BRUNER: And, Judge, I would point out one
11 other factor. Mr. Okonkwo has been locked up for some
12 eight months now in the Montgomery City Jail, which is
13 certainly --
14     THE COURT: Well he will probably be deported
15 anyway, won't he? At least he'll be subject to
16 deportation, I should say.
17     MR. BRUNER: My understanding is there is an
18 immigration hold on him at this point in time.
19     THE COURT: Anything else, Counsel, before I
20 announce the proposed sentence? I'll give you another
21 opportunity to make comments before I decide to sentence
22 him as announced.
23     MR. SCHIFF: Nothing from the Government.
24     MR. BRUNER: No, sir.
25     THE COURT: In compliance with United States

Multi-Page™

Page 10

1  vs. Booker, the Court, while not bound to apply the
2  guidelines, has consulted them and has taken them into
3  account on the issue of the appropriate range of
4  sentence to be imposed in this case. There being no
5  objections, the Court adopts the factual statements
6  contained in the Presentence Report with specific
7  findings that the offense level is fifteen, the criminal
8  history category is one, the guideline range is from
9  eighteen to twenty-four months and the supervised
10 release period is from two to three years. The fine
11 range is from four thousand to forty thousand dollars.
12       The Court, having considered and consulted the
13 sentencing guidelines and evaluated the reasonable
14 necessary of a sentence through the lens of Title
15 Eighteen United States Code, Section three five five
16 three, it is the order, judgment and decree of the Court
17 that the defendant, Matthew Okonkwo, is committed to the
18 custody of the Federal Bureau of Prisons to be
19 imprisoned for a total term of twenty-four months. The
20 sentence consists of terms of twenty-four months on each
21 count to be served concurrently.
22       It is further ordered that upon release from
23 imprisonment the defendant shall be placed on supervised
24 release for a term of three years. This term consists
25 of three years on count one, and one year each on counts

Page 11

1  two through twelve. All such terms to run concurrently.
2        Within seventy-two hours of release from
3  custody the defendant shall report to the probation
4  office in the district to which he is released. While
5  on supervised release the defendant shall comply with
6  the mandatory and standard conditions of supervised
7  release on file with the Court.
8        The Court also orders the following special
9  conditions. The defendant shall provide the probation
10 officer any requested financial information. He shall
11 not obtain new credit without the approval of the Court,
12 unless in compliance with the payment schedule. He
13 shall cooperate in the collection of D N A.
14       In light of his illegal status, it is ordered
15 that upon completion of the term of imprisonment, the
16 defendant shall be remanded to the custody of the Bureau
17 of Immigration and Customs Enforcement for deportation
18 proceedings in accordance with the Immigration and
19 Nationality Act. If deported, the term of supervision
20 shall be non-reporting while the defendant lives outside
21 the United States. The defendant shall not reenter the
22 United States, and if the defendant should reenter the
23 United States during the term of supervised release, the
24 defendant shall report to the nearest United States
25 probation office within seventy-two hours of arrival.

Page 12

1        The defendant shall pay to the United States
2  District Court Clerk a special assessment fee of one
3  thousand two hundred dollars, which is due immediately.
4  It is further ordered that the defendant shall make
5  restitution to the Internal Revenue Service in the
6  amount of fifty-six thousand three dollars, which is due
7  immediately. Any balance remaining at the start of
8  supervision shall be paid at the rate of not less than
9  one hundred dollars per month.
10       Now I ask you at this time, are there any
11 objections to the sentence imposed or to the manner in
12 which the Court pronounced it, other than those
13 objections previously dated for the record?  For
14 example, do you have any objection to the Court's
15 ultimate findings of fact or conclusions of law?
16 Furthermore, you are instructed that if you have an
17 objection, you must not only state the objection, you
18 must give the grounds for the objection.
19       MR. BRUNER: Judge, our first objection would
20 be that the Court has stated in light of your illegal
21 status. That would seem to be a finding by the Court
22 that Mr. Okonkwo is here illegally. I don't think
23 there's evidence before the Court at this point in time
24 that he is here illegally, and such determination --
25       THE COURT: I'll say in light of your alleged

Page 13

1  illegal status.
2        MR. BRUNER: That would be sufficient, Your
3  Honor.
4        I would also object to the statement the Court
5  made that he shall be remanded to the custody of the
6  Bureau of Immigration and Customs Enforcement for
7  deportation proceedings. That could be construed as a
8  court order that he be placed in deportation
9  proceedings. As of today I have not been informed that
10 such an order has been issued.
11       THE COURT: I'm going to remand him to the
12 custody of that bureau. That objection is overruled.
13       Anything else?
14       MR. BRUNER: No, Your Honor.
15       THE COURT: Do you have anything to say as to
16 why the sentence as announced should not be imposed, or
17 do you have anything to say in mitigation of the
18 sentence?
19       MR. BRUNER: Judge, just what we have stated
20 before, that this is a first time offender who has been
21 eight months in the Montgomery City Jail in a lockdown
22 facility, and we would respectfully request the Court to
23 reconsider and give him the bottom line end of the
24 guidelines.
25       THE COURT: It is the order, judgment and

Multi-Page™

Page 14

1  decree of the Court that the sentence as announced is
2  hereby imposed.
3      Now, Mr. Okonkwo, you have ten days to file
4  any notice of appeal.  If you cannot afford the cost of
5  an appeal, the Court will allow you to appeal at no
6  cost, including furnishing you with a free transcript
7  and a free attorney.
8      Now, Mr. Bruner, were you retained?
9      MR. BRUNER:  Yes, sir.
10     THE COURT:  Okay.  So you know you have ten
11 days to make sure there is an appeal filed.
12     MR. BRUNER:  Sure.
13     THE COURT:  And make sure if he wants to
14 appeal, that it is filed within that ten day period.
15     MR. BRUNER:  Yes, sir.
16     THE COURT:  Anything else?
17     MR. BRUNER:  No, sir.
18     THE COURT:  You are in the custody of the
19 marshal.
20     (Whereupon, the proceedings were concluded.)
21
22
23      * * * * * * * * *
24
25

Page 15

1
2          COURT REPORTER'S CERTIFICATE
3
4      I certify that the foregoing is a correct
5  transcript from the record of proceedings in the
6  above-entitled matter as prepared by me to the best of
7  my ability.
8
9      I further certify that I am not related to any
10 of the parties hereto, nor their counsel, and I have no
11 interest in the outcome of said cause.
12
13     Dated this 26th day of March 2007.
14
15          /s/  Mitchell P. Reisner
            MITCHELL  P.  REISNER,  CM, CRR,
16          Official US Dist. Court Reporter
            Registered Professional Reporter
17          Certified   Real-Time   Reporter
18
19
20
21
22
23
24
25